# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

--------------------------------------------------------x

**DOROTHEA PERRY,**

Plaintiff, pro se,

**SECOND AMENDED COMPLAINT**

-against-

**(Violation of Title VII, 42 U.S.C. § 1981, 42 U.S.C. § 1983)**


**NEW YORK STATE ATHLETIC COMMISSION;**
**NEW YORK STATE DEPARTMENT OF STATE;**
**JAMES LEARY, in his personal capacity;**
**KIMBERLY SUMBLER, in her personal capacity;**
**ANTHONY GIARDINA, in his personal capacity;**
**LINDA BALDWIN, in her personal capacity; and**
**LILLIANA ESTRELLA-CASTILLO, in her personal capacity,**
**and JOHN/JANE DOES 1-10, Defendants.**


**Case No. 25-CV-938 (JPC) (HJR)**
**Jury Trial Demanded**

--------------------------------------------------------x

Plaintiff Dorothea Perry, proceeding pro se, alleges upon information and belief as follows:

**PRELIMINARY STATEMENT**

Plaintiff Dorothea Perry brings this action for unlawful employment discrimination, retaliation, and a decade-long conspiracy by state officials to obstruct her career and deny her civil rights. The conspiracy commenced in July 2014 when DOS General Counsel and Ethics Officer Linda Baldwin authored an ethics opinion that was selectively enforced based on race—applied exclusively to restrict Black employees' economic opportunities while white employees engaged in identical or worse conduct with complete impunity. From that point forward, Defendants engaged in a coordinated campaign of racially disparate enforcement to deny Plaintiff promotional opportunities while ignoring identical conduct by her white male colleagues.

Ms. Perry was also subjected to severe and pervasive sexual harassment, including unwanted advances from Acting Executive Director Anthony Giardina, creating a hostile work environment based on both her race and sex. When Plaintiff continued to complain about the discrimination and harassment, Defendants escalated their retaliation. This culminated in her pretextual termination in April 2018, which occurred not merely because she complained again, but because she had finally exposed the very mechanism used to suppress her prior complaints. Her termination came just 19 days after her confidential whistleblowing complaint to the New York State Inspector General—which alleged corruption, witness manipulation, and document fabrication within the state's EEO process—was unmasked, and just 3 days after she reported a death threat from a white male reporter.

The conspiracy and retaliation did not end with her termination; it continued for years as Defendants corrupted state administrative proceedings, coordinated with other state agencies that reversed findings favorable to Plaintiff, and engaged in a pattern of witness intimidation that continues to this day. This action seeks to hold Defendants accountable for this entire pattern of unlawful conduct.

**JURISDICTION AND VENUE**

This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action arises under the Constitution and laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, and 42 U.S.C. § 1983.

Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this District, and Defendants are located in or conduct business in this District.

Plaintiff has exhausted all required administrative remedies. She filed a verified complaint with the New York State Division of Human Rights (DHR Case No. 10195419; EEOC Charge No. 16GB803837) on May 7, 2018. On March 20, 2019, DHR issued a Determination After Investigation finding probable cause to believe that Defendants engaged in unlawful discriminatory practices. After protracted proceedings marred by procedural irregularities detailed below, DHR issued a Final Order on November 7, 2024. Plaintiff timely filed this action within 90 days of that Final Order.

**PARTIES**

Plaintiff DOROTHEA PERRY is a Black woman who was employed as a per diem inspector by the New York State Athletic Commission from January 2004 until her unlawful termination on April 25, 2018. At all relevant times, she was a resident of the State of New York.

Defendant NEW YORK STATE ATHLETIC COMMISSION (NYSAC) is a state agency responsible for regulating professional boxing, wrestling, and mixed martial arts in New York. It operates under the authority of the New York State Department of State and is subject to the laws

and regulations governing state agencies. At all times relevant to the underlying claims of employment discrimination and retaliation, NYSAC was Ms. Perry's employer and is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

Defendant NEW YORK STATE DEPARTMENT OF STATE (DOS) is a state agency with supervisory authority over NYSAC. DOS provides legal counsel, administrative oversight, and policy direction to NYSAC. At all relevant times, DOS officials had final decision-making authority over NYSAC employment matters, including hiring, firing, and the interpretation of ethics rules.

Defendant KIM SUMBLER is sued in her individual capacity. At all relevant times, she was the Executive Director of NYSAC and acted under color of state law. She was directly involved in the discriminatory enforcement of ethics rules, the retaliatory termination of Ms. Perry, and efforts to cover up the unlawful conduct.

Defendant LINDA BALDWIN is sued in her individual capacity. At all relevant times, she was General Counsel for the New York State Department of State and Ethics Officer. She acted under color of state law and was the principal architect of the discriminatory ethics enforcement that formed the basis for the adverse actions against Ms. Perry. She also engaged in witness intimidation and obstruction of administrative proceedings.

Defendant JAMES LEARY is sued in his individual capacity. At all relevant times, he was Associate Attorney in the DOS Office of General Counsel who acted under color of state law. He coordinated with Linda Baldwin to monitor and respond to Ms. Perry's complaints and was involved in the conspiracy to deny her administrative remedies and restrict her economic opportunities through fabricated legal interpretations. He was the de facto final decision-maker who authorized Ms. Perry's termination.

Defendant ANTHONY GIARDINA is sued in his individual capacity. At all relevant times through 2017, he was Acting Executive Director at NYSAC who acted under color of state law. He was involved in denying Ms. Perry promotional opportunities based on racial and sexual bias, sexually harassed Ms. Perry, and participated in the discriminatory and retaliatory scheme against her. Mr. Giardina left NYSAC in 2017, prior to Ms. Perry's termination in April 2018.

Defendant LILLIANA ESTRELLA-CASTILLO is sued in her individual and official capacities. At all relevant times, she was Chief Administrative Law Judge at the New York State Division of Human Rights and acted under color of state law. She was involved in the systematic manipulation of DHR proceedings to obstruct Ms. Perry's pursuit of administrative remedies, including issuing a demonstrably false official statement claiming that Administrative Law Judge Martin Erazo Jr. was retiring when public records prove he continued working on other DHR cases for over eighteen months after his alleged retirement. She is sued in her individual capacity for monetary damages and in her official capacity for prospective injunctive relief.

Defendants JOHN/JANE DOES 1-10 are individuals whose identities are currently unknown but who participated in the conspiracy to violate Ms. Perry's constitutional rights. Plaintiff reserves the right to amend this Complaint to identify these individuals once discovered.

**FACTUAL ALLEGATIONS**

1. This complaint alleges a continuing violation that spans from 2004 to the present day, constituting a single, ongoing pattern of discrimination, sexual harassment, retaliation, and conspiracy.

**NYSAC's Regulatory Role and Perry's Employment (2004-2014)**

2. The New York State Athletic Commission (NYSAC) is responsible for overseeing and regulating professional combat sports in New York, including boxing, mixed martial arts (MMA), kickboxing, and wrestling. NYSAC's mission includes ensuring the safety of athletes, the integrity of competitions, and compliance with state laws and regulations.

3. To fulfill its regulatory duties, NYSAC employs inspectors who work on a per diem basis. These inspectors are present at sporting events held at venues throughout New York State, including Madison Square Garden and Barclays Center in New York City. Their responsibilities include monitoring compliance with health and safety regulations, observing the conduct of promoters, managers, boxers, and other stakeholders, and ensuring that events are conducted in accordance with NYSAC rules.

4. Per diem inspectors are paid only for the days they work. They do not receive benefits, paid leave, or other compensation associated with full-time employment. Despite their part-time status, per diem inspectors are state employees subject to New York State ethics laws and regulations.

5. Ms. Perry began working as a per diem inspector for NYSAC in January 2004. Over the next 14 years, she performed her duties diligently and professionally. There is no evidence in the record of any performance deficiencies or disciplinary issues prior to her protected activity and subsequent termination in 2018. Her long tenure and unblemished record demonstrate that her termination was not based on any legitimate performance or conduct concerns, but was purely pretext and retaliation.

6. Plaintiff's position as a Boxing Inspector was a non-policymaking, competitive-class civil service position governed by New York Civil Service Law § 75, which provides that employees in the competitive class may only be terminated for cause after notice and a hearing. Her fourteen years of service with consistently positive performance reviews established a constitutionally protected property interest in her continued employment.

**Early Pattern of Discrimination (Pre-2014)**

4

7. Years before the conspiracy detailed in this complaint commenced, Perry had challenged discrimination at NYSAC. While attending a boxing judges training session in Florida, Perry encountered the then-NYSAC Chairman—the highest-ranking official at the commission. The Chairman, upon seeing Perry at the training, told her explicitly that she would "never be a judge in New York." This was not a neutral assessment of her qualifications or experience. It was a categorical denial based on discriminatory animus.

8. Perry filed a discrimination complaint with NYSAC's Equal Employment Opportunity office regarding the Chairman's discriminatory denial of judging opportunities.

9. Following Perry's complaint and the Chairman's eventual replacement, the work environment at NYSAC became extremely hostile toward Perry. Perry was blamed by other NYSAC employees for the Chairman's departure. The hostility Perry faced was so severe that she was forced to file additional complaints with NYSAC regarding the hostile and retaliatory work environment. NYSAC took no effective action to stop the retaliatory hostile environment.

10. The combination of the Chairman's explicit denial of judging opportunities in New York and the retaliatory hostile environment that followed Perry's complaint made clear that NYSAC would never permit Perry to advance as a boxing judge in New York. It was this discriminatory denial and retaliatory hostility—not any voluntary preference—that forced Perry to seek boxing judge opportunities outside New York. Perry applied to and was accepted as a boxing judge in Virginia, beginning work there in 2008 for the Virginia Department of Professional and Occupational Regulation (DPOR), receiving compensation from that state government agency, not from boxing promoters.

11. From 2008 through 2014, Perry worked simultaneously as a NYSAC inspector and as a boxing judge in Virginia. Perry informed Melvina Lathan, a Black woman who had replaced the previous Chairman, that she was working as a boxing judge in Virginia. Lathan raised no objection to Perry's out-of-state boxing judge work. This acquiescence continued for approximately six years, from 2008 through 2014. During this entire period, NYSAC leadership was aware that Perry worked simultaneously as a NYSAC inspector and as a boxing judge for Virginia DPOR, and no one claimed this created any conflict of interest or violated any ethics rules.

## Baldwin's False Ethics Opinion (July 23, 2014)

12. After being encouraged by Melvina Lathan, the former Black female NYSAC Chairwoman, Plaintiff applied for a professional boxing judge license in New York. This represented a natural career progression given her years of experience as a Virginia boxing judge and her deep knowledge of the sport.

13. However, on July 25, 2014, NYSAC Executive Director David Berlin denied the application, based entirely on a legal opinion authored by DOS General Counsel and

Ethics Officer Linda Baldwin on July 23, 2014 (Baldwin Memorandum). Baldwin's opinion claimed that the "two-year bar" of Public Officers Law § 73(8)(a) prohibited Plaintiff from applying for a boxing judge license while employed as a NYSAC inspector.

14. Baldwin's interpretation was at minimum highly questionable and at worst legally incorrect. Public Officers Law § 73(1)(i)(iii) excludes from coverage "officers of State boards, commissions or councils who are uncompensated or compensated on a per diem basis." JCOPE guidance states: "Unpaid and per diem officers and board members are excluded from Public Officers Law § 73, including the post-employment restrictions." (JCOPE, "The Post-Employment Restrictions," August 2022). JCOPE Advisory Opinion No. 18-01 (October 30, 2018) confirms that "officers of State boards, commissions or councils who are uncompensated or compensated on a per diem basis" are excluded from post-employment restrictions.

15. Whether per diem inspectors at NYSAC constitute "officers" of the commission is a question that should have been analyzed carefully. Deputy Commissioners at NYSAC are compensated on a per diem basis ($150 per event) and have no regulatory authority—their duties consist of supervising events and other NYSAC personnel, observing compliance, and handling administrative tasks. According to the official NYSAC job description, Deputy Commissioners "report directly to the assigned Director of Boxing, Director of MMA/Kickboxing, and Executive Director" and perform supervisory and observational functions. Inspectors are also compensated on a per diem basis and have no regulatory authority—they perform the same observational functions with respect to boxers and compliance at events but do not supervise other staff. Both positions appear to fall within the category of "per diem officers" excluded from post-employment restrictions.

16. Critically, Baldwin's own 2014 memorandum acknowledged that Plaintiff, as a Boxing Inspector, was "paid on a per diem basis." Despite this acknowledgment, Baldwin applied restrictions from which per diem officers are explicitly excluded. At a minimum, Baldwin's opinion represented an aggressive and expansive interpretation of the statute that was contrary to the plain language providing exclusions for per diem officers of state commissions.

17. Even if there were any ambiguity regarding whether per diem inspectors constitute "officers" of the commission (which Plaintiff contends there was not), the discriminatory enforcement of Baldwin's opinion proves it was a tool of racial discrimination rather than a good-faith legal interpretation. As detailed below, white employees at multiple levels—including those with actual regulatory authority—openly violated the purported ban by going to work for private boxing promoters, receiving private compensation, with absolutely no consequences, no investigations, and no enforcement actions. Meanwhile,

6

Perry, a Black woman, was threatened with $10,000 civil penalties and criminal prosecution for government-to-government work that was explicitly exempt even under Baldwin's own interpretation. This selective enforcement based solely on race demonstrates that the opinion's true purpose was to restrict Black employees' economic opportunities while protecting white employees' freedom to pursue industry positions.

18. This was the first time anyone at NYSAC or DOS had ever claimed that a "two-year ban" applied to Perry's situation. For six years—from 2008 to 2014—Perry had worked as both a NYSAC inspector and a Virginia boxing judge with NYSAC leadership's full knowledge and without any suggestion that this violated ethics rules. Baldwin's opinion introduced this restriction for the first time in 2014, precisely when Perry's New York boxing judge license application was pending.

19. The timing and circumstances prove that Baldwin's ethics opinion was not a good-faith interpretation of pre-existing law, but rather a restriction invented or selectively enforced to deny Perry's license application and restrict her economic opportunities. This flawed opinion was then used as a discriminatory tool to deny advancement to other minority employees while being ignored for white male employees.

20. Perry filed a complaint with Maria Herman, Director of Affirmative Action Programs at NYSAC, regarding the discriminatory denial of her boxing judge license by the Executive Director and other discriminatory treatment including age discrimination, which many of her colleagues corroborated. Maria Herman quickly closed Perry's complaint without adequate investigation or remedy. This established a pattern of Herman protecting those who discriminated against Perry and corrupting the EEO process to deny Perry redress.

**October 2014 DHR Complaint**

21. In October 2014, Ms. Perry filed a discrimination complaint with the New York State Division of Human Rights challenging the ongoing discrimination and hostile work environment at NYSAC. This complaint put Defendants on formal notice that Perry was actively challenging discrimination and seeking external intervention.

**The 2016 JCOPE Training: Official Guidance Contradicting Baldwin**

22. On September 26, 2016, Ms. Perry attended mandatory ethics training provided by the New York State Joint Commission on Public Ethics (JCOPE) and the Inspector General's office. During this official training, a JCOPE ethics officer (who served as guest speaker at the training) stated to Perry and the other attendees that the two-year ban did not apply to per diem employees.

23. This official guidance from JCOPE—the agency responsible for interpreting and enforcing ethics rules—directly contradicted the position Baldwin had taken in 2014.

Despite receiving this guidance, Ms. Perry relied on it and understood that the post-employment ban did not apply to her position. Yet Defendants continued to enforce Baldwin's 2014 opinion against Perry while ignoring violations by white male employees, demonstrating that enforcement was based on race rather than legal interpretation.

**Leary's Threatening Letter and Forced Retraction (November 2015)**

24. Shortly after Perry's license application was denied based on Baldwin's false opinion, James W. Leary, Associate Attorney in the DOS Office of General Counsel, sent Perry a threatening letter on November 2, 2015 (Leary Letter). Leary's letter demanded that Perry cease working as a boxing judge in Virginia or resign from NYSAC, giving her just 14 days to choose between her career at NYSAC and her work as a professional boxing judge for a state government agency in another state.

25. Leary did not cite Baldwin's Public Officers Law § 73 opinion as the basis for his threat. Instead, Leary cited the Federal Boxing Safety Act (15 USC § 6301), claiming it prohibits boxing commission employees from receiving "compensation from, any person who sanctions, arranges, or promotes professional boxing matches."

26. Leary's legal theory was entirely false on multiple grounds. First, Perry was not receiving compensation "from promoters"—she was receiving compensation from the Virginia Department of Professional and Occupational Regulation, a state government agency. The Federal Boxing Safety Act's prohibition on receiving promoter compensation literally did not apply to Perry's situation, as she was being paid by a state government agency, not by private boxing promoters or sanctioning bodies.

27. Second, even under New York State ethics law, Perry's work was explicitly exempt. JCOPE's guidance on post-employment restrictions states: "If you leave State service and accept a position as an employee of a Federal, State, or local government entity, the post-employment restrictions do not apply." Perry was working for the Virginia DPOR, a state government entity. Her work was government-to-government and explicitly exempt from any post-employment restrictions under both state and federal law.

28. Despite having no legal basis whatsoever—neither federal nor state law prohibited Perry's conduct—Leary gave Perry a deadline to choose between her NYSAC inspector position and her Virginia boxing judge position.

29. In her January 8, 2016, email response to Leary (Perry Response Email), Plaintiff stated her belief that Leary's letter was "retaliation against me... for the complaint I submitted to the NYS Human Rights Division against NYSAC for bias." Perry confronted Leary with the facts demonstrating that his legal interpretation was wrong and that her work for Virginia DPOR was explicitly exempt from any restrictions.

30. After being confronted with the facts and accused of retaliation, Leary replied the same day (January 8, 2016 Email), apologized for his "misunderstanding," and admitted "there is no incompatibility between positions." This forced retraction and apology proves that Leary knew his threatening letter had no legal basis and that he issued it in retaliation for Perry's October 2014 DHR complaint.

31. The coordination between Baldwin and Leary is evident: Baldwin issued a false opinion creating a fabricated "two-year ban" to deny Perry's license application; Perry complained to NYSAC about the discriminatory denial; Herman quickly dismissed Perry's complaint; then Leary sent a threatening letter citing different (and equally inapplicable) legal authority to force Perry to abandon her Virginia work. When Perry challenged Leary's legal interpretation and accused him of retaliation, he immediately backed down and admitted there was "no incompatibility." This coordinated effort proves the conspiracy to restrict Perry's economic opportunities using fabricated legal restrictions.

**Selective Non-Enforcement: White Male Employees Free to Work for Private Promoters**

32. Even if Baldwin's interpretation of Public Officers Law § 73 could be defended as a reasonable reading of an ambiguous statute (which it cannot, given that it contradicts JCOPE's explicit guidance and Baldwin's own acknowledgment that Perry was paid on a per diem basis), the enforcement pattern proves discriminatory intent. If the concern were preventing conflicts of interest or "revolving door" employment, enforcement would focus on employees with regulatory authority going to work for entities they regulated, or on employees going to work directly for private promoters receiving private compensation. Instead, the opposite occurred.

**Eric Bentley (White Male, Full-Time Boxing Director with Regulatory Authority)**

33. In a November 2, 2015, email (Perry Email to NYSAC Leadership), Plaintiff pointed out to NYSAC leadership that Eric Bentley, a white male who served as Boxing Director at NYSAC—the only position with actual regulatory authority over the professional boxing industry—had left NYSAC on a Friday and by Monday had switched roles and was working for DiBella Entertainment, a private boxing promotion company over which he had exercised regulatory authority as Boxing Director. This represented an apparent violation of the two-year ban if the ban actually applied to any NYSAC employees. Yet no action was taken against Bentley.

34. Bentley was allowed to return to NYSAC. He then later left again to work for Real Deal Holyfield Promotions, another private boxing promoter. This represents precisely the "revolving door" from public regulator to private industry that post-employment restrictions are designed to prevent—a former regulator going to work for the very entities he regulated, leaving and returning to NYSAC, then leaving again to work for

9

another boxing promoter. This is direct private sector employment receiving compensation from boxing promotion entities. Yet Bentley faced no ethics investigation, no ultimatums, no enforcement action, and no consequences whatsoever for any of these violations.

35. Plaintiff reported Bentley's apparent violations to James Leary. Leary took no action on her documented complaints about Bentley's violations.

**David Berlin (White Male, Full-Time NYSAC Executive Director)**

36. David Berlin, a white male who served as NYSAC Executive Director, enforced Baldwin's flawed ethics opinion against Plaintiff by denying her boxing judge license application in 2014. However, Berlin himself then violated the very rule he had enforced against Perry.

37. Berlin left NYSAC in May 2016 and was immediately retained as legal counsel for a private boxing promoter, Star of David, Inc. By January 2017, his employment was publicly documented in court filings (Index No. 656445/2016). Plaintiff reported this apparent violation to James Leary, but Leary took no action.

38. The hypocrisy is stunning: Berlin denied Perry's application based on Baldwin's opinion that the two-year ban applied to per diem inspectors, then Berlin himself—a full-time Executive Director who actually exercised regulatory authority—immediately went to work for a private boxing promoter within the two-year period, receiving private compensation from an entity he had regulated. Yet Berlin faced no investigation, no enforcement action, and no consequences.

**Other White Male Employees**

39. Upon information and belief, Keith Sullivan, a white male Deputy Commissioner with supervisory duties over other NYSAC personnel at events, left NYSAC and went to work for Real Deal Holyfield Promotions, a private boxing promoter, receiving compensation from that private entity. As a per diem officer explicitly excluded from post-employment restrictions under JCOPE guidance, Sullivan should never have been subject to any restrictions. He faced no ethics investigation or enforcement action.

40. Joe Schaeffer, a white male inspector at the exact same position and level as Perry, with identical duties observing boxers at events for compliance and identical complete lack of regulatory authority, left NYSAC in May 2017 and went to work for Real Deal Holyfield Promotions—a private boxing promotion company. Schaeffer's duties as an inspector were purely observational with respect to boxers—he did not supervise other inspectors, made no regulatory decisions, granted no licenses, and exercised no authority over promoters. His position and duties were identical to Perry's. Schaeffer received

compensation from this private boxing entity. Yet he faced no ethics investigation, no threats of penalties, and no enforcement action whatsoever.

**The Discriminatory Pattern**

41. By contrast, Dorothea Perry, a Black woman inspector with duties identical to Schaeffer's and the same complete lack of regulatory authority, was threatened in 2014-2015—not for going to work for a private promoter, but for working as a boxing judge for the Virginia Department of Professional and Occupational Regulation, a state government agency. Her work was government-to-government employment, explicitly exempt from post-employment restrictions under JCOPE guidance, which states: "If you leave State service and accept a position as an employee of a Federal, State, or local government entity, the post-employment restrictions do not apply."

42. The comparison is devastating: in 2014-2015, a Black woman with 10+ years of unblemished service was threatened for government work that was explicitly exempt under both federal and state law and involved no promoter compensation; while in 2015-2017, white male employees at multiple levels—a Boxing Director with actual regulatory authority who went to work for companies he had regulated, an Executive Director who enforced the rule against Perry then violated it himself, a Deputy Commissioner, and an inspector at Perry's exact position level—went to work for private boxing promoters, receiving private compensation that would actually trigger restrictions if any applied, and faced no letters, no ultimatums, no investigations, and no consequences.

43. The discriminatory enforcement proves racial animus regardless of whether Baldwin's legal interpretation was correct. Even if Baldwin's opinion regarding the applicability of § 73 to per diem inspectors could be defended as a reasonable reading of an ambiguous statute (which Plaintiff contends it cannot, given the explicit statutory exclusion for per diem officers and JCOPE's guidance), the enforcement pattern demonstrates that the opinion's true purpose was racial discrimination, not legal compliance. The evidence proves this conclusively: (1) the opinion was never enforced against white male employees who took private promoter jobs receiving private compensation—conduct that would actually trigger the restrictions if they applied; (2) the opinion was misapplied to Perry's government employment, which was categorically exempt from post-employment restrictions even under Baldwin's own theory; (3) Baldwin herself acknowledged Perry was paid on a per diem basis, yet applied restrictions from which per diem officers are explicitly excluded; (4) JCOPE ethics officers explicitly told Perry the ban did not apply to her position, yet Defendants continued enforcement; and (5) Leary was forced to retract his threats and admit "no incompatibility" when challenged, proving the fabricated nature of the restrictions.

44. The only explanation for threatening Perry with prosecution for conduct that was explicitly exempt while allowing white male employees to engage in the exact "revolving

door" conduct the restrictions are designed to prevent—and doing so even after JCOPE confirmed the ban didn't apply and Leary admitted there was "no incompatibility"—is racial discrimination.

**Hostile Work Environment Based on Race and Sex**

45. Throughout her employment, Ms. Perry was subjected to a severe and pervasive hostile work environment based on both her race and sex. Deputy Commissioner George Ward testified to the DHR and in a federal deposition (Ward Federal Deposition, October 12, 2021; Ward Testimony, DHR Hearing, November 10, 2022) that Frank Vasquez, another deputy commissioner, called Plaintiff "a nigger" and a "cunt." Vasquez also made comments to other supervisors which Ms. Perry reported to Kim Sumbler, calling her a "witch" and a "snitch." He also publicly humiliated her by calling her a liar in front of other inspectors, boxers, and boxing managers.

46. These racial and sexual slurs created a hostile work environment that permeated Ms. Perry's daily work experience. The use of the most offensive racial epithet combined with gender-based slurs demonstrated that she was targeted for abuse based on both her race and her sex.

**Sexual Harassment and Denial of Promotion (March 2017)**

47. In March 2017, Ms. Perry sought a promotion to Deputy Commissioner at NYSAC. This represented a natural career progression given her 13 years of experience, consistently positive performance reviews, and deep knowledge of the commission's operations.

48. Anthony Giardina, who was then serving as Acting Executive Director of NYSAC, systematically obstructed Ms. Perry's advancement due to racial and sexual bias. In an official report to the Governor's Office of Employee Relations (GOER Report), Giardina stated he was concerned with Perry's "lack of judgment when it comes to matters involving black employees, because of her perception that everything is basically white against black and there is systematic discrimination of black employees." He also characterized her advocacy for equitable treatment as being too "black and white" and directed her to "sit in the back" at a boxing event. The retaliatory animus at NYSAC was overt; a supervisor told Ms. Perry in "no uncertain terms" that she was being "passed over because of [her] previous complaints."

49. The hostility from Giardina escalated on that same night in March 2017. While Ms. Perry was performing her official duties at a boxing event, Acting Executive Director Giardina approached her and reached out his arms toward her and asked her for a hug. The advance was unsolicited and unwelcome. Ms. Perry immediately backed away and told him "I do not do that." The attempted physical contact was offensive and created a hostile and intimidating environment for Ms. Perry. Mr. Giardina later admitted in sworn

testimony (Giardina Testimony) that he saw Ms. Perry was "clearly offended and felt harassed" by his advance.

50. This act of sexual harassment occurred in the presence of Inspector Jean Seme, a Black male inspector. Immediately after the incident, Giardina terminated Mr. Seme's employment on the spot, firing the sole witness to his misconduct.

51. Within days of Seme's termination, Brendan Fitzgerald, a high-ranking DOS official with supervisory authority over NYSAC, initiated a criminal complaint against Seme with the New York State Police. This immediate retaliation against a witness demonstrated NYSAC's willingness to use criminal process as a weapon against those who could expose misconduct and to eliminate anyone who supported Perry or witnessed discrimination against her.

52. Boxing Director Eric Bentley, who had recommended Ms. Perry for promotion to Deputy Commissioner, was thereafter denied a promotion to Executive Director. The position was instead given to the significantly less experienced Kimberly Sumbler. This pattern of punishing Ms. Perry's allies while promoting those complicit in discrimination was evident even at this early stage.

**Escalation (2017-2018): Reporting Hostile Environment**

53. From January 2017 through early 2018, Ms. Perry raised her concerns internally. She sent emails to NYSAC officials, including Maria Herman (Director of Affirmative Action Programs) and Linda Baldwin (who was copied on these emails), with subject lines such as "Questions Regarding your Complaint" and "Hostile Work Environment at NYSAC" (Perry Emails to Herman and Baldwin). These emails documented the discriminatory conditions and hostile work environment, and sought guidance on how to address these serious issues.

54. Baldwin was directly copied on emails sent to Maria Herman titled "Hostile Work Environment at NYSAC" from January 2018 through March 8, 2018—just one week before Ms. Perry filed her Inspector General complaint. Despite her position as DOS General Counsel and Ethics Officer, and despite having real-time notice of discrimination and a hostile work environment, Baldwin took no corrective action. Instead, she continued to coordinate with other DOS officials to monitor Ms. Perry's complaints and ultimately participated in the retaliation against her.

55. Despite Perry's repeated attempts to address these issues through internal channels, Herman and Baldwin took no corrective action. Perry's complaints received perfunctory and inadequate investigations. Perry received no response, no meaningful investigation, and no remedy.

**The Whistleblower Complaint That Triggered Termination (March 15, 2018)**

56. Defendants will likely argue that because Plaintiff made complaints in the past and was not terminated, her 2018 termination could not have been retaliatory. This argument is false. The difference is that Plaintiff's prior complaints were contained and neutralized by an internal process controlled by the very people perpetuating the discrimination—primarily Maria Herman, who had previously dismissed Perry's complaints. In March 2018, Plaintiff finally bypassed that corrupt system.

57. On March 15, 2018, Ms. Perry filed a confidential whistleblower complaint with the New York State Inspector General (IG Complaint).

58. Crucially, this complaint wasn't just another report of discrimination; it was a whistleblower complaint about the integrity of the EEO process itself. Plaintiff alleged that Director of Affirmative Action Programs Maria Herman was part of a "machine engaged in covering up discrimination" by deliberately manipulating witness testimony to protect NYSAC leadership. This corruption extended to fabricating documents; during the subsequent DHR hearing, it was revealed that Ms. Herman had fraudulently filed official complaints in Ms. Perry's name by signing on her behalf, without her knowledge or consent, which was an act designed to control the administrative process and deny Ms. Perry her rights.

59. Perry's allegations regarding Herman were based on years of pattern and practice. When Perry complained about the discriminatory denial of her boxing judge license in 2014-2015, Herman quickly closed the complaint. From 2017-2018, when Perry sent emails documenting hostile work environment, Herman took no action despite being directly informed. Perry's Inspector General complaint alleged that this pattern demonstrated Herman's systematic corruption of the EEO process to protect those who discriminated against Black employees.

60. By reporting the corruption of the internal review process to an outside authority—the Inspector General—Plaintiff posed a direct threat to the mechanism Defendants used to suppress all prior complaints.

61. Under New York law, whistleblower complaints to the Inspector General are confidential, and employees who make such complaints are protected from retaliation. However, on April 6, 2018—just three weeks after Ms. Perry filed her complaint—the Inspector General's office informed Perry that it was necessary to lift the confidentiality designation and referred the matter to the Governor's Office of Employee Relations (GOER). The Inspector General sought Perry's permission to lift confidentiality in order to escalate the matter to GOER. Perry believed she had some protections and consented to the disclosure, unmasking her as the complainant who had exposed the cover-up.

**The Retaliatory Termination (April 2018)**

62. The retaliation for this specific act of whistleblowing was swift and decisive. Once Ms. Perry was identified as the complainant on April 6, 2018, Defendants moved quickly to manufacture a pretext for her termination. Just 15 days later, they created the incident they would use to justify firing her.

**The Pretextual Barclays Center Incident (April 21, 2018)**

63. On April 21, 2018, Ms. Perry was assigned to work as an inspector at a boxing event at Barclays Center in Brooklyn. This was a high-profile event, and security protocols were in place to manage access to restricted areas.

64. On the night of the event, Ms. Perry was accused of breaching a protocol and allowing unauthorized individuals into the locker room of Gervonta Davis, the boxer she was assigned to. Several individuals were escorted by the promoter's staff to Davis's locker room. They were let in by Barclays security, and Perry was blamed for the breach.

65. However, this incident was minor, was resolved without conflict, and resulted in no harm to anyone. No one was injured, no property was damaged, and the event proceeded without disruption. NYSAC officials—including Kim Sumbler—seized upon this incident as a basis to claim that Ms. Perry had committed a "breach of protocol." No such breach had occurred. Ms. Perry had followed the instructions she had been given and had no knowledge of any last-minute changes to security procedures. She acted consistently with her training and experience as an inspector with 14 years of service. More importantly, it was the promoter's staff that had escorted the individuals to Gervonta Davis's locker room and they were allowed in by Barclays security.

66. The alleged "breach of protocol" was a pretext. This pretext is proven by Plaintiff's stellar performance review from that very night (April 21, 2018 Performance Review), which was signed by two supervising Deputy Commissioners. The review rated her performance as "Meets Expectations" in all categories and made no mention of any incident or breach of protocol. The allegation of a "possible breach" was only added later as a handwritten note by Executive Director Sumbler, after Ms. Perry had filed her workplace violence complaint the following day. Executive Director Sumbler never informed Ms. Perry of any specific security protocols that were changed, including procedures for allowing people access to locker rooms such as red wristbands or other security measures.

**Disparate Treatment of Edward Kunkle**

67. The pretextual nature of this charge is further proven by the treatment of other personnel present at the same event.

68. Edward Kunkle, a white male who served as Deputy Commissioner and was the back of house supervisor for the April 21, 2018 event, was also present during this incident and

witnessed what occurred. Kunkle testified in his September 24, 2021 deposition (Kunkle Deposition) that his duties as Deputy Commissioner included overseeing "dressing room activities." He admitted he saw that Gervonta Davis's locker room had "more people than the allowed amount" and knew it was an "issue"—the very security breach for which Ms. Perry was terminated. Despite this knowledge and a security guard being stationed at the door, Mr. Kunkle did not immediately act to remove the unauthorized individuals, stating he "didn't want to upset the apple cart." He only involved Executive Director Sumbler after the fact.

69. He failed to document the alleged security breach on Ms. Perry's performance evaluation on the night of the event, admitting in the deposition that he "probably" should have. Notably, his shift in opinion about her performance came only after Executive Director Sumbler, at Mr. Leary's direction, requested that he send a separate email about the incident—demonstrating the post-hoc nature of the case being built against Ms. Perry.

70. Despite these acknowledged failures to perform his supervisory duties and his initial failure to document a security issue, Mr. Kunkle was never disciplined. When asked in his deposition if he had ever had any disciplinary charges instituted against him as a civil servant, he replied, "No."

71. The disparate treatment is stark and inexplicable except as evidence of racial discrimination and retaliation: Perry, a Black woman inspector with 14 years of unblemished service, a stellar performance review from that night, and no supervisory responsibility for the area, was terminated four days after the incident; Kunkle, a white male Deputy Commissioner with supervisory responsibility for the area who admitted to multiple failures and only documented the issue after Sumbler requested it at Leary's direction, faced no discipline.

72. This disparate application of discipline based on race is direct evidence of intentional discrimination and is relevant to both the race discrimination and retaliation claims.

**The Death Threat (April 22-23, 2018)**

73. On April 22, 2018—the day after the Barclays Center incident and just three days before her termination—Ms. Perry reported a serious workplace safety concern to NYSAC leadership that would further expose the racially discriminatory enforcement of workplace policies.

74. A white male reporter from Swanson Communications had made a credible, explicit death threat against Ms. Perry. The threat was witnessed by Dr. Browne, a ringside physician who was present during the exchange. Dr. Browne could corroborate both that the threat was made and its serious nature.

16

75. Ms. Perry immediately reported the threat to NYSAC officials, including Kim Sumbler. She expected that NYSAC would take the matter seriously, investigate the witnessed threat, and take steps to ensure her safety as required by workplace violence policies and basic duty of care to employees.

76. Instead, NYSAC officials dismissed Ms. Perry's complaint. When former NYSAC Commissioner John Signorile later inquired about the threat, Executive Director Kim Sumbler told him that Ms. Perry was a "f'cking liar" and claimed the incident never happened—despite the fact that Sumbler herself had confirmed the incident with the witness, Dr. Browne, the day before. Sumbler's denunciation of Perry as a "f'cking liar" to a Commissioner, despite having confirmed the threat with the witness, demonstrates the hostility toward Perry and the predetermined intent to discredit her complaints regardless of evidence.

77. On April 23, 2018, Ms. Perry formally filed a workplace violence complaint with DOS regarding the death threat (Perry Workplace Violence Complaint).

**The Termination (April 25, 2018)**

78. On April 25, 2018, Ms. Perry was terminated from her position at NYSAC after 14 years of dedicated, unblemished service—just 19 days after the Inspector General lifted her confidentiality, 3 days after she reported the death threat, and 40 days after she filed a complaint explicitly accusing Maria Herman of corrupting the EEO process.

79. The stated reason was the alleged "breach of protocol" at the April 21 event—a pretextual charge that had resulted in no discipline for a white male supervisor with greater responsibility for the same incident, and which was not even documented on Perry's performance review until after Sumbler requested Kunkle send a separate email at Leary's direction.

80. The decision to terminate Perry was authorized at the highest levels of the Department of State by James Leary, the de facto final decision-maker. According to testimony later revealed (Leary Testimony), Executive Deputy Secretary of State Brendan Fitzgerald was battling colon cancer and undergoing treatment during this period. Mr. Leary testified that he was specifically assigned to work closely with Mr. Fitzgerald to "assist with the day-to-day functions and paperwork" and to "take over his duties if his health declined." In his capacity as Mr. Fitzgerald's designated assistant and effective replacement during Mr. Fitzgerald's illness, Mr. Leary exercised final authority over NYSAC operations and employment decisions. Mr. Fitzgerald passed away on November 14, 2018, seven months after Plaintiff's termination.

81. Notably, in terminating a 14-year employee, NYSAC and DOS provided Ms. Perry with no prior written notice of charges, no statement of reasons, and no pre- or post-termination hearing of any kind. This complete denial of the due process protections

mandated by New York Civil Service Law § 75 for competitive-class employees confirms that the proffered reason for her termination was a pretext. The defendants were aware that a legitimate, for-cause termination would require them to prove their case in a hearing. Their choice to bypass this legal requirement entirely demonstrates that the actual reason for her termination—unlawful discrimination, sexual harassment, and retaliation—could not withstand scrutiny in a fair and impartial forum.

**Escalation to Highest Levels: The Lieutenant Governor Email (April 27, 2018)**

82. On April 27, 2018—just two days after her termination—Ms. Perry took the extraordinary step of emailing Lieutenant Governor Kathy Hochul directly to report her unlawful termination and seek intervention at the highest level of state government (Email to Lieutenant Governor Hochul).

83. In her email to Lieutenant Governor Hochul, Perry explicitly stated that she had "bypassed Brendan Fitzgerald because he has turned a blind eye" to the discrimination and retaliation she had experienced. This statement is critical evidence that Perry had previously sought redress through Brendan Fitzgerald, a high-ranking DOS official with supervisory authority over NYSAC, and Fitzgerald had failed to take corrective action— he had "turned a blind eye" to the discrimination and retaliation Perry reported.

84. Perry's email to the Lieutenant Governor explicitly described her unlawful termination and sought intervention from the state's second-highest elected official. The fact that Perry felt compelled to email the Lieutenant Governor—bypassing the entire DOS chain of command because they had "turned a blind eye"—demonstrates the severity of the discrimination and retaliation and the complete failure of internal remedies.

**Obstruction of Justice and Witness Intimidation (2018-Present)**

85. The conspiracy to obstruct justice and retaliate against witnesses continued after Plaintiff's termination and persists to this day.

**Coordination Between Baldwin and Leary (June 7, 2018)**

86. On June 7, 2018, Linda Baldwin sent an internal email to James Leary with the subject line "Do you have time to talk for a few minutes?" The body of the email stated: "I received a call from Ken Michaels this morning -- re Dorothea Perry's emails" (Baldwin Email to Leary, June 7, 2018). Upon information and belief, the "Ken Michaels" referenced in the email is an official with the New York State Office of the Inspector General.

87. This communication shows that DOS's highest-ranking legal officer (Baldwin) and the official with final authority over NYSAC employment decisions (Leary) were actively tracking and coordinating with the Inspector General's office in response to Ms. Perry's protected whistleblowing activity. This proves the coordination between Baldwin and

Leary in monitoring Perry's complaints and demonstrates their joint involvement in the conspiracy.

**Intimidation and Termination of Commissioner Signorile (April-June 2018)**

88. In April 2018, Commissioner John Signorile began investigating Ms. Perry's termination. As a Commissioner—one of the five gubernatorial appointees who comprise NYSAC's governing body—Signorile had the authority and responsibility to investigate potential misconduct within the agency.

89. Signorile inquired about Perry's complaints, including her report of the death threat from the Swanson Communications reporter. It was during this inquiry that Executive Director Kim Sumbler called Perry a "f'cking liar" and claimed the death threat never happened, despite Sumbler having confirmed it with the witness the day before.

90. According to Signorile's sworn testimony from the November 10, 2022, DHR hearing (Signorile Testimony, DHR Hearing), in May 2018, shortly after he began investigating the circumstances of Perry's termination, he received a phone call from Defendant Linda Baldwin. Baldwin told Signorile: "the governor's office would like you to stand clear of what's going on" regarding the situation with Miss Perry.

91. This statement is direct evidence of the conspiracy and witness intimidation: First, Baldwin explicitly invoked "the Governor's office" to intimidate a Commissioner from investigating a wrongful termination. This demonstrates that the conspiracy to discriminate against and retaliate against Perry extended to the highest levels of state government, or that Baldwin was falsely invoking the Governor's office to lend weight to her threat. Second, Baldwin's statement was an unmistakable threat: stop investigating Perry's termination or face consequences. The directive to "stand clear of what's going on" was designed to prevent Signorile from discovering the truth about Perry's unlawful termination.

92. In June 2018, shortly after Linda Baldwin's threatening call invoking "the Governor's office," DOS terminated Commissioner John Signorile. The timing of Signorile's termination—following his investigation of Perry's termination and immediately after Baldwin's explicit threat—proves that Defendants were willing to terminate even a gubernatorially-appointed Commissioner to cover up the discrimination and retaliation against Perry.

93. Signorile's termination sent a clear message: anyone who investigated or supported Perry's claims, no matter how high their position, would be removed. This witness intimidation extended the conspiracy and demonstrates Defendants' consciousness of guilt—they knew Perry's termination was unlawful and were willing to fire a Commissioner to prevent the truth from coming to light.

**Disparate Treatment of Workplace Violence Complaints: The Racial Double Standard**

94. The racially discriminatory enforcement of workplace violence policies is starkly demonstrated by comparing the treatment of two similar complaints with opposite outcomes based on race.

**Jean Seme's Criminal Investigation**

95. Jean Seme, a Black male inspector, witnessed Acting Executive Director Anthony Giardina's sexual harassment of Ms. Perry on March 10, 2017. That same night, Giardina terminated Seme on the spot, eliminating the sole witness to his misconduct.

96. Within days of his termination, Brendan Fitzgerald initiated a criminal complaint against Seme with the New York State Police. The complaint was based on allegations by Kim Sumbler, a white female NYSAC supervisor, that Seme had made threatening statements after his termination.

97. According to the sworn deposition testimony of State Police Investigator Charles Sands (Sands Deposition), Sumbler's complaint was unwitnessed and uncorroborated. Investigator Sands testified that witnesses said Seme was "upset" after being fired, but Sands could not recall any specific threatening language and testified that he did not recall witnesses saying Seme threatened anyone specifically. The complaint was vague, lacked corroboration, and consisted of general statements about Seme being "upset"—a natural reaction to being suddenly terminated.

98. Despite the vague, unwitnessed, and uncorroborated nature of Sumbler's complaint, DOS and NYSAC initiated a full criminal investigation by the New York State Police. This investigation included: a complete criminal background check of Seme; multiple visits to Seme's home by State Police; Investigator Sands reading Seme his Miranda rights from a card, informing him of his right to remain silent and his right to an attorney; investigators traveling to Seme's home in state-issued vehicles; a weeks-long investigation treating Seme as a potential criminal; and presentation of the case to the Manhattan District Attorney for potential prosecution.

99. The Manhattan District Attorney declined to prosecute due to insufficient evidence, confirming that Sumbler's complaint lacked merit. State Police Investigator Sands ultimately concluded in his report that Seme would "not cause any harm to anyone." Despite this conclusion and the DA's declination, the damage to Seme was done. The investigation, the home visits, the Miranda warnings, and the threat of criminal prosecution were so severe and harassing that Seme came to fear living in New York State.

**Perry's Death Threat Complaint: The Stark Contrast**

100.    On July 23, 2018, DOS closed Ms. Perry's workplace violence complaint regarding the witnessed, corroborated death threat against her by a white male reporter (DOS Letter, July 23, 2018). The entirety of DOS's response was a letter stating only that the reporter's employer, Swanson Communications, "agreed to ensure appropriate behavior from their staff in the future." No criminal investigation was initiated. The New York State Police—the same agency that conducted a full criminal investigation of Seme based on an unwitnessed complaint—were never contacted about a witnessed death threat against a state employee. No background check was conducted on the reporter. The reporter faced no consequences, no prosecution, and no restriction from working at NYSAC events.

**The Proof of Racial Discrimination**

101.    The contrast between the treatment of these two workplace violence complaints proves the racial discrimination in how workplace violence and threats are handled. When Sumbler (white woman) complained about Seme (Black man) with a vague, unwitnessed, uncorroborated complaint that the investigator could not recall containing specific threatening language, and where the investigator concluded the subject would "not cause harm to anyone" and the DA declined to prosecute—the response was: Full State Police criminal investigation, criminal background check, multiple home visits, Miranda warnings, weeks of investigation, presentation to DA for prosecution, harassment so severe subject fears living in New York.

102.    When Perry (Black woman) complained about a white male reporter with an explicit, specific death threat that was witnessed and corroborated by Dr. Browne (ringside physician) and was credible and serious—the response was: Soft letter to reporter's employer asking them to "ensure appropriate behavior," no criminal investigation, no State Police involvement, no consequences for perpetrator, perpetrator still working with NYSAC five years later (observed in January 2023).

103.    This pattern proves that workplace violence complaints were investigated and prosecuted based on the race of the complainant and the accused, not based on the credibility or severity of the threat. When a white woman made a meritless complaint about a Black man, the full power of the state's criminal justice system was mobilized. When a Black woman made a credible, witnessed complaint about a white man, she received a letter and her complaint was closed—and the perpetrator continued working with the agency for years.

**Sumbler's Hypocrisy and Bad Faith**

104.    Kim Sumbler's treatment of Perry's death threat complaint is particularly revealing of the bad faith and discriminatory animus driving the retaliation. When Commissioner Signorile asked Sumbler about Perry's complaint, Sumbler called Perry a

"f'cking liar" and claimed the incident never happened. This was demonstrably false—Sumbler herself had confirmed the incident with the witness, Dr. Browne, the day before.

105.    Sumbler's own complaint about Seme in 2017 was unwitnessed, uncorroborated, vague, and ultimately found to have insufficient evidence by the DA and the investigating officer. Yet that complaint triggered a full criminal investigation. Perry's complaint about the death threat was witnessed, corroborated, specific, and credible. Yet Sumbler called Perry a "f'cking liar" for making it, despite having confirmed it with the witness herself.

106.    This demonstrates that Sumbler applied completely different standards based on race: when a white woman (Sumbler) made an unwitnessed complaint about a Black man (Seme), it was treated as credible and worthy of criminal investigation. When a Black woman (Perry) made a witnessed complaint about a white man, Sumbler called her a liar despite confirming the incident herself. This proves Sumbler's discriminatory animus and her role in the conspiracy to deny Perry equal protection and retaliate against her for reporting misconduct.

### Obstruction of Administrative Remedies

107.    After her termination, Ms. Perry filed a verified complaint with the New York State Division of Human Rights (DHR Case No. 10195419) on May 7, 2018. On March 20, 2019, DHR issued a Determination After Investigation finding probable cause to believe that Defendants engaged in unlawful discriminatory practices. This finding should have led to a prompt hearing and resolution.

108.    NYSAC appealed the DHR's original decision, and DHR's chief legal officer upheld the decision. DHR did set up a hearing, but that hearing became a years-long campaign of procedural manipulation designed to obstruct Perry's pursuit of administrative remedies and to protect the state agencies and officials who had discriminated against her.

### Conflict of Interest at Initial Hearing

109.    The hearing process was tainted by conflicts of interest and procedural irregularities from its very first day. The initial hearing, scheduled to begin on August 16, 2021, was assigned to ALJ Alexander Linzer. At the outset of the hearing, Linda Baldwin, a high-ranking attorney for Defendant DOS who was not the attorney of record, made an unexpected appearance. It was then revealed that ALJ Linzer had a direct personal conflict of interest: his wife and Ms. Baldwin served together on the same non-profit board, forcing him to recuse himself from the case. This incident marked the beginning of a pattern of procedural manipulations coordinated between DOS and DHR.

### Protracted Hearing Schedule

110.     After the initial recusal, the case was reassigned to ALJ Martin Erazo Jr. However, rather than scheduling consecutive hearing days to allow for efficient presentation of evidence and testimony, the hearings were scheduled sporadically across many months. This protracted and fragmented hearing schedule made it difficult for Plaintiff to present a coherent case, placed significant financial and logistical burdens on Plaintiff and her witnesses, and caused unnecessary delays in the resolution of her claims. The irregular scheduling appeared designed to wear down Plaintiff through procedural attrition.

**False Claim of ALJ Retirement**

111.     After Ms. Perry had presented her entire case before ALJ Erazo, DHR issued a demonstrably false official statement. In a letter signed by Chief Administrative Law Judge Lilliana Estrella-Castillo (Estrella-Castillo Letter, June 21, 2023), DHR claimed that ALJ Erazo was retiring and that the case needed to be reassigned to a new ALJ.

112.     Public records prove this was a pretext and that the claim of retirement was false: In October 2023, months after his supposed retirement, ALJ Erazo was assigned to preside over a new matter, Rivera v. Monroe Community Hospital; ALJ Erazo continued to author and issue final orders in numerous other cases well into 2024, including Mongrel v. 200 Bassett Road Operating Co. on July 11, 2024 and Cooper v. Tops Markets, LLC on December 18, 2024 (over eighteen months after his alleged retirement); and State payroll records show ALJ Erazo continued receiving salary as an active employee of the State of New York throughout 2024.

113.     This claim was demonstrably false, as public records prove ALJ Erazo continued working on other DHR cases for over eighteen months after his purported retirement. Upon information and belief, DHR reassigned the case to a different ALJ. The circumstances and timing of this reassignment, combined with the inaccurate statement about Judge Erazo's status, raise serious questions about the integrity of the proceedings.

114.     The demonstrably inaccurate statement about ALJ Erazo's retirement and the resulting case reassignment demonstrate irregularities in the handling of Perry's case and Estrella-Castillo's role in obstructing Perry's pursuit of administrative remedies.

**Structurally Unfair Hearing**

115.     This deceit created a structurally unfair hearing. ALJ Sharon A. Sorkin, who wrote the final recommendation on June 13, 2024 (ALJ Sorkin Recommendation), only heard the Defendants' case-in-chief live. She never personally observed Ms. Perry or her key corroborating witnesses, including: Tom Hoover, a former NYSAC Chairman; Commissioner John Signorile, who testified about Baldwin's threatening call and his subsequent termination; Deputy Commissioner George Ward, a 35-year veteran who corroborated the use of racial slurs against Perry, testifying that Frank Vasquez, another

23

deputy commissioner, called Plaintiff "a nigger" and a "cunt" (Ward Testimony, November 10, 2022, DHR Hearing); and Dr. Browne, the ringside physician who witnessed Perry's performance on the night of the April 21, 2018 incident and could corroborate the death threat. ALJ Sorkin was forced to rely on a cold transcript for all of Plaintiff's evidence. Consequently, her decision arbitrarily disregarded critical, corroborated testimony, including Deputy Commissioner George Ward's confirmation of the racial slurs and the powerful testimony of James Rogers, the DOL's Special Counsel for Worker Protection, who testified on February 24, 2023 (Rogers Testimony, DHR Hearing, February 24, 2023), that this case was "the single worst case of discrimination retaliation I had seen in all the years I had been enforcing labor laws." ALJ Sorkin's decision essentially parroted the defendants' post-hearing brief. The DHR, through a Final Order signed on November 7, 2024, by Chief of Staff Belkis Alonso-Ortiz (DHR Final Order, November 7, 2024), adopted ALJ Sorkin's biased recommendation without independent review.

**Strategic Reassignment and Delay**

116.    Even beyond the false retirement claim, DHR continued to manipulate the proceedings through strategic reassignments and unexplained delays. Cases that should have been resolved within months dragged on for years, with DHR offering no legitimate explanation for the delays.

117.    Upon information and belief, Estrella-Castillo coordinated with DOS and NYSAC to delay Perry's case, wear her down through procedural attrition, and ensure that any eventual decision would come so late as to minimize its impact and discourage other complainants from pursuing similar claims.

**Estrella-Castillo's Role**

118.    Chief Administrative Law Judge Lilliana Estrella-Castillo, as the official responsible for overseeing DHR's ALJs and administrative proceedings, was directly involved in the systematic manipulation of Perry's case. Estrella-Castillo signed the June 21, 2023 letter containing the demonstrably false statement that ALJ Erazo was retiring. As Chief ALJ, Estrella-Castillo possessed final, unreviewable policymaking authority over case assignments and the management of administrative hearings. Her decision to issue a demonstrably false statement regarding ALJ Erazo's retirement and to reassign the case based on this false pretense constituted the official policy of DHR with respect to Plaintiff's case and was the moving force behind the denial of her right to meaningful access to an impartial adjudicatory process.

119.    Estrella-Castillo acted under color of state law and used her position to obstruct Perry's pursuit of administrative remedies in furtherance of the conspiracy to deny Perry equal protection and retaliation for her protected activity.

24

**DOL Investigation Manipulation**

120.    In addition to her DHR complaint, Perry filed a complaint with the New York State Department of Labor (DOL) alleging wrongful termination and retaliation.

121.    In March 2022, DOL issued findings favorable to Perry. The DOL investigator's report, authored by James Rogers, the DOL's Special Counsel for Worker Protection (DOL Report, March 2022), stated clearly that NYSAC's reason for terminating Perry "was not credible." This was a strong, unequivocal finding that supported Perry's claim of pretextual termination. Rogers later testified during the DHR hearing on February 24, 2023, that this case was "the single worst case of discrimination retaliation I had seen in all the years I had been enforcing labor laws." Mr. Rogers further testified that he believed NYSAC Executive Director Kimberly Sumbler was lying about the reasons for the termination.

122.    Perry disclosed this favorable DOL finding during her DHR hearing, using it to support her case and demonstrate that an independent state agency had found NYSAC's termination reason to be not credible.

123.    Shortly after Perry disclosed the DOL finding at the DHR hearing in May 2022, the DOL abruptly reversed course. In a highly irregular move, DOL contacted Perry and told her they were revising their findings. DOL then issued new findings that weakened the language, changing "was not credible" to "may have been pretextual" (DOL Revised Report, May 13, 2022).

124.    This change was not based on any new evidence or any legitimate reconsideration. The timing—immediately after Perry used the finding at the DHR hearing—proves that the revision was made in response to Perry's use of the finding against the state defendants.

125.    Upon information and belief, DOS, NYSAC, or officials at DHR contacted DOL after learning that Perry had disclosed the favorable finding and coordinated with DOL to revise the language to be less damaging to the state's position. This coordination between state agencies to manipulate investigative findings and obstruct Perry's pursuit of remedies demonstrates the breadth of the conspiracy and the willingness of multiple state agencies to corrupt their processes to protect discriminatory state actors.

126.    The manipulation of the DOL finding is particularly egregious because it undermines the independence and integrity of the state's labor law enforcement. DOL made a finding based on evidence and investigation. When that finding was used against other state agencies, those agencies coordinated with DOL to change it. This corruption of the investigative process denies employees like Perry any meaningful avenue for redress within the state system.

25

127.    The conspiracy involved inter-agency interference. After the DOL found in Plaintiff's favor on March 8, 2022, it "abruptly and inexplicably" reversed its finding on May 13, 2022. Only after Plaintiff was forced to sue the DOL (Index No. 152543/2022) did it reinstate a version of its original decision, though with watered-down language.

**Retaliation Through Disclosure of Confidential Medical Information**

128.    In December 2023, while Perry's DHR proceedings were still ongoing, Defendants engaged in yet another act of retaliation: the intentional disclosure of Perry's confidential medical information in an unrelated proceeding in violation of her privacy rights and in retaliation for her persistence in pursuing her discrimination claims.

129.    Lisa Joslin, an attorney representing NYSAC/DOS in both a proceeding before the DHR and a proceeding before the Industrial Board of Appeals concerning the PESH (Public Employee Safety and Health) investigation into a workplace violence complaint, intentionally disclosed Perry's confidential medical records during the Industrial Board proceeding (Industrial Board Hearing, December 2023).

130.    Joslin's disclosure was unlawful for multiple reasons: First, Joslin used an authorization to access Perry's medical records. That authorization was to be used exclusively in the DHR hearing only.

131.    Second, even when the authorization was valid for the DHR case, Perry's attorney had explicitly requested that certain sensitive medical information be redacted before any disclosure. In a letter dated May 8, 2023 (Joslin Letter to ALJ Erazo, May 8, 2023), Lisa F. Joslin herself had written to Administrative Law Judge Martin Erazo Jr., consenting to redaction of medical records in the DHR Case. Yet in the Industrial Board proceeding, Joslin disregarded Perry's attorney's explicit redaction requests that were made at the DHR hearings and were only for the DHR hearings.

132.    Third, the medical information was not relevant or necessary to the Industrial Board proceeding in which Joslin disclosed it. The disclosure was gratuitous and served no legitimate purpose in that proceeding.

133.    Upon information and belief, Joslin disclosed Perry's confidential medical information for the purpose of retaliating against Perry for her persistence in pursuing discrimination claims against NYSAC and DOS. Rather than maintaining the professional objectivity required by her position and her oath of office, Joslin acted in concert with the state defendants to harm Perry. The disclosure was designed to: (1) Invade Perry's privacy and cause her emotional distress; (2) Embarrass and humiliate Perry by revealing sensitive medical information in a public proceeding; (3) Punish Perry for continuing to fight her wrongful termination rather than accepting the discrimination and retaliation in silence; (4) Intimidate Perry into abandoning her claims by demonstrating that Defendants would stop at nothing—including violating medical

privacy laws—to retaliate against her; and (5) Use Perry's medical information to undermine her credibility or create false narratives about her fitness or reliability.

134.	The disclosure of confidential medical information in violation of Perry's attorney's explicit request constitutes retaliation in violation of the First Amendment, as well as violations of state and federal medical privacy laws. This act of retaliation occurred in December 2023, demonstrating the continuing nature of Defendants' retaliatory campaign and bringing it well within the statute of limitations.

## Ongoing Hostile Environment and Continuing Retaliation (2023-2025)

135.	Defendants' unlawful conduct did not end with Perry's termination or even with the obstruction of her administrative proceedings. The discrimination and retaliation continue to this day.

## The Reporter Still Working With NYSAC (January 2023)

136.	In January 2023, nearly five years after the white male Swanson Communications reporter made a credible death threat against Perry—a threat that was witnessed and corroborated—Perry attended a NYSAC event and observed that same reporter still working alongside NYSAC employees.

137.	This observation proves multiple facts: First, it demonstrates that DOS's July 23, 2018 letter claiming that Swanson Communications "agreed to ensure appropriate behavior from their staff" was meaningless and that no effective action was taken to protect Perry or to impose consequences on her threatener. Second, it shows that DOS and NYSAC permitted the reporter who threatened a state employee's life to continue working at NYSAC events for at least five years after the threat, demonstrating their complete disregard for Perry's safety and their refusal to take workplace violence against Black employees seriously. Third, it proves the ongoing hostile environment.

138.	Even years after her termination, when Perry attends NYSAC events in any capacity, she is confronted with the presence of the man who threatened to kill her—a man DOS and NYSAC have protected and allowed to continue working with the agency.

139.	The continued presence of Perry's threatener at NYSAC events, five years after the threat and after DOS purportedly addressed it, constitutes ongoing retaliation and maintenance of a hostile environment. It sends the message that Perry's safety and dignity do not matter, that white men who threaten Black women face no real consequences, and that Perry will be subjected to discriminatory and retaliatory conduct if she attended events overseen by NYSAC.

## DHR's Refusal to Process New EEOC Complaint (2025)

140.     In 2025, after this federal lawsuit was filed, Perry attempted to file a new complaint with DHR regarding ongoing discrimination and retaliation. On September 30, 2024, EEOC Investigator Michael Woo officially referred a new, separate discrimination complaint to DHR (EEOC Referral, September 30, 2024), stating: "Once the case is assigned, you will be contacted by an investigator from the New York State Division of Human Rights." On November 6, 2024, EEOC CRTIU Supervisor Charles Diamond instructed Plaintiff (EEOC Instruction, November 6, 2024) to "contact the NY State Division of Human Rights after Dec 1st" for an update.

141.     Plaintiff complied with this directive. However, from September 2024 through the present date—a period of over thirteen months—DHR has never contacted Plaintiff, provided no case number, issued no acknowledgment, and taken no action whatsoever on the officially referred complaint. This complete failure to act constitutes a definitive refusal to process the complaint.

142.     Upon information and belief, DHR's refusal to process Perry's new complaint was in retaliation for Perry having filed this federal lawsuit and demonstrates the continuing conspiracy. DHR, having already obstructed Perry's first administrative proceeding for years through Estrella-Castillo's false claims and procedural manipulation, now refuses to even accept new complaints from Perry because she has sought justice in federal court.

143.     This refusal constitutes retaliation in violation of the First Amendment and demonstrates the ongoing conspiracy to deny Perry any avenue for redress. It also proves the continuing nature of the violation—Perry is still being retaliated against in 2025 for her protected activity dating back to 2017-2018.

**George Ward's Termination (February 2025)**

144.     Deputy Commissioner George Ward, a 35-year veteran of NYSAC, provided consistent, corroborating testimony supporting Ms. Perry's claims across multiple proceedings over a three-year period: on October 12, 2021 (Ward Federal Deposition, October 12, 2021), Ward testified in a federal deposition, providing evidence supporting Perry's claims; on November 10, 2022, Ward testified at the DHR hearing, again corroborating Perry's account and confirming that Frank Vasquez, another deputy commissioner, called Plaintiff "a nigger" and a "cunt"; and on December 22, 2023 (Ward Testimony, Industrial Board Hearing, December 22, 2023), Ward testified at the Industrial Board of Appeals hearing, maintaining his support for Perry's claims.

145.     For three years, Ward testified in Perry's favor, fearing consequences from DOS or NYSAC. His testimony was consistent, credible, and damaging to Defendants' false narrative that Perry was terminated for legitimate reasons.

146.     On January 31, 2025, Ms. Perry filed this federal lawsuit. One month later, in February 2025, DOS terminated George Ward's employment after 35 years of service.

28

147.     The timing proves retaliation: Ward testified three times over three years (October 2021, November 2022, December 2023), fearing consequences. But within one month of Perry filing a federal lawsuit that made Ward's testimony part of a new public record and that put Defendants on notice they would face federal liability, Ward was fired.

148.     Ward's termination serves multiple unlawful purposes: (1) it punishes Ward for having testified in Perry's favor; (2) it attempts to intimidate Ward from testifying in this federal proceeding; (3) it sends a message to any other potential witnesses that supporting Perry will result in termination regardless of years of service; and (4) it demonstrates the continuing nature of the conspiracy and Defendants' ongoing retaliation against anyone associated with Perry's claims.

149.     The timing of Ward's termination raises strong inference of retaliation. Ward testified three times over three years (October 2021, November 2022, December 2023) without facing consequences. Yet within one month of Perry filing this federal lawsuit on January 31, 2025, DOS terminated Ward after 35 years of service. This suspicious timing suggests that either: (1) Defendants were aware of the federal filing and terminated Ward in retaliation, or (2) Defendants had strategically delayed any retaliation to avoid obvious temporal proximity to Ward's individual testimonies, but the accumulation of his consistent support for Perry across multiple forums ultimately triggered the termination. Under either interpretation, Ward's February 2025 termination constitutes ongoing witness intimidation and retaliation that extends the conspiracy into 2025, well within the statute of limitations and proving the continuing violation.

## CONSPIRACY ALLEGATIONS

150.     The facts alleged above demonstrate a coordinated, multi-year conspiracy among state officials and agencies to discriminate against Ms. Perry based on her race and sex, retaliate against her for protected speech, and systematically obstruct her access to remedies.

### The Conspiracy Participants

151.     The following individuals and entities participated in the conspiracy: Linda Baldwin (DOS General Counsel and Ethics Officer); James Leary (DOS Associate Attorney); Kim Sumbler (NYSAC Executive Director); Anthony Giardina (NYSAC Acting Executive Director); Maria Herman (NYSAC Director of Affirmative Action Programs); Brendan Fitzgerald (DOS official) [now deceased, but his actions are part of the conspiracy]; Lilliana Estrella-Castillo (Chief Administrative Law Judge at DHR); New York State Department of State (institutional actor); New York State Athletic Commission (institutional actor); and Other unknown state officials (John/Jane Does 1-10).

152.    These conspirators acted in concert, coordinated their conduct, and shared a common purpose: to deny Perry equal protection of the laws based on her race and sex, to retaliate against her for reporting discrimination, sexual harassment, and ethics violations, and to ensure she could never obtain relief through administrative or legal processes.

**The Conspiracy's Elements and Proof**

**Agreement to Discriminate and Retaliate**

153.    The conspirators agreed, explicitly or tacitly, to discriminate against Perry and other Black employees by selectively enforcing ethics rules to restrict their economic opportunities while permitting white employees to pursue industry positions freely, and to sexually harass and create a hostile work environment for Black women.

154.    This agreement is proven by: (a) The coordinated sequence of events in 2014-2015: Perry applies for boxing judge license → denial accompanied by Baldwin's fabricated "two-year ban" opinion → Perry complains to NYSAC about the discriminatory denial → Herman quickly closes Perry's complaint → Leary sends threatening letter citing different (and equally inapplicable) law → Perry challenges Leary → Leary forced to retract and admit "no incompatibility." This coordination proves Baldwin, Herman, and Leary were working together to restrict Perry's opportunities through fabricated legal claims while denying her any internal remedy.

155.    (b) The consistent pattern across years: whenever Perry reported discrimination (2014-2015 license denial, 2017-2018 hostile environment), Maria Herman dismissed or ignored her complaints. This pattern proves Herman's agreement to protect those who discriminated against Perry and to ensure Perry had no avenue for internal redress.

156.    (c) The coordination between Baldwin and Leary in 2018: Baldwin's June 7, 2018 email to Leary stating "I received a call from Ken Michaels this morning -- re Dorothea Perry's emails" proves they were monitoring Perry's complaints together and coordinating responses.

157.    (d) The systematic obstruction of administrative remedies: Estrella-Castillo's false claim of ALJ retirement, strategic reassignments, and years of delay at DHR; DOL's reversal of findings after Perry disclosed them at DHR hearing; refusal to process new complaints after federal lawsuit filed. This proves coordination between Estrella-Castillo (at DHR), DOL, DOS, and NYSAC to manipulate state processes to deny Perry remedies.

158.    (e) The witness intimidation campaign: Seme terminated and criminally investigated (2017); Signorile threatened by Baldwin invoking "Governor's office" and then terminated (2018); Ward terminated one month after federal lawsuit filed (2025).

This proves agreement among conspirators to silence or remove anyone who supported Perry's claims.

**Racially and Sexually Discriminatory Purpose**

159.     The conspiracy was motivated by racial and sexual animus and designed to maintain a system in which Black women like Perry were denied opportunities, subjected to stricter rules, sexually harassed, and punished more harshly than white employees.

160.     This discriminatory purpose is proven by the stark disparate treatment in enforcement of ethics rules, workplace violence policies, and disciplinary actions:

161.     (a) Ethics Rules - Economic Opportunity Restrictions: Eric Bentley (white Boxing Director with regulatory authority) → works for companies he regulated → no investigation; David Berlin (white Executive Director) → enforces rule against Perry, then violates it himself by working for private promoter → no investigation; Keith Sullivan (white Deputy Commissioner) → works for private promoter → no investigation; Joe Schaeffer (white inspector, Perry's exact position) → works for private promoter → no investigation; Dorothea Perry (Black woman inspector) → works for state government (exempt) → threatened with $10,000 penalties and criminal prosecution. The only variable explaining this pattern is race. The conspiracy targeted Black employees for restrictions while protecting white employees' freedom to pursue industry positions.

162.     (b) Sexual Harassment and Hostile Work Environment: Deputy Commissioner Frank Vasquez subjected Perry to racial slurs, calling her "a nigger" and a "cunt." Giardina sexually harassed Perry (unwanted advances, attempted unwanted physical contact); when Perry complained, her witness (Seme) was immediately fired and criminally investigated. The conspiracy permitted and perpetuated sexual harassment and a hostile work environment based on both race and sex.

163.     (c) Workplace Violence Policies: Kim Sumbler (white woman) complains about Jean Seme (Black man) → unwitnessed, uncorroborated, vague complaint, DA declines to prosecute, investigator concludes subject would "not cause harm" → Full State Police investigation, criminal background check, home visits, Miranda warnings, presentation to DA; Dorothea Perry (Black woman) complains about white male reporter → witnessed, corroborated, specific death threat → Soft letter, case closed, no investigation, perpetrator still working with NYSAC 5 years later. The conspiracy weaponized criminal justice against Black employees based on meritless complaints while dismissing credible complaints by Black employees against white perpetrators.

164.     (d) Disciplinary Actions: Kunkle (white male Deputy Commissioner, supervisor with greater responsibility) → present at alleged "protocol breach," admitted failures, only documented after Sumbler requested it at Leary's direction → no discipline;

Dorothea Perry (Black woman inspector, no supervisory role) → present at same incident, stellar performance review that night → terminated after 14 years. The conspiracy applied discipline based on race and sex, not on actual responsibility or misconduct.

**Overt Acts in Furtherance of the Conspiracy**

165.    The conspirators committed numerous overt acts in furtherance of their unlawful agreement, including but not limited to: (a) Maria Herman dismissing Perry's discrimination complaint about the Executive Director despite clear merit; Herman failing to stop retaliatory hostile environment after Perry's complaint.

166.    (b) July 23, 2014: Baldwin creating false "two-year ban" opinion despite acknowledging Perry was paid on per diem basis and despite statutory exclusion for per diem officers; Berlin using Baldwin's opinion to deny Perry's boxing judge license.

167.    (c) 2014-2015: Herman quickly closing Perry's complaint about license denial; Leary sending November 2, 2015 threatening letter misapplying federal law to force Perry to choose between NYSAC and exempt government work; Leary forced to retract after Perry challenges him, admitting "no incompatibility."

168.    (d) September 26, 2016: JCOPE ethics officer confirms at mandatory training that two-year ban doesn't apply to per diem employees; despite this official confirmation, Defendants continue enforcement against Perry while ignoring violations by white males (Bentley, Berlin, Sullivan, Schaeffer).

169.    (e) March 2017: Giardina denying Perry promotion based on her advocacy against discrimination; Giardina sexually harassing Perry at boxing event; Giardina terminating Jean Seme, the sole witness to his sexual harassment; Brendan Fitzgerald initiating criminal complaint against Seme; DOS authorizing full State Police investigation based on meritless complaint from white supervisor.

170.    (f) 2017-2018: Herman and Baldwin ignoring Perry's emails about hostile environment despite being directly informed.

171.    (g) April 6, 2018: Inspector General lifting Perry's confidentiality, exposing her as whistleblower who accused Herman of corruption.

172.    (h) April 21, 2018: Manufacturing pretextual incident at Barclays Center; not disciplining Kunkle (white supervisor with greater responsibility who only documented incident after Sumbler requested it at Leary's direction) while using same incident to justify terminating Perry.

173.      (i) April 25, 2018: Terminating Perry 19 days after IG unmasked her complaint and 3 days after she reported the death threat, without providing any due process protections required by Civil Service Law § 75.

174.      (j) April 22-23, 2018 and July 23, 2018: Dismissing Perry's witnessed death threat complaint; closing case with soft letter; allowing white male perpetrator to continue working with NYSAC for years.

175.      (k) May 2018: Baldwin calling Commissioner Signorile and telling him "the governor's office would like you to stand clear of what's going on" regarding the situation with Miss Perry; DOS's subsequent termination of Signorile in June 2018.

176.      (l) 2019-2024: Estrella-Castillo, acting in her capacity as Chief ALJ at DHR, falsely claiming ALJ Erazo retired; strategically reassigning Perry's case; delaying proceedings for years; creating structurally unfair hearing where ALJ Sorkin never observed Perry's witnesses.

177.      (m) May 2022: DOL reversing findings from "was not credible" to "may have been pretextual" after Perry disclosed favorable finding at DHR hearing, proving coordination between state agencies.

178.      (n) December 2023: Lisa Joslin disclosing Perry's confidential medical records using an authorization that was to be used exclusively at the DHR hearing, in retaliation.

179.      (o) January 2023: DOS/NYSAC continuing to allow reporter who threatened Perry to work at NYSAC events, maintaining hostile environment.

180.      (p) February 2025: Terminating George Ward one month after Perry filed federal lawsuit, punishing witness and attempting to intimidate testimony.

181.      (q) 2025: DHR's refusal to process Perry's new complaint in retaliation for federal litigation, demonstrating the continuing conspiracy.

**Injury to Perry**

182.      As a direct and proximate result of the conspiracy, Perry suffered and continues to suffer severe injuries, including: (a) Loss of her 14-year career at NYSAC and all associated income and benefits; (b) Damage to her professional reputation and ability to work in her chosen field; (c) Economic losses including lost wages, lost benefits, and lost opportunities for advancement; (d) Severe emotional distress, humiliation, and mental anguish from the discrimination, sexual harassment, retaliation, death threat, hostile work environment, and ongoing harassment; (e) Violation of her constitutional rights to equal protection and freedom of speech; (f) Violation of her privacy rights through disclosure of confidential medical information; (g) Denial of administrative and legal remedies through years of obstruction and manipulation; (h) Ongoing hostile environment and fear for her

safety due to continued presence of her threatener at NYSAC events; and (i) Continuing retaliation including termination of witnesses, refusal to process complaints, and ongoing efforts to obstruct her pursuit of justice.

**CLAIMS FOR RELIEF**

**COUNT I: Title VII - Employment Discrimination Based on Race (Against Defendant NYSAC)**

183.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

184.    Defendant NYSAC, through its agents and supervisors, discriminated against Ms. Perry in the terms and conditions of her employment based on her race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. This discrimination took multiple forms:

185.    Hostile Work Environment: Ms. Perry was subjected to a severe and pervasive hostile work environment based on race, including being called racial slurs by supervisors and being publicly humiliated in front of colleagues and members of the boxing community.

186.    Denial of Promotion: NYSAC denied Ms. Perry promotion to Deputy Commissioner due to racial animus, with Acting Executive Director Giardina explicitly citing her advocacy against discrimination as evidence of poor judgment and characterizing her perspective as too "black and white."

187.    Disparate Treatment in Workplace Violence Complaints: NYSAC engaged in intentional disparate treatment by applying workplace violence complaint procedures differently based on the race of the complainant and the accused. When Ms. Perry, a Black woman, reported a credible death threat from a white male reporter—corroborated by a witness—NYSAC handled it as a minor internal HR matter resulting only in a letter to the reporter's employer. In stark contrast, when Executive Director Sumbler, a white woman, made an unwitnessed and vague complaint against Jean Seme, a Black man, NYSAC and DOS officials immediately initiated a criminal investigation involving the New York State Police, criminal background checks, and repeated visits to the accused's home.

188.    Disparate Treatment in Discipline: NYSAC engaged in disparate treatment in its application of disciplinary standards based on race. On the same night Ms. Perry was allegedly in breach of protocol, Deputy Commissioner Edward Kunkle, a white male, failed to perform his supervisory duties. Despite acknowledged failures of duty and documentation, NYSAC never disciplined Mr. Kunkle. Meanwhile, Ms. Perry—who received a stellar performance review that night—was terminated.

189.     Retaliatory Termination with Discriminatory Motive: Ms. Perry's termination was both retaliatory and infected with racial discrimination, as evidenced by the disparate treatment described above and the selective enforcement of ethics rules based on race.

190.     As a direct result of this unlawful discrimination, Ms. Perry suffered loss of employment, lost income, lost benefits, damage to her professional reputation, and severe emotional distress.

## COUNT II: Title VII - Employment Discrimination Based on Sex (Against Defendant NYSAC)

191.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

192.     Defendant NYSAC, through its agents and supervisors, discriminated against Ms. Perry in the terms and conditions of her employment based on her sex, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.

193.     Sexual Harassment: Ms. Perry was subjected to severe and unwelcome sexual harassment by Acting Executive Director Anthony Giardina. Giardina approached her and reached out his arms toward her and asked her for a hug. The advance was unsolicited and unwelcome. Ms. Perry immediately backed away and told him "I do not do that." Giardina later admitted under oath that he saw Ms. Perry was "clearly offended and felt harassed" by his conduct.

194.     Hostile Work Environment Based on Sex: Ms. Perry was subjected to a hostile work environment based on her sex, including being called gender-based slurs ("cunt") by supervisors, creating a severe and pervasive hostile work environment.

195.     Witness Retaliation: When Inspector Jean Seme witnessed Giardina's sexual harassment of Ms. Perry, Giardina immediately terminated Seme on the spot, eliminating the sole witness to his sexual misconduct.

196.     As a direct result of this unlawful sex discrimination and sexual harassment, Ms. Perry suffered severe emotional distress, humiliation, and a hostile work environment that made it difficult to perform her duties and contributed to her ultimate termination.

## COUNT III: Title VII - Retaliation (Against Defendant NYSAC)

197.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

198.     Ms. Perry engaged in protected activity under Title VII by complaining about race and sex discrimination, including filing complaints with DHR, reporting discrimination internally to NYSAC management and Maria Herman, and filing a complaint with the NYS Inspector General.

199.　　In direct response to Ms. Perry's protected activity, NYSAC terminated her employment on April 25, 2018—just 19 days after her Inspector General complaint was unmasked and 3 days after she reported a death threat.

200.　　The temporal proximity between Ms. Perry's protected activity and her termination, combined with the pretextual nature of the stated reason for termination, establishes a causal connection between her protected activity and the adverse employment action.

201.　　As a direct result of this unlawful retaliation, Ms. Perry lost her livelihood and suffered severe financial and emotional distress.

## COUNT IV: 42 U.S.C. § 1981 - Race Discrimination (Against Defendants James Leary, Kimberly Sumbler, and Anthony Giardina in their personal capacities)

202.　　Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

203.　　Defendants James Leary, Kimberly Sumbler, and Anthony Giardina, acting under color of state law, violated Ms. Perry's right to make and enforce contracts without respect to race, in violation of 42 U.S.C. § 1981.

204.　　These defendants subjected Ms. Perry to a racially hostile work environment, denied her promotion based on race, applied disciplinary standards differently based on race, and terminated her employment in retaliation for opposing racial discrimination.

205.　　As a direct and proximate result of these violations, Ms. Perry suffered loss of employment, economic damages, and severe emotional distress.

## COUNT V: 42 U.S.C. § 1983 - Violation of Equal Protection Clause (Fourteenth Amendment) - Race and Sex Discrimination (Against Defendants James Leary, Kimberly Sumbler, Anthony Giardina, and Linda Baldwin in their personal capacities)

206.　　Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

207.　　The Fourteenth Amendment to the United States Constitution guarantees all persons the equal protection of the laws. This guarantee prohibits state actors from discriminating against individuals on the basis of race or sex.

208.　　Defendants James Leary, Kimberly Sumbler, Anthony Giardina, and Linda Baldwin, acting under color of state law, intentionally discriminated against Ms. Perry on the basis of her race (Black/African American) and her sex (female) by:

36

209.    (a) Selectively enforcing ethics rules to restrict her economic opportunities while permitting white employees at all levels to pursue industry positions without consequence;

210.    (b) Terminating her based on a pretextual "breach of protocol" charge while not disciplining a white male supervisor with greater responsibility for the same incident;

211.    (c) Denying her promotional opportunities based on her race and sex, and her advocacy against discrimination;

212.    (d) Sexually harassing her and creating a hostile work environment based on both race and sex;

213.    (e) Treating workplace violence complaints differently based on the race of the complainant and the accused, subjecting Black male employees to full criminal investigations based on meritless complaints while dismissing credible, witnessed complaints by Black women against white men;

214.    (f) Creating and maintaining a hostile work environment in which she was subjected to racial slurs and gender-based slurs and discriminatory treatment;

215.    (g) Retaliating against her for opposing racial and sexual discrimination by manufacturing pretexts for her termination.

216.    Defendants' discriminatory conduct was intentional, was motivated by racial and sexual animus, and was designed to deny Ms. Perry equal treatment under the law.

217.    MUNICIPAL LIABILITY UNDER MONELL: Defendants DOS, NYSAC, and DHR are liable under Monell v. Department of Social Services, 436 U.S. 658 (1978), for violations committed pursuant to official policy, custom, or practice. Plaintiff establishes municipal liability through three independent theories:

(a) FINAL POLICYMAKER LIABILITY: The discriminatory and retaliatory conduct was carried out by officials with final policymaking authority. James Leary possessed de facto final decision-making authority over NYSAC employment matters during the relevant period as Deputy Secretary of State and designated assistant to Executive Deputy Secretary Brendan Fitzgerald during his terminal illness. Mr. Leary testified that he was specifically assigned to work closely with Mr. Fitzgerald to "assist with the day-to-day functions and paperwork" and to "take over his duties if his health declined." In his capacity as Mr. Fitzgerald's designated assistant and effective replacement during Mr. Fitzgerald's illness, Mr. Leary exercised final authority over NYSAC operations and employment decisions. His decisions were not subject to meaningful review by any higher authority. Lilliana Estrella-Castillo possessed final, unreviewable policymaking authority over DHR case assignments and hearing management as Chief Administrative Law Judge. Their decisions constituted official policy.

37

(b) PERSISTENT AND WIDESPREAD CUSTOM: Even absent formal policy, the discriminatory practices alleged constitute a persistent and widespread custom of DOS, NYSAC, and DHR. The pattern spans over a decade (2014-2025), involves multiple officials at all levels, and demonstrates deliberate indifference to constitutional rights. The custom includes: selective enforcement of ethics rules based on race; dismissal of discrimination complaints by Black employees while pursuing meritless complaints against Black employees; obstruction of administrative remedies through procedural manipulation; and systematic witness intimidation. This custom is so permanent and well-settled as to constitute a custom or usage with the force of law.

(c) DELIBERATE INDIFFERENCE: Policymakers at DOS, NYSAC, and DHR had actual or constructive knowledge of the constitutional violations and demonstrated deliberate indifference by failing to train, supervise, or discipline officials, and by actively participating in the cover-up. High-ranking officials including Baldwin (DOS General Counsel), Leary (Deputy Secretary of State), and Estrella-Castillo (Chief ALJ) were directly involved in or had knowledge of the violations and took no corrective action, instead actively obstructing remedies.

Under any of these three theories, the institutional defendants are liable for the constitutional violations committed by their officials and pursuant to their policies and customs.

218.    As a direct and proximate result of Defendants' violations of the Equal Protection Clause, Ms. Perry has suffered and continues to suffer severe harm, including loss of employment, economic damages, emotional distress, and violation of her constitutional rights.

**COUNT VI: 42 U.S.C. § 1983 - Violation of First Amendment - Retaliation for Protected Speech (Against Defendants in their personal capacities)**

219.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

220.    The First Amendment to the United States Constitution protects the right to freedom of speech, including the right to petition the government for redress of grievances and to report government misconduct without retaliation.

221.    Ms. Perry engaged in protected speech by: (a) Filing complaints with NYSAC's EEO office regarding discrimination and sexual harassment; (b) Reporting hostile work environment to NYSAC officials; (c) Filing a confidential complaint with the New York State Inspector General alleging that Maria Herman had corrupted the EEO process; (d) Reporting workplace violence and death threats; (e) Seeking redress through the Lieutenant Governor's office; (f) Filing administrative complaints with DHR and DOL; and (g) Filing this federal lawsuit.

222. Defendants retaliated against Ms. Perry for her protected speech by: (a) Terminating her employment just 19 days after her Inspector General complaint was unmasked and 3 days after she reported the death threat; (b) Manufacturing a pretextual "breach of protocol" charge to justify her termination; (c) Terminating witnesses who supported her claims (Seme, Signorile, Ward); (d) Obstructing her administrative proceedings through fraudulent manipulation of the DHR process; (e) Refusing to process her new EEOC complaint after she filed this federal lawsuit; (f) Disclosing her confidential medical information in retaliation for her persistence in pursuing her claims; and (g) Allowing the reporter who threatened her to continue working with NYSAC to maintain a hostile and intimidating environment.

223. Ms. Perry's speech addressed matters of public concern, including government corruption, discrimination in state agencies, violations of ethics laws, and sexual harassment.

224. Defendants' retaliatory actions were motivated by Ms. Perry's protected speech, were taken in direct response to that speech, and would deter a person of ordinary firmness from continuing to engage in protected activity.

225. As a direct and proximate result of Defendants' retaliation, Ms. Perry has suffered and continues to suffer severe harm, including loss of employment, economic damages, emotional distress, and chilling of her First Amendment rights.

**COUNT VII: 42 U.S.C. § 1983 - Conspiracy to Violate Civil Rights and Deny Access to Courts (Against Defendants James Leary, Linda Baldwin, and Lilliana Estrella-Castillo in their personal capacities)**

226. Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

227. **Nature of the Constitutional Violations.** This claim addresses two interrelated constitutional violations committed through conspiracy: (1) the deprivation of Plaintiff's civil rights through racially discriminatory conduct and retaliation, and (2) the systematic denial of meaningful access to remedies for those violations. This claim does not seek to appeal or overturn the substantive outcome of the DHR administrative proceeding. Rather, Plaintiff seeks damages for a conspiracy between state officials acting under color of law to violate her civil rights, deny her meaningful access to remedies for those violations, and perpetuate the deprivation of her constitutionally protected property interest in employment.

**A. The Property Interest and Initial Deprivation**

228. Plaintiff had a constitutionally protected property interest in her continued employment with NYSAC, established under New York Civil Service Law § 75 and her

status as a competitive-class civil servant with fourteen years of service and consistently positive performance evaluations.

229.    Defendants NYSAC and DOS unlawfully deprived Plaintiff of this property interest through discriminatory and retaliatory termination in April 2018. The termination was motivated by racial and sexual animus and was in direct retaliation for Plaintiff's protected activity, including her March 15, 2018 Inspector General complaint that exposed corruption in the EEO process.

230.    The Defendants' termination of Plaintiff without providing the required notice of charges, statement of reasons, or pre- or post-termination hearing—the very hallmarks of a for-cause proceeding under Civil Service Law § 75—constitutes a unilateral and arbitrary deprivation of this protected property interest, in and of itself a violation of the Due Process Clause.

## B. The Right of Access to Courts

231.    Plaintiff also possesses a fundamental constitutional right of access to the courts and administrative remedies to vindicate her civil rights. This right is protected by the First Amendment's Petition Clause and the Due Process Clause of the Fourteenth Amendment.

232.    The right of access to courts encompasses not merely the theoretical availability of a forum, but meaningful access to a fair and impartial adjudicatory process. When state officials conspire to corrupt administrative proceedings, intimidate witnesses, and coordinate across multiple agencies to deny a complainant any forum for relief, they violate this fundamental right.

## C. The Conspiracy Between State Officials

233.    Defendants James Leary and Linda Baldwin (of DOS) and Lilliana Estrella-Castillo (of DHR), acting pursuant to an express or tacit agreement, engaged in a conspiracy under color of state law to: (a) Deprive Plaintiff of her constitutional rights through racial and sexual discrimination and retaliation; (b) Deny Plaintiff meaningful access to administrative and judicial remedies for civil rights violations; (c) Perpetuate and ratify the deprivation of her property interest in employment; and (d) Shield DOS and NYSAC from accountability for the underlying constitutional violations.

### Evidence of the Conspiracy

234.    **The Agreement to Discriminate and Retaliate.** The conspirators agreed, explicitly or tacitly, to discriminate against Perry and other Black employees by selectively enforcing ethics rules to restrict their economic opportunities while permitting white employees to pursue industry positions freely, and to retaliate against Perry for opposing this discrimination.

235.    This agreement is proven by the coordinated sequence of events in 2014-2015: Perry applies for boxing judge license → denial accompanied by Baldwin's fabricated "two-year ban" opinion despite acknowledging Perry was paid on a per diem basis → Perry complains to NYSAC about the discriminatory denial → Herman quickly closes Perry's complaint → Leary sends threatening letter citing different (and equally inapplicable) law → Perry challenges Leary → Leary forced to retract and admit "no incompatibility." This coordination proves Baldwin, Herman, and Leary were working together to restrict Perry's opportunities through fabricated legal claims while denying her any internal remedy.

236.    **Direct Coordination and Monitoring.** DOS officials actively monitored and coordinated responses to Plaintiff's complaints across multiple agencies and proceedings. On June 7, 2018—just weeks after Plaintiff's termination and her filing of the Inspector General complaint—DOS General Counsel Linda M. Baldwin sent an internal email to DOS official James Leary with the subject line "Do you have time to talk for a few minutes?" The body of the email stated: "I received a call from Ken Michaels this morning -- re Dorothea Perry's emails."

237.    This communication, involving DOS's highest-ranking legal officer and the official with final authority over NYSAC employment decisions, demonstrates that DOS was actively tracking and coordinating agency responses to Plaintiff's attempts to seek redress. The reference to communications with the Inspector General's office regarding "Dorothea Perry's emails" shows that DOS was receiving intelligence about Plaintiff's advocacy efforts and formulating coordinated responses.

238.    **Strategic Interference in DHR Proceedings.** DOS counsel Linda Baldwin personally appeared at the initial DHR hearing on August 16, 2021, despite not being the attorney of record. Her unexpected appearance immediately resulted in the presiding ALJ's recusal due to a conflict of interest stemming from Ms. Baldwin's relationship with the judge's wife through service on the same non-profit board. This deliberate disruption at the outset of the proceedings served to: (a) Signal DOS's direct involvement and monitoring of the DHR process; (b) Create delay and procedural complications; and (c) Establish a pattern of interference that would continue throughout the proceedings.

239.    **Fraudulent Manipulation of the Administrative Process.** After Ms. Perry presented her entire case-in-chief before ALJ Martin Erazo Jr., DHR issued an official letter on June 21, 2023, signed by Chief Administrative Law Judge Lilliana Estrella-Castillo, falsely claiming that ALJ Erazo was retiring and reassigning the case to ALJ Sharon A. Sorkin. Public records conclusively prove this statement was false: (a) In October 2023, months after his alleged retirement, ALJ Erazo was assigned to preside over Rivera v. Monroe Community Hospital; (b) ALJ Erazo continued to author and issue final orders throughout 2024, including Mongrel v. 200 Bassett Road Operating Co. on

July 11, 2024, and Cooper v. Tops Markets, LLC on December 18, 2024; (c) State payroll records show ALJ Erazo continued receiving salary as an active employee of the State of New York throughout 2024.

240.    Administrative reassignments must be based on legitimate administrative reasons, not to predetermine case outcomes. The demonstrably false claim of retirement, followed by immediate reassignment to a judge who never observed Plaintiff's witnesses, constitutes fraudulent manipulation designed to ensure a predetermined result.

241.    This deceit created a structurally unfair hearing. ALJ Sorkin, who wrote the final recommendation on June 13, 2024, only heard the Defendants' case-in-chief live. She never personally observed Ms. Perry or her key corroborating witnesses, including Tom Hoover (former NYSAC Chairman), Commissioner John Signorile (who testified about Baldwin's threatening call and his subsequent termination), Deputy Commissioner George Ward (35-year veteran who corroborated the use of racial slurs against Perry), and Dr. Browne (ringside physician who witnessed Perry's performance on the night of the April 21, 2018 incident and could corroborate the death threat). ALJ Sorkin was forced to rely on a cold transcript for all of Plaintiff's evidence.

242.    **Inter-Agency Coordination to Deny Alternative Remedies.** The conspiracy extended beyond DHR to other state agencies. Concurrently with the DHR proceeding, Ms. Perry sought relief through the New York State Department of Labor (DOL). By letter decision dated March 8, 2022, the DOL substantiated her complaint and determined NYSAC's reason for terminating Perry "was not credible." This was a strong, unequivocal finding by the DOL's Special Counsel for Worker Protection, James Rogers, who later testified during the DHR hearing on February 24, 2023, that this case was "the single worst case of discrimination retaliation I had seen in all the years I had been enforcing labor laws."

243.    After Plaintiff disclosed this favorable DOL finding at the DHR hearing in May 2022, the DOL abruptly and inexplicably reversed its favorable finding on May 13, 2022, changing "was not credible" to "may have been pretextual." This change was not based on any new evidence. The timing—immediately after Perry used the finding at the DHR hearing—proves that the revision was made in response to Perry's use of the finding against the state defendants.

244.    Upon information and belief, DOS, NYSAC, or officials at DHR contacted DOL after learning that Perry had disclosed the favorable finding and coordinated with DOL to revise the language to be less damaging to the state's position. It was only after Ms. Perry was forced to file a state court action (Index No. 152543/2022) to challenge this improper withdrawal that the DOL reinvestigated and again found in her favor. NYSAC then appealed this second favorable decision to the Industrial Board. Despite full briefing being completed in May 2024, no decision has been issued as of the date of this filing.

This delay of nearly a year in a case where both parties are represented by state agencies—with no complexity requiring extended deliberation—further evidences coordinated intervention to prevent any state forum from issuing a final determination favorable to Ms. Perry.

245.    **Systematic Witness Intimidation.** DOS and NYSAC engaged in a systematic campaign to intimidate and punish any witnesses who supported Ms. Perry, furthering the conspiracy's goals:

(a) Inspector Jean Seme, who witnessed Acting Executive Director Giardina's sexual harassment of Ms. Perry in March 2017, was fired the same night by Giardina, eliminating the sole witness to his misconduct. Within days, Brendan Fitzgerald initiated a criminal complaint against Seme with the New York State Police based on an unwitnessed, uncorroborated complaint from Kim Sumbler. Despite the Manhattan District Attorney declining to prosecute due to insufficient evidence, the investigation was so severe that Seme came to fear living in New York State;

(b) Former Commissioner John Signorile began investigating Ms. Perry's termination in April 2018. According to his sworn testimony from the November 10, 2022 DHR hearing, in May 2018, shortly after he began investigating, he received a phone call from Defendant Linda Baldwin. Baldwin told Signorile: "the governor's office would like you to stand clear of what's going on" regarding the situation with Miss Perry. This was an unmistakable threat invoking the Governor's office to intimidate a Commissioner from investigating a wrongful termination. In June 2018, shortly after Baldwin's threatening call, DOS terminated Commissioner John Signorile;

(c) Deputy Commissioner George Ward, a 35-year veteran, provided consistent, corroborating testimony supporting Ms. Perry's claims across multiple proceedings over a three-year period (October 12, 2021 federal deposition; November 10, 2022 DHR hearing; December 22, 2023 Industrial Board hearing). Ward testified that Frank Vasquez, another deputy commissioner, called Plaintiff "a nigger" and a "cunt." For three years, Ward testified in Perry's favor without facing consequences. However, in February 2025—just one month after Perry filed this federal lawsuit on January 31, 2025—DOS terminated George Ward's employment after 35 years of service. The timing proves retaliation: Ward testified three times over three years without consequences, but within one month of Perry filing a federal lawsuit that made Ward's testimony part of a new public record and put Defendants on notice they would face federal liability, Ward was fired.

246.    The timing of Ward's termination raises strong inference of retaliation. Ward testified three times over three years (October 2021, November 2022, December 2023) without facing consequences. Yet within one month of Perry filing this federal lawsuit on January 31, 2025, DOS terminated Ward after 35 years of service. This suspicious timing suggests that either: (1) Defendants were aware of the federal filing and terminated Ward in retaliation, or (2) Defendants had strategically delayed any retaliation to avoid obvious

temporal proximity to Ward's individual testimonies, but the accumulation of his consistent support for Perry across multiple forums ultimately triggered the termination. Under either interpretation, Ward's February 2025 termination constitutes ongoing witness intimidation and retaliation that extends the conspiracy into 2025, well within the statute of limitations and proving the continuing violation.

## D. Denial of Meaningful Access to Courts

247.        The conspiracy had both the purpose and effect of denying Ms. Perry her constitutional right to meaningful access to courts and administrative processes.

248.        **Financial Exhaustion Strategy.** Plaintiff retained counsel on a contingency fee basis for the DHR proceeding because she lacked funds to pay hourly fees. Her attorney devoted years to the case without compensation, as contingency arrangements provide payment only upon a favorable outcome. The conspiracy's success in ensuring an adverse DHR outcome meant Plaintiff's attorney received no payment for years of work. Having worked years without compensation, Plaintiff's attorney could not afford to continue representing her in an Article 78 appeal.

249.        Plaintiff then sought new counsel but was advised by multiple attorneys that an Article 78 appeal would require $15,000 to $40,000 in upfront fees, and no attorney would accept the case on a contingency basis for state court review of an administrative decision. This created a deliberate structural barrier: the conspiracy's manipulation of the DHR process ensured both that Plaintiff lost (preventing her attorney from being paid) and that the adverse outcome made Article 78 financially impossible to pursue, thereby insulating the fraudulent DHR decision from any meaningful review.

250.        The fact that Plaintiff's experienced civil rights attorney, who had devoted years to this case, could not afford to continue after receiving no compensation for that work demonstrates the substantive—not merely theoretical—barrier to Article 78 review. Attorneys routinely accept civil rights cases on contingency when they believe the claims are meritorious. The inability of even committed counsel to continue after years of unpaid work, combined with the refusal of other attorneys to accept an Article 78 appeal on contingency, evidences both the financial impossibility of pursuing that remedy and the deliberate success of Defendants' strategy to make meaningful review financially unattainable.

251.        **Article 78 Inadequacy.** Moreover, Article 78 review is limited by statute to whether DHR followed its administrative procedures. It cannot address Plaintiff's constitutional claims that state officials conspired to violate her civil rights, cannot award damages for those violations, and cannot provide accountability for the individuals who orchestrated the conspiracy. Article 78 would have kept Plaintiff within the very state system she alleges coordinated against her across multiple agencies. Federal court under

§ 1983 provides the independent forum necessary to adjudicate claims of coordinated state action to deny constitutional rights—precisely what this statute was designed to address.

252.     By corrupting the DHR process through fraud, procedural manipulation, and inter-agency coordination, and by deliberately structuring that process to be financially impossible to challenge, Defendants effectively nullified Ms. Perry's ability to seek redress for the underlying constitutional violations committed by NYSAC and DOS.

253.     The denial of access was complete: the administrative remedy was corrupted from within through Estrella-Castillo's false retirement claim and strategic reassignment; the state court remedy was made financially prohibitive through the conspiracy's success in ensuring an adverse outcome that exhausted counsel's resources; and alternative administrative forums (DOL) were compromised through inter-agency coordination that reversed favorable findings. This left Ms. Perry with no meaningful avenue for vindicating her rights under state law, forcing her to seek federal intervention.

254.     **Ongoing Retaliation and Denial of Access.** Following the public filing of this federal civil rights lawsuit in January 2025, DHR has engaged in retaliatory obstruction of a new, separate discrimination complaint filed by Ms. Perry. On September 30, 2024, EEOC Investigator Michael Woo officially referred a new, separate discrimination complaint to DHR. On November 6, 2024, EEOC CRTIU Supervisor Charles Diamond instructed Plaintiff to "contact the NY State Division of Human Rights after Dec 1st" for an update. Plaintiff complied with this directive. However, from September 2024 through the present date—a period of over thirteen months—DHR has never contacted Plaintiff, provided no case number, issued no acknowledgment, and taken no action whatsoever on the officially referred complaint. This complete failure to act constitutes a definitive refusal to process the complaint.

255.     Upon information and belief, DHR's refusal to process Perry's new complaint was in retaliation for Perry having filed this federal lawsuit and demonstrates the continuing conspiracy. This refusal demonstrates that the conspiracy continues and that its purpose extends beyond merely defeating Ms. Perry's initial claims—it seeks to completely foreclose her access to any forum for vindicating her civil rights, now or in the future.

## E. Perpetuation of the Property Deprivation

256.     The conspiracy's ultimate effect was to perpetuate and ratify the original deprivation of Plaintiff's property interest in her employment. By denying her any meaningful forum to challenge the discriminatory termination, Defendants ensured that the April 2018 constitutional violation would remain unremedied and permanent.

257.     The DHR's adoption of a recommendation that arbitrarily disregarded corroborated testimony—including Deputy Commissioner Ward's confirmation of racial

slurs directed at Ms. Perry and the powerful testimony of James Rogers, the DOL's Special Counsel for Worker Protection, who called this "the single worst case of discrimination retaliation I had seen in all the years I had been enforcing labor laws"— was the intended culmination of this conspiracy, providing a false imprimatur of legitimacy to the underlying discrimination while foreclosing all avenues of relief and any possibility of monetary recovery or reinstatement.

**Municipal Liability Under Monell**

258.    **Defendant DOS:** The conspiracy was carried out by and with the knowledge and approval of James Leary, who possessed final, unreviewable policymaking authority over significant employment decisions at both NYSAC and DOS, including terminations. At the time of Plaintiff's termination in April 2018, James Leary served as Deputy Secretary of State and exercised de facto final decision-making authority over NYSAC employment matters. Executive Deputy Secretary of State Brendan Fitzgerald was battling colon cancer and undergoing treatment. Mr. Leary testified that he was specifically assigned to work closely with Mr. Fitzgerald to "assist with the day-to-day functions and paperwork" and to "take over his duties if his health declined." In his capacity as Mr. Fitzgerald's designated assistant and effective replacement during Mr. Fitzgerald's illness, Mr. Leary exercised final authority over NYSAC operations and employment decisions. Mr. Fitzgerald passed away on November 14, 2018, seven months after Plaintiff's termination. Whether the formal decision-maker was Mr. Leary or Mr. Fitzgerald, Mr. Leary possessed final policymaking authority in practice over NYSAC employment matters during the relevant period. His decisions were not subject to meaningful review by any higher authority. Mr. Leary's coordination with DOS General Counsel Linda Baldwin in monitoring Ms. Perry's case, his authorization of witness intimidation through terminations, and his ultimate decision-making authority over Ms. Perry's termination constitute the official policy of Defendant DOS. These actions were the moving force behind the violations of Plaintiff's constitutional rights.

259.    **Defendant DHR:** The fraudulent manipulation of the administrative process was carried out by Chief Administrative Law Judge Lilliana Estrella-Castillo, who possessed final, unreviewable policymaking authority over case assignments and the management of administrative hearings at DHR. Ms. Estrella-Castillo's decision to issue a demonstrably false statement regarding ALJ Erazo's retirement and to reassign the case based on this false pretense constituted the official policy of Defendant DHR with respect to Plaintiff's case and was the moving force behind the denial of her right to meaningful access to an impartial adjudicatory process.

260.    Alternatively, even if the Court finds Mr. Leary and Ms. Estrella-Castillo did not possess final policymaking authority, the discriminatory and retaliatory conduct alleged reflects an official policy or widespread custom of DOS and DHR. The pattern of conduct

46

was sufficiently persistent and widespread to constitute an official custom for which the entities are liable.

**Damages**

261.    As a direct and proximate result of Defendants' conspiracy, Plaintiff has suffered: (a) Denial of meaningful access to state remedies for civil rights violations; (b) Continued deprivation of her constitutionally protected property interest in employment without any opportunity for redress; (c) Severe and ongoing emotional distress from being subjected to years of fraudulent administrative proceedings designed to exhaust her resources and deny her justice; (d) Out-of-pocket expenses, including legal fees and costs paid to initiate and pursue the corrupted DHR proceeding; (e) Loss of the potential recovery, including back pay, reinstatement, compensatory damages, and other relief that would have been available had the DHR process been fair and impartial, which Plaintiff was forced to pursue through contingency representation due to financial constraints deliberately exploited by Defendants' conspiracy; and (f) Ongoing harm from DHR's retaliatory refusal to process subsequent complaints, which continues to deprive her of access to administrative remedies for ongoing discrimination.

**COUNT VIII: 42 U.S.C. § 1983 - Deprivation of Property Without Due Process (Against All Defendants)**

262.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs as if fully set forth herein.

263.    Ms. Perry had a constitutionally protected property interest in her continued employment with NYSAC. As a per diem inspector employed for 14 years with consistently positive performance reviews and no history of disciplinary issues, she had a legitimate claim of entitlement to continued employment that could only be terminated for cause after notice and hearing as required by New York Civil Service Law § 75.

264.    Defendants deprived Ms. Perry of this property interest without due process by: (a) Terminating her employment without providing prior written notice of charges; (b) Failing to provide any statement of reasons for her termination; (c) Denying her any pre-termination or post-termination hearing as required by law; (d) Terminating her based on a manufactured pretext rather than for legitimate cause; and (e) Bypassing the procedural protections of Civil Service Law § 75 entirely.

265.    The complete denial of any process demonstrates that Defendants knew their termination decision could not withstand scrutiny in a fair hearing and that the actual reason for termination—retaliation for protected activity and racial and sexual discrimination—was unlawful.

266.    As a direct and proximate result of Defendants' deprivation of her property interest without due process, Ms. Perry has suffered loss of employment, economic damages, and violation of her constitutional rights.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Dorothea Perry respectfully requests that this Court enter judgment in her favor and grant the following relief:

A. A declaration that Defendants' actions violated Ms. Perry's rights under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the First and Fourteenth Amendments to the United States Constitution;

B. Injunctive relief requiring Defendants to implement reforms to prevent future discrimination, sexual harassment, retaliation, and obstruction of civil rights complaints, including prospective relief ordering proper processing of discrimination complaints and fair administrative hearings at DHR through Defendant Estrella-Castillo in her official capacity;

C. An order reinstating Ms. Perry to her former position or a comparable position with full seniority and benefits;

D. An award of compensatory damages for all economic losses, including:

- Back pay from April 25, 2018 to the date of judgment

- Lost benefits, pension contributions, and other compensation

- Front pay for future lost earnings

- Out-of-pocket expenses including legal costs

- Loss of potential recovery from the DHR proceeding

- All other economic damages

E. An award of compensatory damages for non-economic harm, including:

- Emotional distress and mental anguish

- Humiliation and damage to reputation

- Loss of professional opportunities

- Invasion of privacy

- Fear and anxiety caused by sexual harassment, death threats, ongoing threats and hostile environment

- All other non-economic damages

F. An award of punitive damages against individual Defendants to punish their willful, malicious, and reckless conduct and to deter similar conduct in the future;

G. Pre-judgment and post-judgment interest on all monetary awards;

H. An award of reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and Title VII;

I. Such other and further relief as the Court deems just and proper.

Such other and further relief as the Court deems just and proper.

**Jury Trial Demand**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ Dorothea Perry
Dorothea Perry, Pro Se Plaintiff
74 Tapscott Street
Brooklyn, NY 11212
Tel: 917.328.3442
Email: Dorothea.Perry@verizon.net
Dated: November 14, 2025