# EXHIBIT D

**Alex Hippolyte**
Supervising Safety and Health Inspector
Department of Labor
Public Employee Safety & Health Bureau (PESH)
New York City District Office
75 Varick Street, 7ᵗʰ Fl., NY, NY 10013
Phone: (212) 775-3548    Fax: (212) 775-3542

State of New York

JUN 2 8 2018

Department of State
Secretary of State

www.labor.ny.gov

---

Employer Notification Letter
June 20, 2018

Commissioner Ndidi Massay
New York State Athletic Commission
123 William Street, 2ⁿᵈ Floor
New York, NY 10038

CERTIFIED MAIL 7015 3010 0000 2602 6687
RETURN RECEIPT REQUESTED 9590 9402 1420 5329 0780 94
First Class Mail

Re: Perry vs. NYS Athletic Commission
     Case Number: 30041867

The New York State Department of Labor hereby serves you notice that a complaint has been filed by Dorothea Perry with the Public Employee Safety and Health Bureau, alleging a violation of section 27-a.10 of the New York State Labor Law.

A copy of the complaint is enclosed.

We would appreciate receiving from you promptly a full and complete written account of the facts and a statement of your position in response to the complainant's allegation that you have discriminated against Dorothea Perry in violation of the Act. Please note that PESH will disclose to the parties in this case any information relevant to the resolution of the case, because evidence submitted by the parties must be tested and the opposing party provided the opportunity to fully respond. If information provided contains personal, identifiable information about individuals other than Complainant, such information, where appropriate, will be redacted before disclosure.

Please note that a full and complete initial response, supported by appropriate documentation, may serve to help achieve early resolution of this matter. Voluntary adjustment of meritorious complaints can be effected by way of a settlement agreement at any time.

This case has been assigned to Varghese Mathew, Senior Safety and Health Inspector. Please address all correspondence and communications regarding this investigation to the assigned investigator.

Varghese Mathew
75 Varick Street, 7ᵗʰ Floor
New York, NY 10013
212-775-3541
Varghese.mathew@labor.ny.gov

Attention is called to your right and the right of any other party to be represented by counsel or other representative in this matter. In the event you choose to have a representative appear on your behalf, please have your representative complete the Designation of Representative form enclosed and forward it promptly.

In order to expedite our investigation, we request that you submit your written response within <u>ten working days</u> of receipt of this letter. Failure to respond to all requests by the investigator within the given periods will be deemed "no response" on the part of management and our investigation will proceed without a position from you or your representative.

Sincerely,

Alex Hippolyte
Supervising Safety & Health Inspector

Enclosures:

Copy of Complaint (Intake)
Designation of Representative (Blank copy)


cc      Discrimination Program Manager
        Counsel's Office
        Varghese Mathew

**NYS DEPARTMENT OF LABOR**

**PUBLIC EMPLOYEE SAFETY AND HEALTH**

**DESIGNATION OF REPRESENTATIVE**

| |
|---|
| Case Name: Perry vs. NYS Athletic Commission<br><br>Case Number: 30041687 |

TO:

| |
|---|
| Senior Safety and Health Inspector Varghese Mathew<br>NYS Department of Labor – PESH<br>75 Varick Street, 7th Floor<br>New York, NY 10013 |

The undersigned hereby enters his appearance as representative of:

_____

In the above captioned matter:

| | Representative's Address and ZIP Code |
|---|---|
| _____<br>Signature of Representative<br><br>_____<br>Type or Print Name<br><br>_____<br>Title<br><br>_____<br>Date | <br><br><br><br><br>_____<br>Area Code     Telephone Number<br><br>E-mail address: _____ |

## PESH Discrimination Complaint Intake Form

| Name of Person Taking Complaint<br>Varghese Mathew | | | | Date Received | | Time Received |
|---|---|---|---|---|---|---|
| Related Inspection Number, if appropriate | | | | Date of Filing | | |

### Complainant Information

| Full name- | Last<br>Perry | First<br>Dorothea | Middle<br>R | | | |
|---|---|---|---|---|---|---|
| Address<br>74 Tapscott Street | | | | | | |
| City<br>Brooklyn | | | State<br>New York | | | Zip<br>11212 |
| Home Phone Number<br>917.328.3442 | | | E-mail<br>MsDorothea.Perry@gmail.com | | | |
| Work Phone Number<br>718.403.8147 | | | | | | |
| Additional Phone Number<br>917.455.6271 | | | | | | |

Summary of the alleged retaliation (protected activity, respondent knowledge, adverse action, n

As a matter of history:  On Nov. 2, 2013 during a 10-round fight Magomed Abdusalamov fought Mike Perez in a heavyweight championship bout at Madison Square Garden.  He suffered a major brain injury as a result and an Inspector General investigation concluded that NYSAC's post-fight care regimen was largely at fault. On Friday, September 8, 2017, New York State agreed to pay Abdusalamov and his family $22 million for negligence by the New York State Athletic Commission (inclusive of NYSAC employees and representatives) in connection with that fight.  As a result of the IG's investigation NYSAC has since changed its post-fight care regimen to include more stringent medical exams between rounds, an immediate post-fight exam at ringside, and a mandatory more extensive post-fight triage in the Commission area immediately after the fight.

On April 21st I was assigned to work at the Barclays Center on the Adrien Broner vs. Jesse Vargas card.  I arrived at the assigned time, 2:30 pm.  At the team meeting Ms. Kim Sumbler advised the inspectors, deputies and other staff in attendance that security would be tight (as a result of the Conor McGregor incident in Brooklyn on April 6th).  We were told that at least 50 police (some with dogs) and additional Barclays Center security would be in attendance and that we were not security.  Barclays Center Security would keep the halls clear, only people with credentials would be allowed in the secured areas and locker rooms.  We would only be charged with doing our jobs.  I had two assignments that evening one of which was to work with Mr. Gervonta Davis, an elite fighter, who was scheduled to be the first televised fight on Showtime.  I was sent to Mr. Davis' room when he arrived, at approximately 7:45 or so. At some point before Mr. Davis had given his pre-fight urine, I was surprised when an entourage of young men arrived was allowed into the dressing room. The media room had been converted into a dressing room for Mr. Davis, half for him and half for some of the undercard. Gervonta's room had a Barclays security guard stationed at the door.  I walked out to the Barclay's security officer and asked him why he was letting people in the room.  I told all the men to leave the room, especially those with drinks. I told them "NO DRINKS" were allowed in the locker rooms and that "they were not allowed in the locker room". There were at least ten of them.  The men were mannerable, those with drinks left, but a few remained, but they were not on the list of people authorized to be in the locker room. The one that appeared to be leading the group introduced himself to me. I did not know who he was.  Two weeks later I learned that it was the rapper named Casonova.  When I took Mr. Davis to the locker room for his pre-fight urine and

medical exam, I had another inspector take Mr. Davis into the bathroom for the collection. While Mr. Davis was out of earshot I spoke to Deputy Commissioner George Ward loud enough for other Commission personnel to hear, and advised him that there were many people in Mr. Davis' locker room that were not on the list and that Barclays Security let them in. I asked DC Ward to give me 3 – 4 minutes head start when I left the Commission room then to send in back up to help me clear Gervonta's dressing room because Barclays security weren't doing their job. Exactly as I requested NYSAC staff came to Gervonta's dressing room. It was Ms. Sumbler along with DC Kunkle. She spoke directly to Mr. Davis who was of the impression that he could have the rapper "Casonova" walk him out. She said to Mr Davis "You and I had this conversation yesterday, no rappers are walking anyone out because of security concerns". DC Kunkle asked me to point out the members on the list who were authorized to be in the room and I did, I pointed out the team and two family members (one in the room, and the personal security guard on the door). Note: There were two guards on the door. A Barclays security guard to the right, and a personal security guard to the left. At some point Mr. Casonova said it was okay, gave Mr. Davis a hug and told him he would be outside cheering for him. He left with his friends. There was no incident. Later, the actor 50 Cent, and at least two of his own security people, came into the room for about 1 minute to wish Gervonta good luck. They promptly left.

Mr. Davis' ring walk was scheduled for 8:55 but he was late, we walked to the ring about 9:00 instead.

At some point during the start of the bout we heard that the building was on locked down because there was a shooting. I looked around when I was on the apron after the first round but didn't see anyone moving to leave, and no other broadcasts had been given so I continued to work. I was very concerned for my safety at that point. After the fight, which Gervonta ended with a 2nd round stoppage of Mr. Jesus Cuellar, I began escorting Mr. Davis from the arena back to the Commission room for this post-fight medical exam per established protocol, accompanied by Inspector Juan Rivera and Doctor Avery Brown and several Barclay Security men. The Barclays security left us at the entrance of the tunnels. As we entered the tunnels leading back to the Commission room we were confronted by Mr. Andrew Roberts (of Swanson Communications). This is not the first time I have seen Mr. Roberts, but I do not know him personally. Customarily Mr. Roberts begins a dialogue with the boxers as they are walked back to the Commission room. This time Mr. Roberts began speaking to me, almost immediately. He began telling me that I am to take the fighter to be interviewed. I told him he was going for a post-fight medical exam. He then told me again that "I was to take the fighter for interviews because Kim Sumbler said it was okay for him to do the interviews first". At the point I looked around for Kim Sumbler. Not seeing her I said "Where's Kim Sumbler? I paused. As he began to talk again I asked him, "Why are you even talking to me? If you want to talk to this kid you're wasting valuable time talk to him". As Mr. Roberts continues talking to me I ask "Where's the doctor?" I looked around for the doctor and realized he is behind someone that was behind me. At that point I heard Doctor Brown clearly yell out "DO NOT STOP FOR INTERVIEWS ... KEEP GOING TO THE COMMISSION ROOM!". I said to Mr. Roberts "We're not stopping". As I approached the door to Commission room I indicated to a dark-skinned, middle aged male, Barclays security officer that I had "the fighter, plus one (meaning Gervonta's representative from his camp)". Mr. Roberts became irate and begins swearing and making threats. When I enter the Commission room I turn to see who is coming through the door and see that the doctor and Mr. Rivera are quite visibly upset. After getting Mr. Davis seated in the triage area with the doctor and the other inspector, Mr. Rivera. We all commented on Robert's behavior, which was erratic, and I say, "he wants to murk me" although he didn't use that word. Roberts said "kill". I say, "No one is gonna murk me". I left the fighter with Dr. Brown and Juan Rivera and went out to the general Commission area where I see Kim

Sumbler and Dr. Nitin Sethi. I explain that "some guy was trying to stop us from bringing the fighter for his physical and he said Kim said it was ok". At that point Kim throws her head back and says, "Oh yeah I did say it was okay". I pause and tell her that she never told us and walk away. At some point I hear Luana Ferreira apologizing to someone saying, "the inspectors are only doing their jobs".

After Mr. Davis' exam (time would be on the inspector report), I asked him to stay in the Commission room to give urine because I believed his locker room would have too many people. He complied and sat on the couch at first with a member of his team. I was surprised to see Mr. Roberts in the room standing near me so I gave him a gracious downward wave of my hand inviting him to speak to Mr. Davis. I do not believe he spoke to Mr. Davis. I let Mr. Davis sit for a while, then he switched positions to watch the next bout (Charlo vs. Centeno) from a chair facing the tv. Mr. Davis comments on how hard Charlo hits. At some point after that fight ends early Charlo comes into the room. Charlo and Davis have a beef so I sit Davis in another chair and stand in front of him to block his view when I see the two of them glaring at each other. Charlo goes in to be triaged and Davis is taken in for his post-fight urine.

After Mr. Davis gave urine (time would be on the inspector report) he is paid out, and leaves for the Commission room for his interviews. As I am doing my paperwork, Mr. Charlo comes out and speaks to me for a couple of minutes. I then leave the room with Inspector Juan Rivera and we follow Mr. Davis back to his dressing room to make sure he is okay and I pick up my papers that I left in his room. When I turned in my paperwork for Mr. Gervonta's bout I told DC Ward about the Mr. Roberts threatening me. At some point while in the Commission room I heard Luana Ferrerria speaking about Mr. Roberts and she mentioned Swanson Communications. That is how I learned of Mr. Roberts affiliation.

Later that evening as I sat ringside watching the Broner fight an inspector, Compuverde, asked me "what was up with the guy stopping the fighters after the fight?" I asked him what he meant and he said, "he told us he had already told you off so we'd better listen to him, and since no one said anything we just did what we were told. We stopped with the fighters at the table so they could interview them. They even changed the way the fighters were exiting the ring to accommodate this".

After the show was over I met with DC Robert Orlando ringside and as we walked back to the Commission room I told him about the guy that threatened to kill me. A female fan overhead the conversation and gasped.

On April 22nd I sent a written report about the incident to Kim Sumbler and Matt Delaglio and the Commissioner (Signorile). The only person that showed any concern was Commissioner Signorile who stated he would look into the matter. On April 23rd he called me to inform me that Kim Sumbler told him I had no witnesses to the incident. I explained that Doctor Brown and Inspector Juan Rivera were with me. At that point fearing the matter was going to swept under the rug I went to the 78th precinct to lodge a complaint. I had the option of pressing charges but did not because I only wanted to make it a matter of record. On April 24th I sent an update about the incident to Kim Sumbler, Matt Delaglio and Commissioner Signorile advising them of my understanding of my rights as it pertains to workplace violence and requesting that the matter not be taken lightly. I submitted a copy of the police complaint ticket (absent the #). I requested that the matter be treated like a similar situation that happened a year before in which Ms. Sumbler alleged that a male black NYSAC inspector had issued a death threat to NYSAC staff and the State police were sent to his home. Let me point out that Ms. Sumbler was not terminated in that case for filing a complaint.

At some point, on April 24th I requested to know who was handling my complaint because no one was communicating with me about it. I wanted to know "who should I keep apprised of the police activity?" Ms. Sumbler responded that the matter was not handled by her, but instead it was being handled by HR. Later that day I did I received a call from the PAA with the police complaint number, and I submitted it to Kim Sumbler, Matthew Delaglio and the Commissioner.

On April 25th at approximately 4:40 pm I received a call from Ms. Debra Meade, Director of HR to "advise me that my services were no longer needed and that as of COB I would no longer be a State employee". I asked her was it in retaliation for the workplace violence complaint that I submitted or was it in retaliation for the IG complaint that I submitted a couple of weeks before. She said she was only the person that makes the phone calls and she was not aware of any of this. I asked her "if she was making such a call, and as the Director of HR, didn't she think it was her duty to know why she was making the call".

I called Matt Delaglio, since he is my direct superior to find out if he was aware of the termination. He said he was not. I asked if he was aware of any problems with my performance that evening. He stated he was only aware of two incidents. I asked which two. He said, "the one you reported in writing, and that there were too many people in Gervonta's room". I told him I reported both incidents. One in writing and one verbally. He said he didn't know what was going on.

On April 26th I called Dr. Brown and also Inspector Rivera to ask them to make a mental note of the events of April 21st. Dr. Brown thought it was odd that I was the second person asking about that incident. When I told him that I had been fired he was shocked and responded, "they fired the best inspector they have?". When I asked him who else inquired about the incident he said Kim text him on Sunday 4/22/18 about it, and he confirmed it did in fact happened. "Why did Kim Sumbler tell Commissioner Signorile on Monday 4/23/18 that I did not have any witnesses if she knew I did?", I asked. I asked Dr. Brown to please save a copy of the text message. He agreed.

Since my termination I have been trying to get access to my employee records, to no avail. Only limited information has been sent to me despite me proving that other document exists e.g. my employee evaluations. I have also requested a public hearing which I believe I am entitled to as a public officer. I sent emails to Commission personnel, e.g. Matt, Kim, Ms. Meade, the Commissioners, Ryan (attorney), James Leary (attorney), my elected representatives, and another attorney Mr. Antonio Milillo. Mr. Milillo has responded twice, very condescendingly, to tell me that I should not CC anyone and Ms. Meade will decide who should get my emails.

I believe the workplace violence complaint was the catalyst for my termination but also another example of discrimination against me because Ms. Sumbler, a white woman, was not terminated when in 2017 she alleged a black male inspector, that was terminated, made a death threat against NYSAC. The STATE took her word for it, but me being a black woman with multiple witnesses and video (which NYSAC now has) following the proper course as recommended by the IG, was terminated under a similar scenario. The termination ties into and supports my previous complaints of discrimination / retaliation that I have submitted internally, to the IG, and to the Department of Human Rights.

I followed the post-fight protocols that the Inspector General recommended despite threats to my own life and should not have been retaliated against for adhering to that protocol. Nor should my employer have taken any adverse action against me for filing a credible complaint to the NYPD. Let me remind you that was also that night someone snuck a gun into the venue and the Barclays was on lock down temporarily.

I also believe that Commissioner Signorile was retaliated against for being the only one to advocate for me as a victim of workplace violence and continuing to investigate the reason for my termination even when he was told to back off. Without even knowing the reason for my termination he went so far as to discredit their "too many people in the room" defense when he discovered a similar situation a week later at a boxing event held at the Amazura. No inspector was terminated for that which demonstrates, in other words, NYSAC's proffered reason, is a phony one to cover up its discriminatory and retaliatory intent. Commissioner Signorile has since been told that he is being replaced as Commissioner pending the NYS Senate confirmation of the new Commissioners.

I still believe the workplace violence incident was the catalyst because it bared too much of a resemblance to the 2017 matter Kim Sumbler was involved, in except that I had multiple witnesses, and video. I learned of NYSAC's internal investigation into the matter a day after receiving my termination letter.

No inspector, in three decades, has been terminated for no reason at all. NYSAC has yet to explain to me why I was terminated.

## Respondent Information

| Name of Employer | Name of Chief Executive Officer | |
|---|---|---|
| New York State Athletic Commission | Kim Sumbler | |
| Address | | |
| 123 William Street | | |
| City | State | Zip |
| New York | NY | 10038 |
| Name of Complainant Supervisor | Name of Contact Person / Phone # | |
| Mathew Delaglio | Kim Sumbler / 212-417-5703 | |
| Phone 1 | E-mail | |
| 212-417-4952 | Kim.Sumbler@dos.ny.gov | |
| Phone 2 | | |
| 212-417-5700 | | |

| Other Contacts<br>Cell phone 732-513-9268<br>Email: Matthew.delaglio@dos.ny.gov | |
|---|---|
| # of employees<br>State Department has more than 1000 employees, NYSAC has more than 50. | Unionized? If yes provide Name of Union and Contact Information<br>No |
| **Signature of Complainant →** | X  _Dorothea R Perry_ |