# EXHIBIT E

**STATE OF NEW YORK**
**INDUSTRIAL BOARD OF APPEALS**

---------------------------------------------------------------------------x

In the Matter of the Petition of:                                    :

NEW YORK STATE ATHLETIC COMMISSION,                                  :

                             Petitioner,                        :          **PETITION FOR REVIEW**

                                                    :      **OF A DETERMINATION**

To Review Under Section 101 of the Labor Law               :     **OF THE COMMISSIONER**

A Determination dated March 8, 2022                              :         **OF LABOR**

                                 -against-                        :

THE COMMISSIONER OF LABOR,                                           :

                            Respondent.                      :

---------------------------------------------------------------------------x

1.      We are attorneys with the law firm of Gleason, Dunn, Walsh & O'Shea, with an address of 40 Beaver Street, Albany, NY 12207, telephone number of 518-432-7511, and fax number of 518-432-5221. A Notice of Appearance Form is attached hereto as **"Exhibit A."**

2.      We are filing this Petition on behalf of Petitioner, the New York State Athletic Commission (hereinafter, "Petitioner" or "NYSAC"), a division of the New York State Department of State (hereinafter, "NYSDOS").

3.      The address for Petitioner is 123 Williams Street, 20th Floor, New York, NY 10038.

4.      On or about June 20, 2018, a former NYSAC employee, Dorothea Perry (hereinafter, "Ms. Perry") filed a PESH Discrimination Complaint against NYSAC. A copy of Ms. Perry's Complaint is attached hereto as **"Exhibit B."**

5.      On or about August 8, 2018, Antonio Milillo, Associate Attorney, NYSDOS, submitted a response to Perry's Complaint, on behalf of NYSAC. A copy of Mr. Milillo's response is attached hereto as **"Exhibit C."**

6. On or about May 17, 2021, we submitted a Designation of Representative Form to PESH. A copy of this Form is attached hereto as **"Exhibit D."**

7. On July 19, 2021, we signed a Tolling Agreement on behalf of NYSDOS with James Rogers, Special Counsel, New York State Department of Labor Counsel's Office, for Roberta Reardon, Commissioner of Labor, providing that any statute of limitations otherwise applicable in this matter was suspended until April 25, 2022. A copy of this Tolling Agreement is attached hereto as **"Exhibit E."**

8. The Tolling Agreement further provided that both the Commission and NYSAC "desire to have a full and compete investigation completed" (*see* Ex. E).

9. However, Mr. Rogers did not conduct a "full and complete" investigation, in that: (a) he did not seek information, documentation or testimony from any witnesses identified by NYSAC or NYDOS; (b) he did not interview any NYSAC or NYSDOS employees with personal knowledge of the facts and circumstances forming the basis for Ms. Perry's termination (including Kim Sumbler and Ed Kunkle); (c) he did not interview anyone who participated in the investigation of Ms. Perry's workplace violence complaint; and (d) he did not interview any NYSAC or NYDOS employees who made the determination to terminate Ms. Perry's employment.

10. Rather, Mr. Rogers interviewed only Ms. Perry and four (4) witnesses identified by Ms. Perry.

11. The witnesses interviewed by Mr. Rogers did not possess personal knowledge regarding: Petitioner's investigation of Ms. Perry's workplace violence complaint; the remedial actions taken by Petitioner as a result of Ms. Perry's workplace violence complaint; or the facts and circumstances leading to Ms. Perry's separation from employment.

2

12.    Based substantially on the beliefs and conclusions of Ms. Perry and her witnesses, Mr. Rogers issued a Determination on March 8, 2022.[1] concluding that NYSAC "discriminated against [Ms. Perry] for filing a workplace violence incident report in violation of section 27-a of the New York State Labor Law." A copy of this Determination, is attached hereto as **"Exhibit F."**

13.    By this Petition, we are appealing the Determination issued by Mr. Rogers, on behalf of NYSAC (*see* Ex. F).

14.    The Determination is unreasonable and/or invalid because:

a.    There is no evidentiary support for Ms. Perry's conclusory allegations that NYSAC retaliated against her for filing a workplace violence incident report, or for any other reason.

b.    NYSAC terminated Ms. Perry's employment because of legitimate business reasons that are not pretextual.

c.    Mr. Rogers failed to conduct a full and complete investigation, and relied on information obtained solely from Ms. Perry and her witnesses.

d.    Mr. Rogers failed to contact NYSAC, NYSDOS or their attorneys, at any time after the tolling agreement was signed, in order to conduct his investigation; and did not seek information or testimony from any witnesses for the defense.

e.    Mr. Rogers failed to conduct a "full and complete" investigation, in that: (a) he did not seek information, documentation or testimony from any witnesses identified by NYSAC or NYDOS; (b) he did not interview any NYSAC or NYSDOS employees with personal knowledge of the facts and circumstances forming the basis for Ms. Perry's termination (including Kim Sumbler and Ed Kunkle); (c) he did not interview anyone who participated in the investigation of Ms. Perry's workplace violence complaint; and (d) he did not interview any NYSAC or NYDOS employees who made the determination to terminate Ms. Perry's employment.

f.    The witnesses interviewed by Mr. Rogers did not possess personal knowledge regarding: Petitioner's investigation of Ms. Perry's workplace violence complaint; the remedial actions taken by Petitioner as a result of Ms. Perry's workplace violence complaint; or the facts and circumstances leading to Ms. Perry's separation from employment.

---

[1] Although the Determination is dated March 8, 2021, the year is an error, as it was received by NYSDOS on March 11, 2022.

3

g. Rather than fully investigate the rationale for Ms. Perry's discharge, Mr. Rogers relied on conclusions he drew from a video recording from the evening in question.

h. Mr. Rogers failed to seek or review other information collected by NYSAC that resulted in Ms. Perry's termination.

i. Mr. Rogers' finding that "the video evidence is offered not as corroboration of facts gleaned from an investigation conducted prior to [Ms. Perry's] termination but rather as evidence in chief acquired after [Ms. Perry's] termination" is belied by the facts and circumstances of this matter; and is further evidence that Mr. Rogers failed to conduct a full and complete investigation.

15. Petitioner requests the following relief from the Industrial Board of Appeals:

a. A reversal of the Determination, and remand for the completion of a full and fair investigation.

b. A finding that Mr. Rogers failed to conduct a full and complete investigation that would have included speaking to NYSAC personnel and other witnesses.

c. A finding that NYSAC had legitimate business reasons for terminating Ms. Perry's employment.

d. A finding that NYSAC did not retaliate against Ms. Perry for filing a workplace violence incident report.

Date: April 18, 2022

GLEASON, DUNN, WALSH & O'SHEA

By: _____
NANCY S. WILLIAMSON, ESQ.

Attorneys for Petitioner
Office and P.O. Address
40 Beaver Street
Albany, New York 12207
(518) 432-7511

4

# EXHIBIT A



# STATE OF NEW YORK

## NOTICE OF APPEARANCE

Section 166 of the Executive Law requires a regulatory agency to maintain for public inspection, a record of who appears before it, for a fee as a third party (i.e., an attorney, an agent, lobbyist*, or representative) on behalf of a person or organization subject to the regulatory jurisdiction of the agency. This usually occurs when the third party's client is involved in an enforcement, formal permit, or application matter.

**Agency:** New York State Department of Labor            **Date:** March 21, 2022

**Division/Bureau:** Industrial Board of Appeals

1. **Name of individual appearing:** Lisa F. Joslin, Esq. and Nancy S. Williamson, Esq.

   **Address:** Gleason, Dunn, Walsh & O'Shea, 40 Beaver Street, Albany, NY 12207

   **Telephone:** (518) 432-7511

2. **Client represented:** New York State Athletic Commission

   **Address:** NYS Dept of State, One Commerce Plaza, 99 Washington Ave., Albany, NY 12231

   **Telephone:** (518) 486-9844

3. **Subject of appearance:** _____ **Regulatory/Enforcement** _____ **Lobbying**

   Appeal of Determination

4. **Acting in capacity of:**

   __X__ **Attorney** ____ **Lobbyist**

   _____ **Agent** ____ **Other (describe)** _____

5. **Are you being compensated?** _X_ **Yes** _____ **No**   **If Yes:** _X_ **Fee** ___ **Salary**

6. **Signature of individual appearing:** _____

---

7. **Agency official (print name):** Linda M. Baldwin, Esq., General Counsel, NYS Dept. of State

   **Signature:** _____

---

*A LOBBYIST is a person or organization, other than a New York State government employee acting in an official capacity, who appears for the purpose of influencing the adoption or rejection of proposed rules, regulations, rates, legislation, including the State budget or the specification or award of a State Procurement Contract. An "appearance" for lobbying purposes can be a personal visit, letter, telephone call, conversation at a meeting, or any other type of contact, but does not include "on the record" proceedings or hearings.

# EXHIBIT B

## PESH Discrimination Complaint Intake Form

| Name of Person Taking Complaint<br>Varghese Mathew | | Date Received | Time Received |
|---|---|---|---|
| Related Inspection Number, if appropriate | | Date of Filing | |

| Complainant Information | | | |
|---|---|---|---|
| Full name-  Last         First         Middle<br>          Perry        Dorothea       R | | | |
| Address<br>74 Tapscott Street | | | |
| City<br>Brooklyn | State<br>New York | | Zip<br>11212 |
| Home Phone Number<br>917.328.3442 | E-mail<br>MsDorothea.Perry@gmail.com | | |
| Work Phone Number<br>718.403.8147 | | | |
| Additional Phone Number<br>917.455.6271 | | | |

Summary of the alleged retaliation (protected activity, respondent knowledge, adverse action, n

As a matter of history:  On Nov. 2, 2013 during a 10-round fight Magomed Abdusalamov fought Mike Perez in a heavyweight championship bout at Madison Square Garden.  He suffered a major brain injury as a result and an Inspector General investigation concluded that NYSAC's post-fight care regimen was largely at fault. On Friday, September 8, 2017, New York State agreed to pay Abdusalamov and his family $22 million for negligence by the New York State Athletic Commission (inclusive of NYSAC employees and representatives) in connection with that fight.  As a result of the IG's investigation NYSAC has since changed its post-fight care regimen to include more stringent medical exams between rounds, an immediate post-fight exam at ringside, and a mandatory more extensive post-fight triage in the Commission area immediately after the fight.

On April 21st I was assigned to work at the Barclays Center on the Adrien Broner vs. Jesse Vargas card.  I arrived at the assigned time, 2:30 pm.  At the team meeting Ms. Kim Sumbler advised the inspectors, deputies and other staff in attendance that security would be tight (as a result of the Conor McGregor incident in Brooklyn on April 6th).  We were told that at least 50 police (some with dogs) and additional Barclays Center security would be in attendance and that we were not security.  Barclays Center Security would keep the halls clear, only people with credentials would be allowed in the secured areas and locker rooms.  We would only be charged with doing our jobs.  I had two assignments that evening one of which was to work with Mr. Gervonta Davis, an elite fighter, who was scheduled to be the first televised fight on Showtime.  I was sent to Mr. Davis' room when he arrived, at approximately 7:45 or so. At some point before Mr. Davis had given his pre-fight urine, I was surprised when an entourage of young men arrived was allowed into the dressing room.  The media room had been converted into a dressing room for Mr. Davis, half for him and half for some of the undercard.  Gervonta's room had a Barclays security guard stationed at the door.  I walked out to the Barclay's security officer and asked him why he was letting people in the room.  I told all the men to leave the room, especially those with drinks.  I told them "NO DRINKS" were allowed in the locker rooms and that "they were not allowed in the locker room". There were at least ten of them.  The men were mannerable, those with drinks left, but a few remained, but they were not on the list of people authorized to be in the locker room.  The one that appeared to be leading the group introduced himself to me. I did not know who he was.  Two weeks later I learned that it was the rapper named Casonova.  When I took Mr. Davis to the locker room for his pre-fight urine and

medical exam, I had another inspector take Mr. Davis into the bathroom for the collection. While Mr. Davis was out of earshot I spoke to Deputy Commissioner George Ward loud enough for other Commission personnel to hear, and advised him that there were many people in Mr. Davis' locker room that were not on the list and that Barclays Security let them in. I asked DC Ward to give me 3 – 4 minutes head start when I left the Commission room then to send in back up to help me clear Gervonta's dressing room because Barclays security weren't doing their job. Exactly as I requested NYSAC staff came to Gervonta's dressing room. It was Ms. Sumbler along with DC Kunkle. She spoke directly to Mr. Davis who was of the impression that he could have the rapper "Casonova" walk him out. She said to Mr Davis "You and I had this conversation yesterday, no rappers are walking anyone out because of security concerns". DC Kunkle asked me to point out the members on the list who were authorized to be in the room and I did, I pointed out the team and two family members (one in the room, and the personal security guard on the door). Note: There were two guards on the door. A Barclays security guard to the right, and a personal security guard to the left. At some point Mr. Casonova said it was okay, gave Mr. Davis a hug and told him he would be outside cheering for him. He left with his friends. There was no incident. Later, the actor 50 Cent, and at least two of his own security people, came into the room for about 1 minute to wish Gervonta good luck. They promptly left.

Mr. Davis' ring walk was scheduled for 8:55 but he was late, we walked to the ring about 9:00 instead.

At some point during the start of the bout we heard that the building was on locked down because there was a shooting. I looked around when I was on the apron after the first round but didn't see anyone moving to leave, and no other broadcasts had been given so I continued to work. I was very concerned for my safety at that point. After the fight, which Gervonta ended with a 2nd round stoppage of Mr. Jesus Cuellar, I began escorting Mr. Davis from the arena back to the Commission room for this post-fight medical exam per established protocol, accompanied by Inspector Juan Rivera and Doctor Avery Brown and several Barclay Security men. The Barclays security left us at the entrance of the tunnels. As we entered the tunnels leading back to the Commission room we were confronted by Mr. Andrew Roberts (of Swanson Communications). This is not the first time I have seen Mr. Roberts, but I do not know him personally. Customarily Mr. Roberts begins a dialogue with the boxers as they are walked back to the Commission room. This time Mr. Roberts began speaking to me, almost immediately. He began telling me that I am to take the fighter to be interviewed. I told him he was going for a post-fight medical exam. He then told me again that "I was to take the fighter for interviews because Kim Sumbler said it was okay for him to do the interviews first". At the point I looked around for Kim Sumbler. Not seeing her I said "Where's Kim Sumbler? I paused. As he began to talk again I asked him, "Why are you even talking to me? If you want to talk to this kid you're wasting valuable time talk to him". As Mr. Roberts continues talking to me I ask "Where's the doctor?" I looked around for the doctor and realized he is behind someone that was behind me. At that point I heard Doctor Brown clearly yell out "DO NOT STOP FOR INTERVIEWS ... KEEP GOING TO THE COMMISSION ROOM!". I said to Mr. Roberts "We're not stopping". As I approached the door to Commission room I indicated to a dark-skinned, middle aged male, Barclays security officer that I had "the fighter, plus one (meaning Gervonta's representative from his camp)". Mr. Roberts became irate and begins swearing and making threats. When I enter the Commission room I turn to see who is coming through the door and see that the doctor and Mr. Rivera are quite visibly upset. After getting Mr. Davis seated in the triage area with the doctor and the other inspector, Mr. Rivera. We all commented on Robert's behavior, which was erratic, and I say, "he wants to murk me" although he didn't use that word. Roberts said "kill". I say, "No one is gonna murk me". I left the fighter with Dr. Brown and Juan Rivera and went out to the general Commission area where I see Kim

Sumbler and Dr. Nitin Sethi. I explain that "some guy was trying to stop us from bringing the fighter for his physical and he said Kim said it was ok". At that point Kim throws her head back and says, "Oh yeah I did say it was okay". I pause and tell her that she never told us and walk away. At some point I hear Luana Ferreira apologizing to someone saying, "the inspectors are only doing their jobs".

After Mr. Davis' exam (time would be on the inspector report), I asked him to stay in the Commission room to give urine because I believed his locker room would have too many people. He complied and sat on the couch at first with a member of his team. I was surprised to see Mr. Roberts in the room standing near me so I gave him a gracious downward wave of my hand inviting him to speak to Mr. Davis. I do not believe he spoke to Mr. Davis. I let Mr. Davis sit for a while, then he switched positions to watch the next bout (Charlo vs. Centeno) from a chair facing the tv. Mr. Davis comments on how hard Charlo hits. At some point after that fight ends early Charlo comes into the room. Charlo and Davis have a beef so I sit Davis in another chair and stand in front of him to block his view when I see the two of them glaring at each other. Charlo goes in to be triaged and Davis is taken in for his post-fight urine.

After Mr. Davis gave urine (time would be on the inspector report) he is paid out, and leaves for the Commission room for his interviews. As I am doing my paperwork, Mr. Charlo comes out and speaks to me for a couple of minutes. I then leave the room with Inspector Juan Rivera and we follow Mr. Davis back to his dressing room to make sure he is okay and I pick up my papers that I left in his room. When I turned in my paperwork for Mr. Gervonta's bout I told DC Ward about the Mr. Roberts threatening me. At some point while in the Commission room I heard Luana Ferrerria speaking about Mr. Roberts and she mentioned Swanson Communications. That is how I learned of Mr. Roberts affiliation.

Later that evening as I sat ringside watching the Broner fight an inspector, Compuverde, asked me "what was up with the guy stopping the fighters after the fight?" I asked him what he meant and he said, "he told us he had already told you off so we'd better listen to him, and since no one said anything we just did what we were told. We stopped with the fighters at the table so they could interview them. They even changed the way the fighters were exiting the ring to accommodate this".

After the show was over I met with DC Robert Orlando ringside and as we walked back to the Commission room I told him about the guy that threatened to kill me. A female fan overhead the conversation and gasped.

On April 22nd I sent a written report about the incident to Kim Sumbler and Matt Delaglio and the Commissioner (Signorile). The only person that showed any concern was Commissioner Signorile who stated he would look into the matter. On April 23rd he called me to inform me that Kim Sumbler told him I had no witnesses to the incident. I explained that Doctor Brown and Inspector Juan Rivera were with me. At that point fearing the matter was going to swept under the rug I went to the 78th precinct to lodge a complaint. I had the option of pressing charges but did not because I only wanted to make it a matter of record. On April 24th I sent an update about the incident to Kim Sumbler, Matt Delaglio and Commissioner Signorile advising them of my understanding of my rights as it pertains to workplace violence and requesting that the matter not be taken lightly. I submitted a copy of the police complaint ticket (absent the #). I requested that the matter be treated like a similar situation that happened a year before in which Ms. Sumbler alleged that a male black NYSAC inspector had issued a death threat to NYSAC staff and the State police were sent to his home. Let me point out that Ms. Sumbler was not terminated in that case for filing a complaint.

At some point, on April 24th I requested to know who was handling my complaint because no one was communicating with me about it. I wanted to know "who should I keep apprised of the police activity?" Ms. Sumbler responded that the matter was not handled by her, but instead it was being handled by HR. Later that day I did I received a call from the PAA with the police complaint number, and I submitted it to Kim Sumbler, Matthew Delaglio and the Commissioner.

On April 25th at approximately 4:40 pm I received a call from Ms. Debra Meade, Director of HR to "advise me that my services were no longer needed and that as of COB I would no longer be a State employee". I asked her was it in retaliation for the workplace violence complaint that I submitted or was it in retaliation for the IG complaint that I submitted a couple of weeks before. She said she was only the person that makes the phone calls and she was not aware of any of this. I asked her "if she was making such a call, and as the Director of HR, didn't she think it was her duty to know why she was making the call".

I called Matt Delaglio, since he is my direct superior to find out if he was aware of the termination. He said he was not. I asked if he was aware of any problems with my performance that evening. He stated he was only aware of two incidents. I asked which two. He said, "the one you reported in writing, and that there were too many people in Gervonta's room". I told him I reported both incidents. One in writing and one verbally. He said he didn't know what was going on.

On April 26th I called Dr. Brown and also Inspector Rivera to ask them to make a mental note of the events of April 21st. Dr. Brown thought it was odd that I was the second person asking about that incident. When I told him that I had been fired he was shocked and responded, "they fired the best inspector they have?". When I asked him who else inquired about the incident he said Kim text him on Sunday 4/22/18 about it, and he confirmed it did in fact happened. "Why did Kim Sumbler tell Commissioner Signorile on Monday 4/23/18 that I did not have any witnesses if she knew I did?", I asked. I asked Dr. Brown to please save a copy of the text message. He agreed.

Since my termination I have been trying to get access to my employee records, to no avail. Only limited information has been sent to me despite me proving that other document exists e.g. my employee evaluations. I have also requested a public hearing which I believe I am entitled to as a public officer. I sent emails to Commission personnel, e.g. Matt, Kim, Ms. Meade, the Commissioners, Ryan (attorney), James Leary (attorney), my elected representatives, and another attorney Mr. Antonio Milillo. Mr. Milillo has responded twice, very condescendingly, to tell me that I should not CC anyone and Ms. Meade will decide who should get my emails.

I believe the workplace violence complaint was the catalyst for my termination but also another example of discrimination against me because Ms. Sumbler, a white woman, was not terminated when in 2017 she alleged a black male inspector, that was terminated, made a death threat against NYSAC. The STATE took her word for it, but me being a black woman with multiple witnesses and video (which NYSAC now has) following the proper course as recommended by the IG, was terminated under a similar scenario. The termination ties into and supports my previous complaints of discrimination / retaliation that I have submitted internally, to the IG, and to the Department of Human Rights.

I followed the post-fight protocols that the Inspector General recommended despite threats to my own life and should not have been retaliated against for adhering to that protocol. Nor should my employer have taken any adverse action against me for filing a credible complaint to the NYPD. Let me remind you that was also that night someone snuck a gun into the venue and the Barclays was on lock down temporarily.

I also believe that Commissioner Signorile was retaliated against for being the only one to advocate for me as a victim of workplace violence and continuing to investigate the reason for my termination even when he was told to back off. Without even knowing the reason for my termination he went so far as to discredit their "too many people in the room" defense when he discovered a similar situation a week later at a boxing event held at the Amazura. No inspector was terminated for that which demonstrates, in other words, NYSAC's proffered reason, is a phony one to cover up its discriminatory and retaliatory intent. Commissioner Signorile has since been told that he is being replaced as Commissioner pending the NYS Senate confirmation of the new Commissioners.

I still believe the workplace violence incident was the catalyst because it bared too much of a resemblance to the 2017 matter Kim Sumbler was involved, in except that I had multiple witnesses, and video. I learned of NYSAC's internal investigation into the matter a day after receiving my termination letter.

No inspector, in three decades, has been terminated for no reason at all. NYSAC has yet to explain to me why I was terminated.

## Respondent Information

| Name of Employer New York State Athletic Commission | | Name of Chief Executive Officer Kim Sumbler | |
|---|---|---|---|
| Address 123 William Street | | | |
| City New York | | State NY | Zip 10038 |
| Name of Complainant Supervisor Mathew Delaglio | | Name of Contact Person / Phone # Kim Sumbler / 212-417-5703 | |
| Phone 1 212-417-4952 | | E-mail Kim.Sumbler@dos.ny.gov | |
| Phone 2 212-417-5700 | | | |

| Other Contacts<br>Cell phone 732-513-9268<br>Email: Matthew.delaglio@dos.ny.gov | |
|---|---|
| # of employees<br>State Department has more than 1000 employees, NYSAC has more than 50. | Unionized?  If yes provide Name of Union and Contact Information<br>No |
| **Signature of Complainant  →** | X |

# EXHIBIT C

STATE OF NEW YORK
**DEPARTMENT OF STATE**
OFFICE OF GENERAL COUNSEL
ONE COMMERCE PLAZA
99 WASHINGTON AVENUE, SUITE 1120
ALBANY, NY 12231-0001
WWW.DOS.NY.GOV

ANDREW M. CUOMO
GOVERNOR

ROSSANA ROSADO
SECRETARY OF STATE

August 8, 2018

Varghese Matthew
Senior Safety and Health Inspector
New York City District Office
75 Varick Street
7th Floor
New York, NY 10013
Fax: 212-775-3542

Re:    Perry v. NYS Athletic Commission
       Case Number: 30041867

Dear Varghese Matthew:

The New York State Department of State, Athletic Commission ("NYSAC/Respondent") submits this Response to the Complaint filed by Dorothea Perry ("Complainant") with the Public Employee Safety and Health Bureau on or about June 20, 2018.

As supported by the facts set forth below and the documents submitted herewith, Complainant's workplace violence complaint was investigated and properly addressed by DOS, and Respondent has not discriminated against Complainant. More specifically, Complainant was not released from her position as an Athletic Commission Inspector because she filed a work place violence complaint; Complainant was released because she failed to follow protocol in a high-risk environment on April 22, 2018.

## PARTIES

The New York State Athletic Commission (NYSAC) regulates and oversees combat sports in New York State. It is a commission housed within and supported by the New York Department of State. Kim Sumbler, as Executive Director, is the highest official in NYSAC. Ed Kunkle is a Deputy Commissioner. Complainant, Dorothea Perry, and Ed Campoverde, a person whose name appears below, are Inspectors at NYSAC and ensure boxer safety and integrity and therefore are critical components of the NYSAC oversight responsibilities. Inspectors are "at will" employees. Complainant had been employed with NYSAC as an Inspector since January 15, 2004.

## COMPLAINANT'S ALLEGATIONS

Complainant alleges that Respondent Athletic Commission violated New York State Labor Law Section 27-a.10, entitled "Safety and health standards for public employees". Section 27-a.10 states:

> No person shall discharge, or otherwise discipline, or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this section or has testified or is about to testify in any such proceeding, or because of the exercise by such employee on behalf of himself or others of any right afforded by this section.



NEW YORK
STATE OF
OPPORTUNITY.

**Department of State**

Complainant alleges that filing the workplace violence complaint on April 22, 2018 was the "catalyst" for her termination three days later, on April 25, 2018.

## FACTS

### Events Surrounding the Workplace Violence Complaint

On April 21, 2018, the Athletic Commission hosted an event, Broner v. Vargas, at Barclays Center in Brooklyn, New York. The events in question surrounded an event scheduled on the main card, Gervonta Davis v. Jesus Cuellar, at 8:55 PM. Complainant was responsible for working with Mr. Gervonta Davis. After Mr. Davis fought, Complainant, Inspector Juan Rivera, Dr. Avery Brown, and some Barclay's security escorted Mr. Davis back to the locker room for Mr. Davis' post-fight medical exam.

While walking to the locker room, Complainant alleges they were confronted by a person who Ms. Perry initially identified as Mr. Sam Jackson, a reporter with Swanson Communications.[1] Typically, reporters may interview fighters after the fight. The reporter stated he had permission to interview Mr. Davis by Kim Sumbler, but Complainant, Juan Rivera, and Dr. Avery Brown disregarded his request to interview Mr. Davis and continued to the locker room. Complainant alleges the reporter became irate, began swearing, and making threats, like "I'm going to kill somebody!" Complainant filed a workplace violence complaint with DOS on April 22, 2018[2] and filed an Incident Report with the NYPD on April 23, 2018. Veronica Cano, a Labor Relations Specialist at the Department investigated the incidents alleged in Complainant's workplace violence complaint.

During the investigation of the work place violence complaint, Ms. Cano received a witness statement from Dr. Brown. Dr. Brown alleges the reporter made the comment in general frustration and not directed at any specific person. His witness statement alleges:

> when we entered the room, Sam punched or kicked the door or the garbage can and said, 'I'm going to kill somebody.' Yelled it….his outbursts and action weren't directed towards me.

On May 15, 2018, after leaving an email message that went unanswered, Ms. Cano sent a letter to Swanson Communications informing it of its employee's actions and the statement that he yelled "I'm going to f\*\*king kill somebody!" as he punched or kicked the door or the garbage can nearby. Respondent informed Swanson Communications that the conduct by one of its journalists was unacceptable and sought assurance of appropriate behavior from staff in the future.[3] Upon learning that the reporter's name was Andrew Roberts, Ms. Cano sent a revised letter correcting the name. As such, on July 23, 2018, the investigation was closed and Complainant was so notified. The workplace violence complaint was investigated and properly addressed by DOS.

### Events Surrounding Termination of Complainant's Employment

Due to high security risks surrounding the Broner v. Vargas fight, NYSAC placed additional expectations and restrictions on NYSAC employees for the event on April 21, 2018. NYSAC staff were informed that only a list of authorized boxers and cornermen were permitted in the locker rooms/back-of-house. There were no exceptions permitted. Staff were instructed to notify Barclays security staff outside the locker room if additional people enter the locker room and to have the security staff remove the unauthorized people. Authorized boxers and cornermen were provided with wrist bands for easier identification. Once an athlete and a corner had reported, they were to remain in their locker rooms unless accompanied by an inspector. Complainant and Kim Sumbler both state that Kim Sumbler advised the inspectors, deputies, and other staff during the team meeting that security would be tight.

Complainant arrived at Barclays on April 21, 2018 at the report time of 2:30 PM. Respondent has received security camera footage of the night in question, from 7:43 PM to 8:13 PM from Barclays Center. The video is from a camera outside the room that was used as Mr. Gervonta Davis' dressing room (the room is labeled "interview room"). The door viewed from the camera is the only door in and out of the

---

[1] Ms. Perry later learned that the reporter's name was Andrew Roberts, not Sam Jackson, and reported this to DOS on May 22, 2018. See "05-22-18 DP to DM new name" submitted herewith.

[2] See "04-23-18 KS to DM" submitted herewith.

[3] See "Sam Jackson letter" submitted herewith.

room other than an emergency exit.[4] The video, and the still photos taken from it demonstrate that Complainant disregarded the duties and restrictions placed on staff during the Broner v. Vargas event.

Complainant alleges she arrived at Mr. Davis' locker room around 7:45 PM. It is apparent from the video that she was in the room by the start of the video security footage, which begins at 7:43 PM. At 7:43:48 PM, about 15 to 20 unauthorized personnel entered the room with drinks, unstopped by the security at the door. Among the unauthorized personnel were Cassanova - an entertainer who supports Mr. Davis - and his entourage. Complainant alleges that at this point, she walked out to the security officer and asked why he was letting people in the room, but this is not supported by the video footage.

Complainant alleges she told the men to leave and it is apparent that some men left the room at 7:47:17, however, Cassanova and many of his entourage remained in the room. Complainant alleges that she took Mr. Davis to the locker room for pre-fight urine and a medical exam. However, at 7:58:41, Ed Campoverde walked into the dressing room and at 7:59:12, Mr. Campoverde and Complainant walked out with an unidentified man, not Mr. Davis. Mr. Davis remained in his dressing room, without a NYSAC staff member or inspector.

At 8:05:24, Complainant returned and briefly said something to the Barclays security person stationed outside the dressing room. At 8:09:56, DC Kunkle approached the locker room, then he and Kim Sumbler entered. Ms. Sumbler asked the remaining men to leave the room at that time. At 8:12:36, Cassanova and his entourage left the room followed by DC Kunkle and Kim Sumbler. They spoke to security as they left. (8:12:41). The footage ends soon after.

As the foregoing makes clear, Complainant did not follow established procedures during the April 21, 2018 event at Barclays. There were several unauthorized personnel admitted to Mr. Gervonta Davis' locker room on Complainant's watch who did not leave until Kim Sumbler entered, saw them, and directed them to leave. Complainant had a clear responsibility to direct unauthorized persons to leave the locker room or to request security to escort the unauthorized persons out. From the security footage, it is clear Complainant did neither. Unauthorized men, including Cassanova, remained in the locker room for at least 20 minutes.

After reviewing the conduct of Ms. Perry during the Barclays event, and after considering all her violations that night and the dangerous situation they created, Ms. Sumbler decided to fire Complainant. The Bureau of Human Resources of DOS notified Respondent on April 25 that she was fired.

Not only was Complainant terminated for an appropriate business reason, but the workplace violence complaint she initiated was taken seriously, investigated and handled appropriately. Her termination had nothing to do with her filing of a workplace violence complaint.


## CONCLUSION

Respondent, the State of New York, Department of State, Athletic Commission, has not engaged in any unlawful discriminatory practice in violation of the New York State Labor Law Section 27-a.10. The Complaint should therefore be dismissed.


Yours truly,

Antonio Milillo
Associate Attorney

---

[4] Images from the video are provided herewith.

# EXHIBIT D

**NYS DEPARTMENT OF LABOR**

**PUBLIC EMPLOYEE SAFETY AND HEALTH**

**<u>DESIGNATION OF REPRESENTATIVE</u>**

Case Name: Perry vs. NYS Athletic Commission

Case Number: 30041687

TO:

Senior Safety and Health Inspector Varghese Mathew
NYS Department of Labor – PESH
75 Varick Street, 7th Floor
New York, NY 10013

her
The undersigned hereby enters ~~his~~ appearance as representative of:

NEW YORK STATE ATHLETIC COMMISSION

In the above captioned matter:

| | |
|---|---|
| | Representative's Address and ZIP Code |
| Signature of Representative | Gleason, Dunn, Walsh & O'Shea |
| LISA F. JOSLIN, ESQ. | 40 Beaver Street |
| Type or Print Name | Albany, New York 12207 |
| Attorney | |
| Title | (518) 432-7511 |
| | Area Code     Telephone Number |
| May 17, 2021 | |
| Date | E-mail address:  LJoslin@gdwo.net |

# EXHIBIT E

STATE OF NEW YORK DEPARTMENT OF LABOR
PUBLIC EMPLOYEE SAFETY AND HEALTH BUREAU

| |
|---|
| IN THE MATTER OF THE INVESTIGATION OF ROBERTA REARDON, COMMISSIONER OF LABOR OF THE STATE OF NEW YORK, OF:<br><br>THE NEW YORK STATE ATHLETIC COMMISSION, concerning Dorothea Perry. |

TOLLING AGREEMENT

WHEREAS, the Commissioner of Labor of the State of New York, (hereinafter, "the Commissioner"), has received allegations indicating that The New York State Athletic Commission (hereinafter "NYSAC"), violated New York State Law by retaliating against Dorothea Perry for engaging in protected activity under the Public Employee Safety and Health Act, section 27-a of the Labor Law; and

WHEREAS, the Commissioner may request that the New York State Attorney General bring an action pursuant to Section 27-a(10)(b) of the Labor Law concerning the alleged retaliation described above; and

WHEREAS, NYSAC denies engaging in the alleged retaliation described above; and

WHEREAS, the Commissioner and NYSAC desire to have a full and complete investigation completed, including a plenary appeal to the Industrial Board of Appeals ("IBA") should either party so move;

WHEREAS, the Commissioner and NYSAC may also want an opportunity to discuss settlement;

WHEREAS, the applicability of any limitations period, including but not limited to the effect of Executive Orders issued by Governor Andrew M. Cuomo related to the COVID 19 pandemic, may be disputed, and the parties desire to provide adequate time as discussed above without pressure for the Commissioner to make a decision prematurely and, perhaps, unnecessarily.

NOW, THEREFORE, the parties agree as follows:

1. Commencing April 24, 2021, any statute of limitations otherwise applicable to the above-described claim is suspended until April 25, 2022; and any proceeding in connection with this claim must be commenced on or before April 25, 2022.

Date: ___July 19_____, 2021    _James A. Rogers /S/_____

James Rogers, Special Counsel
State Office Campus Bldg 12,Room 509
Albany, NY 12240


For:    Roberta Reardon, Commissioner of Labor


Date: ___July 19___, 2021    _____

Lisa F. Joslin, Esq.
Gleason, Dunn, Walsh & O'Shea
40 Beaver St., Albany, NY 12207


For:    New York State Department of State

# EXHIBIT F

# WE ARE YOUR DOL

NEW YORK | **Department**
STATE OF OPPORTUNITY. | **of Labor**

*Roberta Reardon, Commissioner*
*Kathy Hochul, Governor*

**James Rogers**
Special Counsel for Worker Protection

**New York State Department of Labor | Counsel's Office**
Harriman State Office Campus
Building 12, Albany NY 12240
Mobile: 347-831-5630 | james.rogers@labor.ny.gov

March 8, 2021

Dorothea Perry
74 Tapscott Street
Apartment 1
Brooklyn, NY 11212
msdorothea.perry@gmail.com

Re:    PESH Discrimination
       Case: 30041867



Dear Ms. Perry:

The New York State Department of Labor received your complaint in which you allege that you were terminated after you filed a workplace violence incident report with your former employer, the New York State Athletic Commission ("NYSAC"), and a complaint about the same incident with the New York City Police Department ("NYPD"). You filed a complaint with the New York State Department of Labor's ("Department") Public Employee Safety and Health Bureau ("PESH") on May 2, 2018. Your complaint was investigated by PESH and the findings have been reviewed by this office. Based upon such investigation and review, the Department of Labor has determined that NYSAC violated New York State Labor Law §27-a by retaliating against you when they terminated your employment within days after you filed the workplace violence incident report and police complaint.

## BACKGROUND

### Work History

You worked as a Boxing Inspector for 14 years until the date you were terminated, April 25, 2018. The Department requested and received your performance evaluations, which all demonstrated you executed your duties satisfactorily and met all expectations. Your immediate supervisor completed an evaluation of your performance on the night April 21, 2018, the date of the workplace violence incident, that clearly states you

1

performed satisfactorily in all categories. At a date or time after that evaluation was completed by your immediate supervisor, a comment was added by Executive Director of NYSAC, Kim Sumbler, that there may have been a "possible breach in protocol." Deputy Commissioners George Ward and Robert Orlando; Commissioner John Signorile; and Boxing Inspector Juan Rivera were interviewed by the Department and provided testimony praising the quality of your work and your professionalism at the workplace. Notably, apart from your employer's description of the events of April 21, 2018, NYSAC did not offer any contrary evidence as to the quality of your work or your conduct on the job.

### Workplace Violence Incident Report

On April 22, 2018, you filed a complaint with your employer regarding a workplace violence incident that occurred the previous evening, April 21, 2018. Your complaint was addressed to senior management officials including Executive Director Sumbler. In the complaint you stated that Andrew Roberts ("Roberts")[1], a reporter for Swanson Communications, approached you and Gervonta Davis ("Davis"), the fighter you were assigned to, just after Davis finished his bout. You stated in your workplace violence complaint that Roberts demanded to interview Davis before his post-fight medical exam and that you informed Roberts that, per NYSAC policy and protocol, a fighter was required to complete the post-fight medical exam before any media appearances could occur.

Your April 22 workplace violence complaint stated that Roberts became irate and screamed he "was going to kill [you]". Importantly, your workplace violence complaint alleged that Roberts, in his tirade, stated he had "made arrangements" with Executive Director Sumbler to conduct the interview before Davis' medical exam. Your complaint also noted that "no direction had been given" to you to allow a fighter to be interviewed prior to his medical examination or that the long-standing policy had been changed. Additional testimony revealed that Roberts kicked a garbage can or door as he was screaming and that his statement might have been "I am going to fucking kill somebody".

The investigation revealed that the policy directing fighters to a post-fight medical exam before media interviews was the result of extensive investigation by the New York State Inspector General into the death of a fighter some years before this incident. During our investigation, your employer did not deny that they granted permission to Roberts for a pre-medical exam interview, nor did your employer deny that Sumbler failed to inform you that special arrangements were made with Mr. Roberts. You alleged that the failure to keep you updated on changes to key policies directly contributed to the behavior that caused you to fear violence from Mr. Roberts.

All of the witnesses interviewed during the Department's investigation, including 2 NYSAC Boxing Inspectors, 2 NYSAC Deputy Commissioners, a NYSAC Commissioner and a NYSAC medical doctor, supported your contention by testifying that the standing policy in place on April 21, 2018 was for the fighter to be escorted to the Commission

---

[1] Initially you stated that the name of the reporter was Sam Jackson, but you later learned the named of the reported was Andrew Roberts of Swanson Communications.

2

room for a medical exam directly after the fight. Dr. Brown, who was with you and Davis after the fight when you were confronted by Roberts, provided testimony that the instructions were clear: boxers were to not stop; they were to proceed directly to the Commission room. Dr. Brown also testified that he had been informed that the policy would be different for the main event (not the Davis fight) such that fighters would be directed to an alternate exit so that they could be interviewed before their medical examinations. Your workplace violence complaint highlighted Executive Director Sumbler's unilateral action to change NYSAC post-fight medical procedures. Notably, Executive Director Sumbler made the decision to terminate you.

You stated in your workplace violence complaint that you informed NYSAC that you would file a criminal complaint with the NYPD about the same incident. Your complaint to the NYPD was made on April 23, 2018. You were terminated 2 days later, on April 25, 2018. Ultimately, the Department of State (the umbrella agency of which NYSAC is a part) investigated Roberts' behavior that night and wrote to Swanson Communications to inform them that his conduct was unacceptable and was an incidence of workplace violence that would be reported to the Department of Labor. This occurred weeks after your termination.

## ANALYSIS

### Prima Facie Case

In order to establish a claim of retaliation under New York State Labor Law §27-a a Complainant must establish a prima facie case by establishing that she (1) engaged in protected activity; (2) she was subjected to an adverse action; and (3) there was a causal connection between the protected activity and the adverse action. A causal connection may be shown by demonstrating that there was temporal proximity between the protected activity and the adverse action. Your workplace violence complaint filed with your employer and your report regarding the same facts to the NYPD are protected activities. Your termination is an adverse action and there is a causal connection. You were terminated 3 days after filing the workplace violence incident report and 2 days after filing a criminal complaint with the NYPD. An adverse action that occurs 2 to 3 days after a protected activity constitutes the temporal proximity required to establish a causal connection. Therefore, you have alleged the facts necessary to set forth a prima facie case of retaliation under Labor Law §27-a.

### Employer's Legitimate Business Reason

After a Complainant establishes a prima facie case the employer may provide a legitimate business reason for taking the adverse action. During the PESH investigation, NYSAC stated that you were fired for not following procedure on the night of the fight, specifically that you failed to clear Davis' locker room of unauthorized guests (or apprise Barclay Security of unauthorized guests) and that you left the fighter Davis alone for a short period of time. NYSAC's proffered reasons for your termination are contained principally in 2 documents: a letter written and submitted by Anthony Millilo, a Department

3

of State attorney assigned to this case ("response letter"), and an internal memorandum from Executive Director Sumbler to DOS executive staff on April 23, 2018, 2 days after the incident and 2 days before your termination. ("Sumbler memo").

The response letter relies almost entirely on a review of video footage of Davis' locker room on the night of the incident and includes several still shots taken from the video.

The video, which is central to NYSAC's response, simply does not show what the response letter relies on for the reason for your termination. The response letter states that the video shows that you took no action to remove unauthorized guests from Davis' locker room. The video actually shows you inside the locker room, engaging guests (there is no sound) and several individuals leaving directly thereafter. The employer's response letter states the video shows that you failed to inform Barclays Security about the unauthorized guests in Davis locker room. The video however shows Barclay Security allowing people into the locker room and also shows the door wide open where the unauthorized guests are in full view of Barclay's Security. Citing to your "failure to notify Barclays" Security is of no import given that it was clear that Barclays had as much information as you did. Notably, however, the response letter makes no mention of any interviews conducted or any investigation undertaken by the employer. Only the video is referenced.

The PESH investigation also revealed a memorandum from Executive Director Sumbler (Sumbler Memo) that discusses the events of the night in question. The Sumbler Memo, which was written just prior to your termination, states that you were instructed to inform Barclays Security of unauthorized guests and that you failed to do so. As stated above, the video appears to show that Barclays' security had full notice that unauthorized guests were present and failed to take any action. The memo also states, "Had Dorothea notified Security immediately and had the situation been addressed, we would not have been put in harm's way." Earlier in the memo Sumbler indicates that this was particularly threatening because the fighters on the card that night, including Davis, had known gang affiliations. The video shows that Barclays was fully aware of the locker room situation.

Pretext

Once an employer offers a legitimate business reason for an adverse employment action, the Complainant may show that the reason given is pretext for discriminatory behavior. The Department evaluated whether the reason proffered was the actual reason for your termination or pretext to hide the employer's discriminatory behavior. The Department noted that while the employer's response letter relies heavily on the video evidence, NYSAC did not receive the video footage until weeks after it had access to that video or reviewed the footage. We find that because the video evidence is offered not as corroboration of facts gleaned from an investigation conducted prior to your termination but rather as evidence in chief acquired after your termination of what is alleged to be your wrong-doing a finding of pretext is supported. Furthermore, the Sumbler memo, which was written within days of the incident, mentions nothing at all about the only other

4

reason NYSAC claims you were terminated, namely that you allegedly left Davis in the room without a NYSAC boxing inspector present. If Sumbler had formed the opinion that the reason you were terminated was that you left Davis alone on the night of April 21, 2018 one would expect that, having time to explore the facts, she would have included that fact in her memo. The response letter should reflect evidence of the actual reasons Sumbler terminated you at the time the decision was made. NYSAC's response relies on information constructed after the fact based upon a video obtained weeks after you were terminated is evidence of pretext. The reason for your termination constructed after you were terminated and the Sumbler Memo, written close in time to your termination, mentioning only one of the two reasons ultimately given for your termination, lead us to find that the employer's legitimate business reason is pretext rather than the real reason for your termination.

<u>Conclusion</u>

In light of the foregoing, it is the Department's determination that your employer discriminated against you for filing a workplace violence incident report in violation of section 27-a of the New York State Labor Law.

Pursuant to New York State Labor Law section 27-a, this matter will be referred to the New York State Attorney General for further action. NYSAC may exercise its right to appeal this determination to the Industrial Board of Appeals ("IBA"). The appeal should be addressed to:

Industrial Board of Appeals<br>
State Office Building Campus<br>
Building 12, Room 116<br>
Albany, NY 12240

Sincerely,

James Rogers/s/

_____
James Rogers
Special Counsel

cc:  Antonio Milillo, Esq.
     Office of General Counsel
     Department of State
     One Commerce Plaza
     99 Washington Avenue, Ste. 1120
     Albany, NY 12231-0001

5