# EXHIBIT F



Kathy Hochul, Governor
Roberta Reardon, Commissioner


**BRIDGET HOLOHAN SCALLY**
Deputy General Counsel

**New York State Department of Labor**
State Office Campus, Building 12
Room 509, Albany, NY 12240
(518) 485-2191 | Bridget.HolohanScally@labor.ny.gov


August 11, 2022

**Via Mail and Email**

Dorothea Perry
74 Tapscott Street, Apartment 1
Brooklyn, NY 11212
Msdorothea.perry@gmail.com

Susan Ghim, Esq.
244 Fifth Avenue, Suite 1434
New York, NY 10001
sghim@ghimlaw.com

Nancy S. Williamson, Esq.
Lisa S. Joslin, Esq.
Gleason, Dunn, Walsh & O'Shea
40 Beaver Street
Albany, NY 12207
nwilliamson@gdwo.net
ljoslin@gdwo.net

Re:    PESH Discrimination Case
        Dorothea Perry v. New York State Athletic Commission
        Case No. 30041867

Dear Ms. Perry:

The New York State Department of Labor (DOL) received your complaint in which you allege that as a result of filing a workplace violence incident report with your former employer, the New York State Athletic Commission (NYSAC), you were retaliated against in violation of Section 27-a(10)(a) of the Labor Law. Upon receipt of your complaint, Labor Law Section 27-a(10)(b) required DOL to investigate and determine whether Section 27-a(10)(a) has been violated.

Based upon DOL's investigation and as outlined herein, DOL finds that NYSAC violated Section 27-a(10)(a) of the Labor Law by terminating your employment after you filed a workplace violence incident report.

**BACKGROUND**

You were employed by NYSAC as a Boxing Inspector from approximately January 15, 2004 until April 25, 2018. NYSAC is the New York State (State) entity responsible for sanctioning and regulating combat sports in the State to ensure "the health and safety of participants and the integrity of the contests."[1]  As a Boxing Inspector, you were primarily responsible for assisting NYSAC with ensuring the health and safety of fighters and the fairness and integrity of fights.

On March 2, 2018, you filed a complaint with DOL alleging you were terminated in retaliation for filing a workplace violence incident report with NYSAC.  NYSAC denied the allegation and stated that you were terminated for violating dressing room protocol during a boxing event held at Barclays Center on April 21, 2018. [2]

DOL reviewed approximately 500 pages of documents; took approximately 13 witness statements, including all witnesses identified by NYSAC; and reviewed recorded security footage. Additionally, DOL learned that you filed a federal lawsuit involving many of the same underlying events. DOL obtained and reviewed your sworn deposition testimony, and that of current or former NYSAC employees including Kimberly Sumbler, Edward Kunkle, George Ward, Anthony Giardina, Maria Herman, and James Leary.

**FACTUAL FINDINGS**

<u>Barclays Center Event on April 21, 2018: Pre-Fight Activity</u>

Your workplace violence incident report and NYSAC's stated reason for your termination stem from events that occurred on April 21, 2018, at a NYSAC-sanctioned boxing event held at the Barclays Center in Brooklyn, New York.

Generally, a NYSAC-sanctioned boxing event like the April 21st Barclays Center event includes eight to ten fights. NYSAC is responsible for ensuring each fight comports with New York State rules and regulations.  This includes conducting pre- and post-fight medical exams, obtaining pre- and post-fight urine samples, and observing the fighters.  To accomplish their mission, and for an event of this size, NYSAC typically assigns seven or eight Deputy Commissioners.  Additionally, each boxer is assigned a Boxing Inspector; although, where staffing allows, NYSAC may assign two inspectors to each boxer.  In addition to collecting the fighters' urine samples, boxing inspectors are required to ensure their boxer is constantly monitored.

---

[1] <u>See</u> dos.ny.gov/athletic-commission (last visited July 28, 2022).

[2] DOL and NYSAC entered into a tolling agreement in which DOL and NYSAC agreed to toll the three-year statute of limitations through April 25, 2022. On March 8, 2022, DOL issued a determination finding that NYSAC violated Labor Law Section 27-a(10).  On March 14, 2022, DOL referred this matter to the Office of the Attorney General (OAG). On March 14, 2022, the OAG, on behalf of DOL, extended the tolling agreement to May 2, 2022. On April 28, 2022, the OAG informed DOL that it could no longer represent DOL in this matter due to an undisclosed conflict. DOL subsequently entered into two additional tolling agreements with NYSAC. As a condition of the tolling agreement, and in response to NYSAC's concerns that DOL did not sufficiently interview all necessary individuals, DOL agreed to withdraw its March 8th determination; re-open this investigation; and issue a new determination 90 days thereafter.

One of the headlining events on April 21, 2018 was a fight between Gervonta Davis and Jesus Cuellar.  Prior to the event, Barclays Center security advised NYSAC that social media posts indicated a potential for violence at the event between boxing camps, including Davis's camp, with known gang affiliations.  Due to the security concern, the event promoter, Barclays Center, and NYSAC agreed to increase security by increasing police presence, restricting spectator access to the "back of the house,"[3] posting security guards outside of each boxer's dressing room, and limiting authorized guests in each boxer's dressing room.

Despite the heightened security concerns, due to concurrent NYSAC-sanctioned events on the same night, NYSAC only assigned four Deputy Commissioners to the Barclays Center event and only one Deputy Commissioner to the back of the house.[4]  According to NYSAC Executive Director Kimberly Sumbler, during a pre-event meeting, she informed NYSAC employees that there would be heightened security at the event.  She further instructed the boxing inspectors, including you, that the number of authorized fighters' guests would be limited to two family members.

You were assigned as the boxing inspector for Davis.  According to security footage obtained from Barclays Center by NYSAC, you were inside Davis's dressing room prior to 7:45 pm.[5]  The footage shows that numerous individuals entered and exited Davis's dressing room.  Eventually, many of the individuals leave, but it is undisputed that three or four unauthorized individuals remained in the dressing room, including a musician known as Casanova.  At 8:12:36 pm, Sumbler and former Deputy Commissioner Edward Kunkle enter Davis's dressing room.  There is no footage from inside Davis's dressing room.

According to Kunkle, prior to entering Davis's dressing room with Sumbler, he looked in the dressing room and did not recall seeing you or Davis at that time.  He stated that he left without asking anyone to leave because he did not know who was authorized to be in Davis's dressing room.  Kunkle stated that he subsequently saw you in the hallway; told you there were too many people in Davis's dressing room; and that he would be back to help you remove unauthorized individuals.  Kunkle admits that he observed the unauthorized individuals in Davis's dressing room prior to the start of the video recording, and did not return to Davis's dressing room for approximately 25 minutes because, as he stated, NYSAC was short-staffed and he was handling other issues, including an issue with missing boxing gloves.  When Kunkle returned and entered Davis's dressing room at 8:12:36 pm with Sumbler, Kunkle observed Sumbler remove Casanova and his friends. Kunkle never indicated that he felt intimidated by Casanova.

You stated that after Sumbler and Kunkel entered Davis's dressing room, Sumbler asked Davis the identity of the guests in room.  You stated that Davis informed Sumbler who Casanova was and that they were there to escort him to the ring.  Sumbler informed Davis that there would be no entertainment escorts and asked Casanova and his friends to leave.  They all gave Davis a hug and left.  The security footage corroborates Casanova and two others leave approximately five minutes after Sumbler and Kunkle entered Davis's dressing room.

---

[3] The "back of the house" is a reference to the backstage area of the event location.  "Back of the house" is where fighters' dressing rooms are located, as well as NYSAC's commission room. NYSAC's commission room is where NYSAC conducts much of its business, including but not limited to medical exams, staff meetings, and storage of event paperwork.

[4] During his interview with DOL, former Deputy Commissioner Edward Kunkle stated that he was assigned to the back of the house and, due to being short staffed, he had no help.

[5] The recorded security footage provided by NYSAC to DOL begins at 7:45pm.

At approximately 9:00pm, Davis's fight began.

Barclays Center Event on April 21, 2018: Post-Fight Activity

As part of your duties after the fight, you were required to escort Davis back to his dressing room and ensure he did not have contact with anyone before his post-fight medical exam and urine test. You, along with Dr. Avery Browne and another boxing inspector, escorted Davis to his post-fight medical exam and urine test when a reporter associated with Swanson Communications tried to interview Davis. You stopped the interview, and the reporter lost his temper. It is alleged that the reporter stated that he was "going to kill me [you]" or "going to kill someone." Moments later, the reporter was observed kicking over a garbage can. The reporter's threat of violence was the basis of your workplace violence incident report.

You stated that you spoke to Sumbler regarding the reporter's conduct. Sumbler stated that she saw you later that night but was too busy to discuss either the reporter's conduct or your failure to remove unauthorized individuals from the dressing room at that time.

Following each event, NYSAC Deputy Commissioners complete a "Team Member Performance Review" for each boxing inspector. For the April 21, 2018 event, Kunkle, your direct supervisor at the event, completed your performance review and awarded you 3 out of 4 in all performance categories.[6] Kunkle did not insert any comments on the performance review form in the designated sections, nor did he make any reference to unauthorized individuals in Davis's dressing room.

Events on the Following Days

On Sunday, April 22, 2018, at 8:10 pm, and in accordance with Labor Law § 27-b(6)(a), you filed a workplace violence incident report, via email, with NYSAC management, including Sumbler.[7] Less than 30 minutes later, at 8:39 pm, Sumbler sent a text to Rey Rosario, a Barclays Center security employee and NYSAC Boxing Inspector, to see if you asked for any help to get unauthorized individuals out of Davis's dressing room. At 8:55 pm, Sumbler sent a text to Dr. Browne to determine what he observed regarding the alleged threat from the reporter.

On Monday, April 23, 2018, at 1:51 pm Sumbler sent an email to Rosario for security footage outside of Davis's dressing room. At 7:34 pm that evening, Kunkle emailed Sumbler, expressing his concerns that there were unauthorized persons in Davis's room.[8] At some point on April 23, 2018, Sumbler added a notation to your performance review stating: "Possible breach of protocol, investigation to follow." When asked by DOL what steps she took after adding this notation, Sumbler stated she took no further action because in her mind, she had already determined you committed a terminable offense.

On April 24, 2018, at 5:46 pm, Sumbler forwarded Kunkle's email and a memo she drafted to the Assistant Executive Deputy Secretary of State James Leary and Executive Deputy Secretary of State Brendan Fitzgerald. In her statement to DOL, Sumbler said that it was her recommendation to

---

[6] NYSAC's Team Member Performance Review form scores Boxing Inspectors on a scale from 1 to 4 (with 4 being the highest score) in ten categories, including job knowledge and quality of work, as well as judgment, problem solving, and decision making.

[7] On April 24, 2018, you supplemented your complaint by forwarding a copy of your complaint with the New York City Police Department.

[8] As discussed in greater detail below, Kunkle and Sumbler have different recollections of when and why he drafted this email.

Leary and Fitzgerald that you be terminated, but that it was ultimately not her decision.  In his federal deposition testimony, Leary stated that he was aware of Sumbler's recommendation, but that it was also not his decision; that Fitzgerald agreed with Sumbler's recommendation; and that the recommendation was conveyed to Human Resources (HR).[9]

On April 25, 2018, HR informed you by telephone that you were terminated from your position as a Boxing Inspector.  HR subsequently mailed you a termination letter dated April 26, 2018.  You were not informed of the reason for your termination in either the telephone call or in the termination letter.

On May 2, 2018, approximately 10 days after you filed your workplace violence incident report, HR obtained a statement from Dr. Browne outlining his observations.  Dr. Browne stated that the reporter "was trying to interview Gervonta Davis in the hallway. Dorothea said we can't stop.  I said keep walking. We kept walking as we entered the commission room, and when we entered the room [the reporter] punched or kicked the door or the garbage can and said, 'I'm going to kill somebody.' Yelled it. He walked around in the commission room and then went out the door."  Approximately 19 days later, HR sent a letter to the reporter's employer, Swanson Communications, informing it that the reporter's "behavior is unacceptable" and requested that Swanson Communications take steps to ensure that such behavior does not reoccur.

On May 17, 2018, Sumbler sent an email to Rosario requesting the videotape of outside Davis's dressing room again. At some point after this second request, NYSAC obtained the videorecording, but it only contained approximately 30 minutes of footage.

**ANALYSIS**

To establish a claim that an employee was unlawfully discharged in retaliation under New York State Labor Law §27-a(10)(a), an employee must first establish a prima facie case of retaliation.  To establish a prima facie case, an employee must establish that: (1) they engaged in protected activity; (2) they were subjected to adverse action; and (3) there was a causal connection between the protected activity and the adverse action.  If a prima facie case is established, the burden shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse employment action.  After the employer sets forth a legitimate business reason for the retaliatory act, the burden shifts back to the employee to demonstrate that the stated reason is a pretext for retaliation.

You have established a prima facia case of retaliation as follows: (1) you were engaged in the protected activity of filing a workplace violence incident report; (2) your termination constitutes an adverse action; and (3) a causal connection was established based on the temporal proximity between the protected activity and the adverse action.  Here, the three business days between your filing a workplace violence complaint and your termination satisfy the causal connection element.

NYSAC asserts that you were terminated because you failed to remove unauthorized individuals from Davis's dressing room.  It is undisputed that there were unauthorized individuals in Davis's dressing room and that you knew that it was NYSAC's policy to ensure only authorized individuals are permitted inside dressing rooms.  Thus, NYSAC contends that your breach of protocol is a legitimate business reason for your termination.

However, and despite NYSAC's contention, there is evidence of pretext, as discussed in more detail below.  This evidence includes: (1) the lack of documentation regarding your breach of protocol

---

[9] Fitzgerald was not interviewed because he is deceased.

*prior to* the filing of your workplace violence incident report; and (2) security failures in Davis's dressing room when there were other NYSAC employees present.

<u>Lack of Documentation</u>

The lack of documentation that you committed a terminable offense *prior to* your filing of your workplace violence incident report supports the conclusion that NYSAC's legitimate business justification was pretext for retaliation.

On April 22, 2018, less than 30 minutes after you filed your workplace violence complaint, Sumbler commenced her investigation into your violation of dressing room procedures. Specifically, at 8:39 pm, Sumbler sent a text message to Rey Rosario, her subordinate,[10] seeking assistance "with a confidential matter." She informed Rosario that she was investigating the "actions of the inspector assigned to Gervonta Davis's dressing room." In the detailed text, she outlined the additional security put in place for the event and then she asked Rosario to find out if the inspector assigned to Davis's dressing room asked for assistance. This was the first documentation reflecting your breach of protocol.

On Monday, April 23, 2018, at 10:42 am, Rosario responded that no NYSAC staff "asked for assistance in removing individuals … in the dressing rooms." At 1:51pm, Sumbler emailed Rosario and reiterated the heightened security protocols and requested recorded security footage from outside of Davis's dressing room.

At 4:48 pm, Sumbler responded to and earlier email from Leary seeking "write ups" for all the breaches of protocol stating: "Will do. I have requested the security footage from that night as well."

Sometime on April 23, 2018, Sumbler reviewed the Team Member Performance Reviews from the April 21, 2018 event. Sumbler added the notation: "Possible breach of protocol – Investigation to follow." According to Sumbler, on April 23, 2018, she also reached out to Kunkle and asked him to memorialize his observations regarding Perry's performance.[11] Kunkle sent his observations via email on April 23, 2018, at 7:34 pm.

Prior to receiving the requested security footage, on Tuesday, April 24, 2018, at 5:46 pm, Sumbler sent a memo and Kunkle's email to Leary and Fitzgerald. In the memo, Sumbler outlines her observations upon entering Davis's dressing room. She states: "Upon entering, I saw three large men there in addition to Gervonta's camp, and guests. I asked Inspector Dorothea Perry who they were, she said she didn't know and shrugged her shoulders. So, I asked them who they were, they informed me that they were artists who were going to walk Gervonta to the ring. I told them they were not permitted to do so, and further were not permitted in the dressing room and asked them to leave. There were a few tense moments where they stared me down, then eventually left without incident…. Dorothea's failure to notify security immediately of this breach … placed both Ed Kunkle, and me in a

---

[10] During her interview with DOL, Sumbler stated that she had some concern asking Rosario because he was her subordinate. She stated that because of this concern, neither her text nor subsequent email referenced you by name. However, DOL notes that Sumbler could have asked whether any Boxing Inspector asked for any assistance.

[11] Kunkle's recollection of when Sumbler asked him to put his observations of your performance in writing is different from Sumbler's recollection. Kunkle testified that Sumbler asked him the night of April 21, 2018, to memorialize his observations. As discussed later, Sumbler's recollection is supported by the documentary evidence.

very dangerous situation." Neither Leary nor Fitzgerald made any further inquiries of Sumbler regarding her memo.

The following day, on April 25, 2018, your employment was terminated.

Kunkle's and Sumbler's emails contradict your Team Member Performance Review that Kunkle completed on April 21, 2018. You received 3 out of 4 in all performance categories and Kunkle did not use the comment section to document any breach of protocol. When asked about the "disconnect" between your performance review and his memo of April 23rd, Kunkle stated that because Sumbler had asked him to draft a memo outlining his observations, your breach of protocol was properly documented. However, Kunkle conceded he could not remember whether he had completed your performance review before or after Sumbler asked him to memorialize his observations. He further stated that whenever he granted less than 3 in any performance category for any inspector, the other Deputy Commissioners would push back and not want to sign off on the performance review; to avoid disagreement, Kunkle stated that he could just document his concerns in his memo to Sumbler.

This procedure is contradicted by how Kunkle handled another Boxing Inspector's performance review following the April 21, 2022 Barclays Center event. Kunkle scored 1's and 2's on James Hayes's performance review and entered notes in the comment section highlighting Hayes's repeated violations of NYSAC procedures.[12] Unlike the other performance reviews, Hayes's is typed and not signed by the other Deputy Commissioners. When asked about the Hayes performance review, Kunkle stated that he completed it in his hotel room that night after the fight.

Additionally, as noted above, Sumbler testified that she did not request Kunkle's observations until Monday, April 23, 2018. Kunkle provided his observations after being asked to do so later that day.

Security Failures by Other Individuals

You were not the only NYSAC employee involved in protocol breaches related to Davis's dressing room on April 21, 2022, but you were the only one held responsible.

It is undisputed that there were heightened security protocols put in place for the April 21, 2018 event. It is also undisputed that there were failures in those security protocols. The recorded security footage evidence obtained by NYSAC on May 17, 2018, demonstrates, and Kunkle concedes, that he knew there were unauthorized individuals in Davis's dressing room for at least 25 minutes before he took any steps to address the issue. He stated that it was because NYSAC was short staffed, and he needed to handle other, more pressing matters. Sumbler admitted she would have had concerns with the long delay in addressing the situation but did not take any steps to discipline Kunkle. She attempted to explain Kunkle's delay in addressing the situation by stating that she did not know if Kunkle entered the dressing room from another door; but Kunkle admitted that he did not.

Additionally, Barclays Center's security (a venue approved by NYSAC) was asked to prevent unauthorized individuals from roaming the back of the house hallways. As the recorded security footage evidence establishes, and Sumbler concedes, Barclays failed at preventing unauthorized individuals from entering the back of the house. This failure made your job duty of controlling the number of people in Davis's dressing room harder. Additionally, the recorded security footage shows

---

[12] According to NYSAC, Hayes was terminated by NYSAC on April 27, 2018 for repeated violations of NYSAC procedures on April 21, 2018, as well as prior poor performance. The documentation relied upon by NYSAC in deciding to terminate Hayes was his April 21 performance review and a memo prepared by Sumbler outlining Hayes's "egregious" breach of protocol. There was no separate memo from Kunkle.

7

that the Barclays Center's security stationed outside of Davis's dressing room failed to stop the numerous individuals who were entering and exiting the dressing room.

<u>Additional Considerations</u>

Sumbler conceded that you were an experienced inspector of 14 years, with no prior infractions. In all of your performance reviews, you received 3 out of 4 in all performance categories.  During his interview, Kunkle also stated that you were a very good inspector, with no prior infractions.  When asked if he would recommend terminating an inspector for failure to remove unauthorized individuals from a dressing room, Kunkle could not answer the question because he said that was not his role. Kunkle stated that he was not aware of any inspector being terminated for failing to remove unauthorized individuals from dressing rooms.

Former Deputy Commissioner George Ward testified in his federal deposition that during your 14-year tenure at NYSAC, you were an excellent boxing inspector and a final candidate for a promotion to Deputy Commissioner.

**CONCLUSION**

For the reasons stated above, DOL determines by a preponderance of the evidence that NYSAC violated Labor Law § 27-a(10)(a) by terminating you for filing a workplace violence incident report.  As required by Labor Law § 27-a(10)(b), DOL will refer this determination to the Office of the Attorney General.  NYSAC may exercise its right to appeal this determination to the Industrial Board of Appeals.  An appeal should be addressed to:

Industrial Board of Appeals
State Office Building Campus Building 12, Room 136
Albany, NY 12240

Or filed electronically to: <u>industrialappeals.sm.service@industrialappeals.ny.gov</u>[13].

Very truly yours,

Bridget Holohan Scally
Deputy General Counsel

---

[13] See the Guidelines for Filing Petitions Electronically at:
https://industrialappeals.ny.gov/system/files/documents/2022/03/guideline-for-filing-petitions-electronically-final-rules.pdf.