# EXHIBIT G

**STATE OF NEW YORK**
**INDUSTRIAL BOARD OF APPEALS**
-------------------------------------------------------------------x
:
In the Matter of the Petition of: :
:
NEW YORK STATE ATHLETIC COMMISSION, :
:
Petitioner, :       **PETITION FOR REVIEW**
:       **OF A DETERMINATION**
To Review Under Section 101 of the Labor Law :       **OF THE COMMISSIONER**
A Determination dated August 11, 2022 :       **OF LABOR**
:
-against- :
:
THE COMMISSION OF LABOR, :
:
Respondent. :
-------------------------------------------------------------------x

1.     We are attorneys with the law firm of Gleason, Dunn, Walsh & O'Shea, with an address of 40 Beaver Street, Albany, NY 12207, telephone number of 518-432-7511, and fax number of 518-432-5221.  We previously submitted a Notice of Appearance Form which is attached hereto as **"Exhibit A."**

2.     We are filing this Petition on behalf of Petitioner, the New York State Athletic Commission (hereinafter, "Petitioner" or "NYSAC"), a division of the New York State Department of State (hereinafter, "NYSDOS").

3.     The address for Petitioner is 123 Williams Street, 20th Floor, New York, NY 10038.

4.     On or about June 20, 2018, a former NYSAC employee, Dorothea Perry (hereinafter, "Ms. Perry") filed a PESH Discrimination Complaint against NYSAC.  A copy of Ms. Perry's Complaint is attached hereto as **"Exhibit B."**

5. On or about August 8, 2018, Antonio Milillo, Associate Attorney, NYSDOS, submitted a response to Perry's Complaint, on behalf of NYSAC. A copy of Mr. Milillo's response is attached hereto as **"Exhibit C."**

6. On or about May 17, 2021, we submitted a Designation of Representative Form to PESH. A copy of this Form is attached hereto as **"Exhibit D."**

7. On July 19, 2021, we signed a Tolling Agreement on behalf of NYSDOS with James Rogers, Special Counsel, New York State Department of Labor Counsel's Office, for Roberta Reardon, Commissioner of Labor, providing that any statute of limitations otherwise applicable in this matter was suspended until April 25, 2022. A copy of this Tolling Agreement is attached hereto as **"Exhibit E."**

8. The Tolling Agreement further provided that both the Commission and NYSAC "desire to have a full and compete investigation completed" (*see* Ex. E).

9. However, Mr. Rogers did not conduct a "full and complete" investigation, in that: (a) he did not seek information, documentation or testimony from any witnesses identified by NYSAC or NYDOS; (b) he did not interview any NYSAC or NYSDOS employees with personal knowledge of the facts and circumstances forming the basis for Ms. Perry's termination (including Kim Sumbler and Ed Kunkle); (c) he did not interview anyone who participated in the investigation of Ms. Perry's workplace violence complaint; and (d) he did not interview any NYSAC or NYDOS employees who made the determination to terminate Ms. Perry's employment.

10. Rather, Mr. Rogers interviewed only Ms. Perry and four (4) witnesses identified by Ms. Perry.

11. The witnesses interviewed by Mr. Rogers did not possess personal knowledge regarding: Petitioner's investigation of Ms. Perry's workplace violence complaint; the remedial

2

actions taken by Petitioner as a result of Ms. Perry's workplace violence complaint; or the facts and circumstances leading to Ms. Perry's separation from employment.

12.     Based substantially on the beliefs and conclusions of Ms. Perry and her witnesses, Mr. Rogers issued a Determination on March 8, 2022.[1] concluding that NYSAC "discriminated against [Ms. Perry] for filing a workplace violence incident report in violation of section 27-a of the New York State Labor Law." A copy of this Determination, is attached hereto as **"Exhibit F."**

13.     On April 18, 2022, we filed an appeal with the Industrial Board of Appeals ("IBA Appeal") with Docket No. PES 22-002, pursuant to a Petition for Review of a Determination of the Commissioner of Labor. A copy of our appeal Petition[2] is attached hereto as **"Exhibit G."**

14.     On April 25, 2022, we signed a Stipulation Tolling the Statute of Limitations on behalf of NYSAC with Richard Balletta, Assistant Attorney General, for Letitia James, Attorney General of the State of New York, providing that the previous Tolling Agreement executed by the Commissioner and NYSAC on July 19, 2021 was extended up to and including May 2, 2022. A copy of this Stipulation is attached hereto as **"Exhibit H."**

15.     On May 2, 2022, we signed a Tolling Agreement on behalf of NYSAC with Jill Archambault, Deputy Commissioner and Counsel, for Roberta Reardon, Commissioner for the Department of Labor, providing that any statute of limitations otherwise applicable in this matter was suspended until May 9, 2022. A copy of this Tolling Agreement is attached hereto as **"Exhibit I."**

---

[1] Although the Determination is dated March 8, 2021, the year is an error, as it was received by NYSDOS on March 11, 2022.
[2] Exhibits A-F to petitioner's April 18, 2022 Petition for Review are the same as Exhibits A-F herein and are therefore not duplicated in this Exhibit G.

3

16.    On May 9, 2022, we signed a Tolling Agreement on behalf of NYSAC with Jill Archambault, Deputy Commissioner and Counsel, for Roberta Reardon, Commissioner for the Department of Labor. A copy of this Tolling Agreement is attached hereto as **"Exhibit J."** The May 9, 2022 Tolling Agreement provided the following:

a.   NYSAC would withdraw its IBA appeal.

b.   The Commissioner would withdraw her March 8, 2022 decision and re-open the investigation into the termination of Dorothea Perry.

c.   The Commissioner would issue a new determination within 90 days of the reopened investigation.

d.   Any affected party would have sixty (60) days to file a new petition challenging the new determination pursuant to Labor Law §101(1).

e.   The statute of limitations was suspended until ten (10) days after the Commissioner's new determination and that any proceeding in connection with the claim must be commenced within ten (10) days after the Commissioner's determination.

(*see* Ex. J).

17.    On June 2, 2022, Bridget Holohan Scally, Deputy Counsel, New York State Department of Labor, Office of the General Counsel, issued a request for additional documents. Deputy Counsel Holohan Scally's letter is attached as **"Exhibit K."**

18.    On June 15, 2022, we provided all of the documents requested by Deputy Counsel Scally. Our June 15, 2022 letter to Deputy Counsel Holohan Scally is attached as **"Exhibit L."**

19.    On August 4, 2022, Deputy Counsel Holohan Scally virtually interviewed Kim Sumbler, the current NYSAC Executive Director, and Edward Kunkle, the former NYSAC Director of MMA and a former NYSAC Deputy Commissioner.

20.    Amy C. Karp and Priya Desai also attended the virtual interviews with Ms. Sumbler and Mr. Kunkle, but did not ask any questions. On information and belief, both Ms. Karp and Ms.

4

Desai were involved in the initial investigation and determination issued in response to Ms. Perry's June 20, 2018 PESH complaint.

21.     At the conclusion of the August 4th virtual interviews, your undersigned asked Deputy Counsel Holohan Scally who else was interviewed as part of their investigation; and she responded that she would not provide that information.

22.     On August 11, 2022, we received a Determination issued by Deputy Counsel Holohan Scally in which she wrote, "DOL finds that NYSAC violated Section 27-a(10)(a) of the Labor Law by terminating [Ms. Perry's] employment after [she] filed a workplace violence incident report." This Determination is attached as **"Exhibit M."**

23.     By this Petition and on behalf of NYSAC, we are appealing the Determination issued by Deputy Counsel Holohan Scally, on behalf of NYSAC (*see* Ex. M).

24.     The Determination is unreasonable and/or invalid because:

   a.   There is no evidentiary support for the determination that NYSAC retaliated against her for filing a workplace violence incident report, or for any other reason.

   b.   NYSAC terminated Ms. Perry's employment because of legitimate business reasons that are not pretextual.

   c.   Because Deputy Counsel would not provide information regarding the witnesses interviewed as part of the DOL's investigation, NYSAC does not know if any of the witnesses interviewed possessed personal knowledge regarding: Petitioner's investigation of Ms. Perry's workplace violence complaint; the remedial actions taken by Petitioner as a result of Ms. Perry's workplace violence complaint; or the facts and circumstances leading to Ms. Perry's separation from employment.

   d.   The DOL's finding that there were other NYSAC employees involved in the protocol breaches in the dressing room is incorrect and unsupported by the evidence; because Ms. Perry was solely responsible for individuals in her assigned dressing room. Moreover, any alleged involvement of other employees does not negate Ms. Perry's clear breach of protocols.

5

e. The DOL's findings that Barclay's security was responsible for the individuals in the dressing room controlled by Ms. Perry is incorrect and unsupported by the evidence.

f. The DOL's determination that Ms. Perry did not commit a terminable offense prior to filing her workplace violence complaint is incorrect and unsupported by the evidence.

g. The DOL misinterpreted the timeline of events regarding Ms. Perry's breach of NYSAC protocol and Mr. Kunkle's awareness of such breach.

h. The DOL's reliance on the Ms. Perry's Team Member Performance Review, as it compares to another inspector's Team Member Performance Review, is misguided and unsupported by the evidence.

i. The DOL's reliance on the temporal proximity between Ms. Perry's protected activity and her termination is flawed, as Ms. Perry's clear breach of NYSAC protocol took place the same evening as the alleged events leading to her workplace violence complaint; and NYSAC took appropriate action regarding Ms. Perry's violations the very next business day.

25. Petitioner requests the following relief from the Industrial Board of Appeals:

a. A reversal of the Determination.

b. A finding that NYSAC had legitimate business reasons for terminating Ms. Perry's employment.

c. A finding that NYSAC did not retaliate against Ms. Perry for filing a workplace violence incident report.

Date: October 6, 2022

GLEASON, DUNN, WALSH & O'SHEA

By: _____

LISA F. JOSLIN, ESQ.
NANCY S. WILLIAMSON, ESQ.
*Attorneys for Petitioner*
Officer and P.O. Address
40 Beaver Street
Albany, NY 12207
(518) 432-7511

6

# EXHIBIT A



# STATE OF NEW YORK

## NOTICE OF APPEARANCE

Section 166 of the Executive Law requires a regulatory agency to maintain for public inspection, a record of who appears before it, for a fee as a third party (i.e., an attorney, an agent, lobbyist\*, or representative) on behalf of a person or organization subject to the regulatory jurisdiction of the agency. This usually occurs when the third party's client is involved in an enforcement, formal permit, or application matter.

**Agency:** New York State Department of Labor                **Date:** March 21, 2022

**Division/Bureau:** Industrial Board of Appeals

1.  **Name of individual appearing:** Lisa F. Joslin, Esq. and Nancy S. Williamson, Esq.

    **Address:** Gleason, Dunn, Walsh & O'Shea, 40 Beaver Street, Albany, NY 12207

    **Telephone:** (518) 432-7511

2.  **Client represented:** New York State Athletic Commission

    **Address:** NYS Dept of State, One Commerce Plaza, 99 Washington Ave., Albany, NY 12231

    **Telephone:** (518) 486-9844

3.  **Subject of appearance:** _____ **Regulatory/Enforcement**      _____ **Lobbying**

    Appeal of Determination

4.  **Acting in capacity of:**

    __X__ **Attorney**          ___ **Lobbyist**

    _____ **Agent**            ___ **Other (describe)** _____

5.  **Are you being compensated?** __X__ **Yes** _____ **No**      **If Yes:** __X__ **Fee** ___ **Salary**

6.  **Signature of individual appearing:** _____

----

7.  **Agency official (print name):** Linda M. Baldwin, Esq., General Counsel, NYS Dept. of State

    **Signature:** _____

---

\*A LOBBYIST is a person or organization, other than a New York State government employee acting in an official capacity, who appears for the purpose of influencing the adoption or rejection of proposed rules, regulations, rates, legislation, including the State budget or the specification or award of a State Procurement Contract. An "appearance" for lobbying purposes can be a personal visit, letter, telephone call, conversation at a meeting, or any other type of contact, but does not include "on the record" proceedings or hearings.

# EXHIBIT B

## PESH Discrimination Complaint Intake Form

| Name of Person Taking Complaint<br>Varghese Mathew | | | | Date Received | | Time Received |
|---|---|---|---|---|---|---|
| Related Inspection Number, if appropriate | | | | Date of Filing | | |

### Complainant Information

| Full name- | Last<br>Perry | First<br>Dorothea | Middle<br>R | | | |
|---|---|---|---|---|---|---|
| Address<br>74 Tapscott Street | | | | | | |
| City<br>Brooklyn | | | State<br>New York | | | Zip<br>11212 |
| Home Phone Number<br>917.328.3442 | | | E-mail<br>MsDorothea.Perry@gmail.com | | | |
| Work Phone Number<br>718.403.8147 | | | | | | |
| Additional Phone Number<br>917.455.6271 | | | | | | |

Summary of the alleged retaliation (protected activity, respondent knowledge, adverse action, n

As a matter of history:  On Nov. 2, 2013 during a 10-round fight Magomed Abdusalamov fought Mike Perez in a heavyweight championship bout at Madison Square Garden.  He suffered a major brain injury as a result and an Inspector General investigation concluded that NYSAC's post-fight care regimen was largely at fault. On Friday, September 8, 2017, New York State agreed to pay Abdusalamov and his family $22 million for negligence by the New York State Athletic Commission (inclusive of NYSAC employees and representatives) in connection with that fight. As a result of the IG's investigation NYSAC has since changed its post-fight care regimen to include more stringent medical exams between rounds, an immediate post-fight exam at ringside, and a mandatory more extensive post-fight triage in the Commission area immediately after the fight.

On April 21st I was assigned to work at the Barclays Center on the Adrien Broner vs. Jesse Vargas card.  I arrived at the assigned time, 2:30 pm.  At the team meeting Ms. Kim Sumbler advised the inspectors, deputies and other staff in attendance that security would be tight (as a result of the Conor McGregor incident in Brooklyn on April 6th).  We were told that at least 50 police (some with dogs) and additional Barclays Center security would be in attendance and that we were not security.  Barclays Center Security would keep the halls clear, only people with credentials would be allowed in the secured areas and locker rooms.  We would only be charged with doing our jobs.  I had two assignments that evening one of which was to work with Mr. Gervonta Davis, an elite fighter, who was scheduled to be the first televised fight on Showtime.  I was sent to Mr. Davis' room when he arrived, at approximately 7:45 or so. At some point before Mr. Davis had given his pre-fight urine, I was surprised when an entourage of young men arrived was allowed into the dressing room.  The media room had been converted into a dressing room for Mr. Davis, half for him and half for some of the undercard.  Gervonta's room had a Barclays security guard stationed at the door.  I walked out to the Barclay's security officer and asked him why he was letting people in the room.  I told all the men to leave the room, especially those with drinks.  I told them "NO DRINKS" were allowed in the locker rooms and that "they were not allowed in the locker room".  There were at least ten of them.  The men were mannerable, those with drinks left, but a few remained, but they were not on the list of people authorized to be in the locker room.  The one that appeared to be leading the group introduced himself to me.  I did not know who he was.  Two weeks later I learned that it was the rapper named Casonova.   When I took Mr. Davis to the locker room for his pre-fight urine and

medical exam, I had another Inspector take Mr. Davis into the bathroom for the collection. While Mr. Davis was out of earshot I spoke to Deputy Commissioner George Ward loud enough for other Commission personnel to hear, and advised him that there were many people in Mr. Davis' locker room that were not on the list and that Barclays Security let them in. I asked DC Ward to give me 3 – 4 minutes head start when I left the Commission room then to send in back up to help me clear Gervonta's dressing room because Barclays security weren't doing their job. Exactly as I requested NYSAC staff came to Gervonta's dressing room. It was Ms. Sumbler along with DC Kunkle. She spoke directly to Mr. Davis who was of the impression that he could have the rapper "Casonova" walk him out. She said to Mr Davis "You and I had this conversation yesterday, no rappers are walking anyone out because of security concerns". DC Kunkle asked me to point out the members on the list who were authorized to be in the room and I did, I pointed out the team and two family members (one in the room, and the personal security guard on the door). Note: There were two guards on the door. A Barclays security guard to the right, and a personal security guard to the left. At some point Mr. Casonova said it was okay, gave Mr. Davis a hug and told him he would be outside cheering for him. He left with his friends. There was no incident. Later, the actor 50 Cent, and at least two of his own security people, came into the room for about 1 minute to wish Gervonta good luck. They promptly left.

Mr. Davis' ring walk was scheduled for 8:55 but he was late, we walked to the ring about 9:00 instead.

At some point during the start of the bout we heard that the building was on locked down because there was a shooting. I looked around when I was on the apron after the first round but didn't see anyone moving to leave, and no other broadcasts had been given so I continued to work. I was very concerned for my safety at that point. After the fight, which Gervonta ended with a 2nd round stoppage of Mr. Jesus Cuellar, I began escorting Mr. Davis from the arena back to the Commission room for this post-fight medical exam per established protocol, accompanied by Inspector Juan Rivera and Doctor Avery Brown and several Barclay Security men. The Barclays security left us at the entrance of the tunnels. As we entered the tunnels leading back to the Commission room we were confronted by Mr. Andrew Roberts (of Swanson Communications). This is not the first time I have seen Mr. Roberts, but I do not know him personally. Customarily Mr. Roberts begins a dialogue with the boxers as they are walked back to the Commission room. This time Mr. Roberts began speaking to me, almost immediately. He began telling me that I am to take the fighter to be interviewed. I told him he was going for a post-fight medical exam. He then told me again that "I was to take the fighter for interviews because Kim Sumbler said it was okay for him to do the interviews first". At the point I looked around for Kim Sumbler. Not seeing her I said "Where's Kim Sumbler? I paused. As he began to talk again I asked him, "Why are you even talking to me? If you want to talk to this kid you're wasting valuable time talk to him". As Mr. Roberts continues talking to me I ask "Where's the doctor?" I looked around for the doctor and realized he is behind someone that was behind me. At that point I heard Doctor Brown clearly yell out "DO NOT STOP FOR INTERVIEWS ... KEEP GOING TO THE COMMISSION ROOM!". I said to Mr. Roberts "We're not stopping". As I approached the door to Commission room I indicated to a dark-skinned, middle aged male, Barclays security officer that I had "the fighter, plus one (meaning Gervonta's representative from his camp)". Mr. Roberts became irate and begins swearing and making threats. When I enter the Commission room I turn to see who is coming through the door and see that the doctor and Mr. Rivera are quite visibly upset. After getting Mr. Davis seated in the triage area with the doctor and the other inspector, Mr. Rivera. We all commented on Robert's behavior, which was erratic, and I say, "he wants to murk me" although he didn't use that word. Roberts said "kill". I say, "No one is gonna murk me". I left the fighter with Dr. Brown and Juan Rivera and went out to the general Commission area where I see Kim

Sumbler and Dr. Nitin Sethi. I explain that "some guy was trying to stop us from bringing the fighter for his physical and he said Kim said it was ok". At that point Kim throws her head back and says, "Oh yeah I did say it was okay". I pause and tell her that she never told us and walk away. At some point I hear Luana Ferreira apologizing to someone saying, "the inspectors are only doing their jobs".

After Mr. Davis' exam (time would be on the inspector report), I asked him to stay in the Commission room to give urine because I believed his locker room would have too many people. He complied and sat on the couch at first with a member of his team. I was surprised to see Mr. Roberts in the room standing near me so I gave him a gracious downward wave of my hand inviting him to speak to Mr. Davis. I do not believe he spoke to Mr. Davis. I let Mr. Davis sit for a while, then he switched positions to watch the next bout (Charlo vs. Centeno) from a chair facing the tv. Mr. Davis comments on how hard Charlo hits. At some point after that fight ends early Charlo comes into the room. Charlo and Davis have a beef so I sit Davis in another chair and stand in front of him to block his view when I see the two of them glaring at each other. Charlo goes in to be triaged and Davis is taken in for his post-fight urine.

After Mr. Davis gave urine (time would be on the inspector report) he is paid out, and leaves for the Commission room for his interviews. As I am doing my paperwork, Mr. Charlo comes out and speaks to me for a couple of minutes. I then leave the room with Inspector Juan Rivera and we follow Mr. Davis back to his dressing room to make sure he is okay and I pick up my papers that I left in his room. When I turned in my paperwork for Mr. Gervonta's bout I told DC Ward about the Mr. Roberts threatening me. At some point while in the Commission room I heard Luana Ferrerria speaking about Mr. Roberts and she mentioned Swanson Communications. That is how I learned of Mr. Roberts affiliation.

Later that evening as I sat ringside watching the Broner fight an inspector, Compuverde, asked me "what was up with the guy stopping the fighters after the fight?" I asked him what he meant and he said, "he told us he had already told you off so we'd better listen to him, and since no one said anything we just did what we were told. We stopped with the fighters at the table so they could interview them. They even changed the way the fighters were exiting the ring to accommodate this".

After the show was over I met with DC Robert Orlando ringside and as we walked back to the Commission room I told him about the guy that threatened to kill me. A female fan overhead the conversation and gasped.

On April 22nd I sent a written report about the incident to Kim Sumbler and Matt Delaglio and the Commissioner (Signorile). The only person that showed any concern was Commissioner Signorile who stated he would look into the matter. On April 23rd he called me to inform me that Kim Sumbler told him I had no witnesses to the incident. I explained that Doctor Brown and Inspector Juan Rivera were with me. At that point fearing the matter was going to swept under the rug I went to the 78th precinct to lodge a complaint. I had the option of pressing charges but did not because I only wanted to make it a matter of record. On April 24th I sent an update about the incident to Kim Sumbler, Matt Delaglio and Commissioner Signorile advising them of my understanding of my rights as it pertains to workplace violence and requesting that the matter not be taken lightly. I submitted a copy of the police complaint ticket (absent the #). I requested that the matter be treated like a similar situation that happened a year before in which Ms. Sumbler alleged that a male black NYSAC inspector had issued a death threat to NYSAC staff and the State police were sent to his home. Let me point out that Ms. Sumbler was not terminated in that case for filing a complaint.

At some point, on April 24th I requested to know who was handling my complaint because no one was communicating with me about it. I wanted to know "who should I keep apprised of the police activity?" Ms. Sumbler responded that the matter was not handled by her, but instead it was being handled by HR. Later that day I did I received a call from the PAA with the police complaint number, and I submitted it to Kim Sumbler, Matthew Delaglio and the Commissioner.

On April 25th at approximately 4:40 pm I received a call from Ms. Debra Meade, Director of HR to "advise me that my services were no longer needed and that as of COB I would no longer be a State employee". I asked her was it in retaliation for the workplace violence complaint that I submitted or was it in retaliation for the IG complaint that I submitted a couple of weeks before. She said she was only the person that makes the phone calls and she was not aware of any of this. I asked her "if she was making such a call, and as the Director of HR, didn't she think it was her duty to know why she was making the call".

I called Matt Delaglio, since he is my direct superior to find out if he was aware of the termination. He said he was not. I asked if he was aware of any problems with my performance that evening. He stated he was only aware of two incidents. I asked which two. He said, "the one you reported in writing, and that there were too many people in Gervonta's room". I told him I reported both incidents. One in writing and one verbally. He said he didn't know what was going on.

On April 26th I called Dr. Brown and also Inspector Rivera to ask them to make a mental note of the events of April 21st. Dr. Brown thought it was odd that I was the second person asking about that incident. When I told him that I had been fired he was shocked and responded, "they fired the best inspector they have?". When I asked him who else inquired about the incident he said Kim text him on Sunday 4/22/18 about it, and he confirmed it did in fact happened. "Why did Kim Sumbler tell Commissioner Signorile on Monday 4/23/18 that I did not have any witnesses if she knew I did?", I asked. I asked Dr. Brown to please save a copy of the text message. He agreed.

Since my termination I have been trying to get access to my employee records, to no avail. Only limited information has been sent to me despite me proving that other document exists e.g. my employee evaluations. I have also requested a public hearing which I believe I am entitled to as a public officer. I sent emails to Commission personnel, e.g. Matt, Kim, Ms. Meade, the Commissioners, Ryan (attorney), James Leary (attorney), my elected representatives, and another attorney Mr. Antonio Milillo. Mr. Milillo has responded twice, very condescendingly, to tell me that I should not CC anyone and Ms. Meade will decide who should get my emails.

I believe the workplace violence complaint was the catalyst for my termination but also another example of discrimination against me because Ms. Sumbler, a white woman, was not terminated when in 2017 she alleged a black male inspector, that was terminated, made a death threat against NYSAC. The STATE took her word for it, but me being a black woman with multiple witnesses and video (which NYSAC now has) following the proper course as recommended by the IG, was terminated under a similar scenario. The termination ties into and supports my previous complaints of discrimination / retaliation that I have submitted internally, to the IG, and to the Department of Human Rights.

I followed the post-fight protocols that the Inspector General recommended despite threats to my own life and should not have been retaliated against for adhering to that protocol. Nor should my employer have taken any adverse action against me for filing a credible complaint to the NYPD. Let me remind you that was also that night someone snuck a gun into the venue and the Barclays was on lock down temporarily.

I also believe that Commissioner Signorile was retaliated against for being the only one to advocate for me as a victim of workplace violence and continuing to investigate the reason for my termination even when he was told to back off. Without even knowing the reason for my termination he went so far as to discredit their "too many people in the room" defense when he discovered a similar situation a week later at a boxing event held at the Amazura. No inspector was terminated for that which demonstrates, in other words, NYSAC's proffered reason, is a phony one to cover up its discriminatory and retaliatory intent. Commissioner Signorile has since been told that he is being replaced as Commissioner pending the NYS Senate confirmation of the new Commissioners.

I still believe the workplace violence incident was the catalyst because it bared too much of a resemblance to the 2017 matter Kim Sumbler was involved, in except that I had multiple witnesses, and video. I learned of NYSAC's internal investigation into the matter a day after receiving my termination letter.

No inspector, in three decades, has been terminated for no reason at all. NYSAC has yet to explain to me why I was terminated.

## Respondent Information

| Name of Employer | Name of Chief Executive Officer | |
|---|---|---|
| New York State Athletic Commission | Kim Sumbler | |
| Address | | |
| 123 William Street | | |
| City | State | Zip |
| New York | NY | 10038 |
| Name of Complainant Supervisor | Name of Contact Person / Phone # | |
| Mathew Delaglio | Kim Sumbler / 212-417-5703 | |
| Phone 1 | E-mail | |
| 212-417-4952 | Kim.Sumbler@dos.ny.gov | |
| Phone 2 | | |
| 212-417-5700 | | |

| Other Contacts<br>Cell phone 732-513-9268<br>Email: Matthew.delaglio@dos.ny.gov | |
| --- | --- |
| # of employees<br>State Department has more than 1000 employees, NYSAC has more than 50. | Unionized? If yes provide Name of Union and Contact Information<br>No |
| **Signature of Complainant →** | X  *Dorothea R Perry* |

# EXHIBIT C

STATE OF NEW YORK
**DEPARTMENT OF STATE**
OFFICE OF GENERAL COUNSEL
ONE COMMERCE PLAZA
99 WASHINGTON AVENUE, SUITE 1120
ALBANY, NY 12231-0001
WWW.DOS.NY.GOV

ANDREW M. CUOMO
GOVERNOR

ROSSANA ROSADO
SECRETARY OF STATE

August 8, 2018

Varghese Matthew
Senior Safety and Health Inspector
New York City District Office
75 Varick Street
7th Floor
New York, NY 10013
Fax: 212-775-3542

Re:    Perry v. NYS Athletic Commission
        Case Number: 30041867

Dear Varghese Matthew:

The New York State Department of State, Athletic Commission ("NYSAC/Respondent") submits this Response to the Complaint filed by Dorothea Perry ("Complainant") with the Public Employee Safety and Health Bureau on or about June 20, 2018.

As supported by the facts set forth below and the documents submitted herewith, Complainant's workplace violence complaint was investigated and properly addressed by DOS, and Respondent has not discriminated against Complainant. More specifically, Complainant was not released from her position as an Athletic Commission Inspector because she filed a work place violence complaint; Complainant was released because she failed to follow protocol in a high-risk environment on April 22, 2018.

## PARTIES

The New York State Athletic Commission (NYSAC) regulates and oversees combat sports in New York State. It is a commission housed within and supported by the New York Department of State. Kim Sumbler, as Executive Director, is the highest official in NYSAC. Ed Kunkle is a Deputy Commissioner. Complainant, Dorothea Perry, and Ed Campoverde, a person whose name appears below, are Inspectors at NYSAC and ensure boxer safety and integrity and therefore are critical components of the NYSAC oversight responsibilities. Inspectors are "at will" employees. Complainant had been employed with NYSAC as an Inspector since January 15, 2004.

## COMPLAINANT'S ALLEGATIONS

Complainant alleges that Respondent Athletic Commission violated New York State Labor Law Section 27-a.10, entitled "Safety and health standards for public employees". Section 27-a.10 states:

> No person shall discharge, or otherwise discipline, or in any manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to this section or has testified or is about to testify in any such proceeding, or because of the exercise by such employee on behalf of himself or others of any right afforded by this section.



NEW YORK STATE OF OPPORTUNITY. | **Department of State**

Complainant alleges that filing the workplace violence complaint on April 22, 2018 was the "catalyst" for her termination three days later, on April 25, 2018.

## FACTS

### Events Surrounding the Workplace Violence Complaint

On April 21, 2018, the Athletic Commission hosted an event, Broner v. Vargas, at Barclays Center in Brooklyn, New York. The events in question surrounded an event scheduled on the main card, Gervonta Davis v. Jesus Cuellar, at 8:55 PM. Complainant was responsible for working with Mr. Gervonta Davis. After Mr. Davis fought, Complainant, Inspector Juan Rivera, Dr. Avery Brown, and some Barclay's security escorted Mr. Davis back to the locker room for Mr. Davis' post-fight medical exam.

While walking to the locker room, Complainant alleges they were confronted by a person who Ms. Perry initially identified as Mr. Sam Jackson, a reporter with Swanson Communications.[1] Typically, reporters may interview fighters after the fight. The reporter stated he had permission to interview Mr. Davis by Kim Sumbler, but Complainant, Juan Rivera, and Dr. Avery Brown disregarded his request to interview Mr. Davis and continued to the locker room. Complainant alleges the reporter became irate, began swearing, and making threats, like "I'm going to kill somebody!" Complainant filed a workplace violence complaint with DOS on April 22, 2018[2] and filed an Incident Report with the NYPD on April 23, 2018. Veronica Cano, a Labor Relations Specialist at the Department investigated the incidents alleged in Complainant's workplace violence complaint.

During the investigation of the work place violence complaint, Ms. Cano received a witness statement from Dr. Brown. Dr. Brown alleges the reporter made the comment in general frustration and not directed at any specific person. His witness statement alleges:

> when we entered the room, Sam punched or kicked the door or the garbage can and said, 'I'm going to kill somebody.' Yelled it....his outbursts and action weren't directed towards me.

On May 15, 2018, after leaving an email message that went unanswered, Ms. Cano sent a letter to Swanson Communications informing it of its employee's actions and the statement that he yelled "I'm going to f**king kill somebody!" as he punched or kicked the door or the garbage can nearby. Respondent informed Swanson Communications that the conduct by one of its journalists was unacceptable and sought assurance of appropriate behavior from staff in the future.[3] Upon learning that the reporter's name was Andrew Roberts, Ms. Cano sent a revised letter correcting the name. As such, on July 23, 2018, the investigation was closed and Complainant was so notified. The workplace violence complaint was investigated and properly addressed by DOS.

### Events Surrounding Termination of Complainant's Employment

Due to high security risks surrounding the Broner v. Vargas fight, NYSAC placed additional expectations and restrictions on NYSAC employees for the event on April 21, 2018. NYSAC staff were informed that only a list of authorized boxers and cornermen were permitted in the locker rooms/back-of-house. There were no exceptions permitted. Staff were instructed to notify Barclays security staff outside the locker room if additional people enter the locker room and to have the security staff remove the unauthorized people. Authorized boxers and cornermen were provided with wrist bands for easier identification. Once an athlete and a corner had reported, they were to remain in their locker rooms unless accompanied by an inspector. Complainant and Kim Sumbler both state that Kim Sumbler advised the inspectors, deputies, and other staff during the team meeting that security would be tight.

Complainant arrived at Barclays on April 21, 2018 at the report time of 2:30 PM. Respondent has received security camera footage of the night in question, from 7:43 PM to 8:13 PM from Barclays Center. The video is from a camera outside the room that was used as Mr. Gervonta Davis' dressing room (the room is labeled "interview room"). The door viewed from the camera is the only door in and out of the

---

[1] Ms. Perry later learned that the reporter's name was Andrew Roberts, not Sam Jackson, and reported this to DOS on May 22, 2018. See "05-22-18 DP to DM new name" submitted herewith.
[2] See "04-23-18 KS to DM" submitted herewith.
[3] See "Sam Jackson letter" submitted herewith.

room other than an emergency exit.[4] The video, and the still photos taken from it demonstrate that Complainant disregarded the duties and restrictions placed on staff during the Broner v. Vargas event.

Complainant alleges she arrived at Mr. Davis' locker room around 7:45 PM. It is apparent from the video that she was in the room by the start of the video security footage, which begins at 7:43 PM. At 7:43:48 PM, about 15 to 20 unauthorized personnel entered the room with drinks, unstopped by the security at the door. Among the unauthorized personnel were Cassanova - an entertainer who supports Mr. Davis - and his entourage. Complainant alleges that at this point, she walked out to the security officer and asked why he was letting people in the room, but this is not supported by the video footage.

Complainant alleges she told the men to leave and it is apparent that some men left the room at 7:47:17, however, Cassanova and many of his entourage remained in the room. Complainant alleges that she took Mr. Davis to the locker room for pre-fight urine and a medical exam. However, at 7:58:41, Ed Campoverde walked into the dressing room and at 7:59:12, Mr. Campoverde and Complainant walked out with an unidentified man, not Mr. Davis. Mr. Davis remained in his dressing room, without a NYSAC staff member or inspector.

At 8:05:24, Complainant returned and briefly said something to the Barclays security person stationed outside the dressing room. At 8:09:56, DC Kunkle approached the locker room, then he and Kim Sumbler entered. Ms. Sumbler asked the remaining men to leave the room at that time. At 8:12:36, Cassanova and his entourage left the room followed by DC Kunkle and Kim Sumbler. They spoke to security as they left. (8:12:41). The footage ends soon after.

As the foregoing makes clear, Complainant did not follow established procedures during the April 21, 2018 event at Barclays. There were several unauthorized personnel admitted to Mr. Gervonta Davis' locker room on Complainant's watch who did not leave until Kim Sumbler entered, saw them, and directed them to leave. Complainant had a clear responsibility to direct unauthorized persons to leave the locker room or to request security to escort the unauthorized persons out. From the security footage, it is clear Complainant did neither. Unauthorized men, including Cassanova, remained in the locker room for at least 20 minutes.

After reviewing the conduct of Ms. Perry during the Barclays event, and after considering all her violations that night and the dangerous situation they created, Ms. Sumbler decided to fire Complainant. The Bureau of Human Resources of DOS notified Respondent on April 25 that she was fired.

Not only was Complainant terminated for an appropriate business reason, but the workplace violence complaint she initiated was taken seriously, investigated and handled appropriately. Her termination had nothing to do with her filing of a workplace violence complaint.


## CONCLUSION

Respondent, the State of New York, Department of State, Athletic Commission, has not engaged in any unlawful discriminatory practice in violation of the New York State Labor Law Section 27-a.10. The Complaint should therefore be dismissed.


Yours truly,

Antonio Milillo
Associate Attorney

---

[4] Images from the video are provided herewith.

# EXHIBIT D

**NYS DEPARTMENT OF LABOR**

**PUBLIC EMPLOYEE SAFETY AND HEALTH**

**DESIGNATION OF REPRESENTATIVE**

---

Case Name: Perry vs. NYS Athletic Commission

Case Number: 30041687

---

TO:

Senior Safety and Health Inspector Varghese Mathew
NYS Department of Labor – PESH
75 Varick Street, 7th Floor
New York, NY 10013

The undersigned hereby enters hixappearance as representative of:
(her)

NEW YORK STATE ATHLETIC COMMISSION

In the above captioned matter:

| | Representative's Address and ZIP Code |
|---|---|
| Signature of Representative | Gleason, Dunn, Walsh & O'Shea<br>40 Beaver Street<br>Albany, New York 12207 |
| LISA F. JOSLIN, ESQ.<br>Type or Print Name | |
| Attorney<br>Title | (518) 432-7511<br>Area Code    Telephone Number |
| May 17, 2021<br>Date | E-mail address: LJoslin@gdwo.net |

# EXHIBIT E

STATE OF NEW YORK DEPARTMENT OF LABOR
PUBLIC EMPLOYEE SAFETY AND HEALTH BUREAU

IN THE MATTER OF THE INVESTIGATION OF
ROBERTA REARDON, COMMISSIONER OF LABOR
OF THE STATE OF NEW YORK, OF:

THE NEW YORK STATE ATHLETIC COMMISSION,
concerning Dorothea Perry.

TOLLING AGREEMENT

WHEREAS, the Commissioner of Labor of the State of New York, (hereinafter, "the Commissioner"), has received allegations indicating that The New York State Athletic Commission (hereinafter "NYSAC"), violated New York State Law by retaliating against Dorothea Perry for engaging in protected activity under the Public Employee Safety and Health Act, section 27-a of the Labor Law; and

WHEREAS, the Commissioner may request that the New York State Attorney General bring an action pursuant to Section 27-a(10)(b) of the Labor Law concerning the alleged retaliation described above; and

WHEREAS, NYSAC denies engaging in the alleged retaliation described above; and

WHEREAS, the Commissioner and NYSAC desire to have a full and complete investigation completed, including a plenary appeal to the Industrial Board of Appeals ("IBA") should either party so move;

WHEREAS, the Commissioner and NYSAC may also want an opportunity to discuss settlement;

WHEREAS, the applicability of any limitations period, including but not limited to the effect of Executive Orders issued by Governor Andrew M. Cuomo related to the COVID 19 pandemic, may be disputed, and the parties desire to provide adequate time as discussed above without pressure for the Commissioner to make a decision prematurely and, perhaps, unnecessarily.

NOW, THEREFORE, the parties agree as follows:

1. Commencing April 24, 2021, any statute of limitations otherwise applicable to the above-described claim is suspended until April 25, 2022; and any proceeding in connection with this claim must be commenced on or before April 25, 2022.

Date: July 19 , 2021 ___James A. Rogers /S/___

                **James Rogers, Special Counsel**
                State Office Campus Bldg 12,Room 509
                Albany, NY 12240

For:    Roberta Reardon, Commissioner of Labor

Date: July 19 , 2021 _____

                Lisa F. Joslin, Esq.
                Gleason, Dunn, Walsh & O'Shea
                40 Beaver St., Albany, NY 12207

For:    New York State Department of State

# EXHIBIT F

# WE ARE YOUR DOL



NEW YORK | **Department** of **Labor**

*Roberta Reardon, Commissioner*
*Kathy Hochul, Governor*

**James Rogers**
Special Counsel for Worker Protection

**New York State Department of Labor | Counsel's Office**
Harriman State Office Campus
Building 12, Albany NY 12240
Mobile: 347-831-5630 | james.rogers@labor.ny.gov

March 8, 2021

Dorothea Perry
74 Tapscott Street
Apartment 1
Brooklyn, NY 11212
msdorothea.perry@gmail.com

Re:    PESH Discrimination
Case: 30041867

Dear Ms. Perry:

The New York State Department of Labor received your complaint in which you allege that you were terminated after you filed a workplace violence incident report with your former employer, the New York State Athletic Commission ("NYSAC"), and a complaint about the same incident with the New York City Police Department ("NYPD"). You filed a complaint with the New York State Department of Labor's ("Department") Public Employee Safety and Health Bureau ("PESH") on May 2, 2018. Your complaint was investigated by PESH and the findings have been reviewed by this office. Based upon such investigation and review, the Department of Labor has determined that NYSAC violated New York State Labor Law §27-a by retaliating against you when they terminated your employment within days after you filed the workplace violence incident report and police complaint.

## BACKGROUND

### Work History

You worked as a Boxing Inspector for 14 years until the date you were terminated, April 25, 2018. The Department requested and received your performance evaluations, which all demonstrated you executed your duties satisfactorily and met all expectations. Your immediate supervisor completed an evaluation of your performance on the night April 21, 2018, the date of the workplace violence incident, that clearly states you

1

performed satisfactorily in all categories. At a date or time after that evaluation was completed by your immediate supervisor, a comment was added by Executive Director of NYSAC, Kim Sumbler, that there may have been a "possible breach in protocol." Deputy Commissioners George Ward and Robert Orlando; Commissioner John Signorile; and Boxing Inspector Juan Rivera were interviewed by the Department and provided testimony praising the quality of your work and your professionalism at the workplace. Notably, apart from your employer's description of the events of April 21, 2018, NYSAC did not offer any contrary evidence as to the quality of your work or your conduct on the job.

### Workplace Violence Incident Report

On April 22, 2018, you filed a complaint with your employer regarding a workplace violence incident that occurred the previous evening, April 21, 2018. Your complaint was addressed to senior management officials including Executive Director Sumbler. In the complaint you stated that Andrew Roberts ("Roberts")[1], a reporter for Swanson Communications, approached you and Gervonta Davis ("Davis"), the fighter you were assigned to, just after Davis finished his bout. You stated in your workplace violence complaint that Roberts demanded to interview Davis before his post-fight medical exam and that you informed Roberts that, per NYSAC policy and protocol, a fighter was required to complete the post-fight medical exam before any media appearances could occur.

Your April 22 workplace violence complaint stated that Roberts became irate and screamed he "was going to kill [you]". Importantly, your workplace violence complaint alleged that Roberts, in his tirade, stated he had "made arrangements" with Executive Director Sumbler to conduct the interview before Davis' medical exam. Your complaint also noted that "no direction had been given" to you to allow a fighter to be interviewed prior to his medical examination or that the long-standing policy had been changed. Additional testimony revealed that Roberts kicked a garbage can or door as he was screaming and that his statement might have been "I am going to fucking kill somebody".

The investigation revealed that the policy directing fighters to a post-fight medical exam before media interviews was the result of extensive investigation by the New York State Inspector General into the death of a fighter some years before this incident. During our investigation, your employer did not deny that they granted permission to Roberts for a pre-medical exam interview, nor did your employer deny that Sumbler failed to inform you that special arrangements were made with Mr. Roberts. You alleged that the failure to keep you updated on changes to key policies directly contributed to the behavior that caused you to fear violence from Mr. Roberts.

All of the witnesses interviewed during the Department's investigation, including 2 NYSAC Boxing Inspectors, 2 NYSAC Deputy Commissioners, a NYSAC Commissioner and a NYSAC medical doctor, supported your contention by testifying that the standing policy in place on April 21, 2018 was for the fighter to be escorted to the Commission

---

[1] Initially you stated that the name of the reporter was Sam Jackson, but you later learned the named of the reported was Andrew Roberts of Swanson Communications.

2

room for a medical exam directly after the fight. Dr. Brown, who was with you and Davis after the fight when you were confronted by Roberts, provided testimony that the instructions were clear: boxers were to not stop; they were to proceed directly to the Commission room. Dr. Brown also testified that he had been informed that the policy would be different for the main event (not the Davis fight) such that fighters would be directed to an alternate exit so that they could be interviewed before their medical examinations. Your workplace violence complaint highlighted Executive Director Sumbler's unilateral action to change NYSAC post-fight medical procedures. Notably, Executive Director Sumbler made the decision to terminate you.

You stated in your workplace violence complaint that you informed NYSAC that you would file a criminal complaint with the NYPD about the same incident. Your complaint to the NYPD was made on April 23, 2018. You were terminated 2 days later, on April 25, 2018. Ultimately, the Department of State (the umbrella agency of which NYSAC is a part) investigated Roberts' behavior that night and wrote to Swanson Communications to inform them that his conduct was unacceptable and was an incidence of workplace violence that would be reported to the Department of Labor. This occurred weeks after your termination.

## ANALYSIS

### Prima Facie Case

In order to establish a claim of retaliation under New York State Labor Law §27-a a Complainant must establish a prima facie case by establishing that she (1) engaged in protected activity; (2) she was subjected to an adverse action; and (3) there was a causal connection between the protected activity and the adverse action. A causal connection may be shown by demonstrating that there was temporal proximity between the protected activity and the adverse action. Your workplace violence complaint filed with your employer and your report regarding the same facts to the NYPD are protected activities. Your termination is an adverse action and there is a causal connection. You were terminated 3 days after filing the workplace violence incident report and 2 days after filing a criminal complaint with the NYPD. An adverse action that occurs 2 to 3 days after a protected activity constitutes the temporal proximity required to establish a causal connection. Therefore, you have alleged the facts necessary to set forth a prima facie case of retaliation under Labor Law §27-a.

### Employer's Legitimate Business Reason

After a Complainant establishes a prima facie case the employer may provide a legitimate business reason for taking the adverse action. During the PESH investigation, NYSAC stated that you were fired for not following procedure on the night of the fight, specifically that you failed to clear Davis' locker room of unauthorized guests (or apprise Barclay Security of unauthorized guests) and that you left the fighter Davis alone for a short period of time. NYSAC's proffered reasons for your termination are contained principally in 2 documents: a letter written and submitted by Anthony Millilo, a Department

3

of State attorney assigned to this case ("response letter"), and an internal memorandum from Executive Director Sumbler to DOS executive staff on April 23, 2018, 2 days after the incident and 2 days before your termination. ("Sumbler memo").

The response letter relies almost entirely on a review of video footage of Davis' locker room on the night of the incident and includes several still shots taken from the video.

The video, which is central to NYSAC's response, simply does not show what the response letter relies on for the reason for your termination. The response letter states that the video shows that you took no action to remove unauthorized guests from Davis' locker room. The video actually shows you inside the locker room, engaging guests (there is no sound) and several individuals leaving directly thereafter. The employer's response letter states the video shows that you failed to inform Barclays Security about the unauthorized guests in Davis locker room. The video however shows Barclay Security allowing people into the locker room and also shows the door wide open where the unauthorized guests are in full view of Barclay's Security. Citing to your "failure to notify Barclays" Security is of no import given that it was clear that Barclays had as much information as you did. Notably, however, the response letter makes no mention of any interviews conducted or any investigation undertaken by the employer. Only the video is referenced.

The PESH investigation also revealed a memorandum from Executive Director Sumbler (Sumbler Memo) that discusses the events of the night in question. The Sumbler Memo, which was written just prior to your termination, states that you were instructed to inform Barclays Security of unauthorized guests and that you failed to do so. As stated above, the video appears to show that Barclays' security had full notice that unauthorized guests were present and failed to take any action. The memo also states, "Had Dorothea notified Security immediately and had the situation been addressed, we would not have been put in harm's way." Earlier in the memo Sumbler indicates that this was particularly threatening because the fighters on the card that night, including Davis, had known gang affiliations. The video shows that Barclays was fully aware of the locker room situation.

### Pretext

Once an employer offers a legitimate business reason for an adverse employment action, the Complainant may show that the reason given is pretext for discriminatory behavior. The Department evaluated whether the reason proffered was the actual reason for your termination or pretext to hide the employer's discriminatory behavior. The Department noted that while the employer's response letter relies heavily on the video evidence, NYSAC did not receive the video footage until weeks after it had access to that video or reviewed the footage. We find that because the video evidence is offered not as corroboration of facts gleaned from an investigation conducted prior to your termination but rather as evidence in chief acquired after your termination of what is alleged to be your wrong-doing a finding of pretext is supported. Furthermore, the Sumbler memo, which was written within days of the incident, mentions nothing at all about the only other

4

reason NYSAC claims you were terminated, namely that you allegedly left Davis in the room without a NYSAC boxing inspector present. If Sumbler had formed the opinion that the reason you were terminated was that you left Davis alone on the night of April 21, 2018 one would expect that, having time to explore the facts, she would have included that fact in her memo. The response letter should reflect evidence of the actual reasons Sumbler terminated you at the time the decision was made. NYSAC's response relies on information constructed after the fact based upon a video obtained weeks after you were terminated is evidence of pretext. The reason for your termination constructed after you were terminated and the Sumbler Memo, written close in time to your termination, mentioning only one of the two reasons ultimately given for your termination, lead us to find that the employer's legitimate business reason is pretext rather than the real reason for your termination.

Conclusion

In light of the foregoing, it is the Department's determination that your employer discriminated against you for filing a workplace violence incident report in violation of section 27-a of the New York State Labor Law.

Pursuant to New York State Labor Law section 27-a, this matter will be referred to the New York State Attorney General for further action. NYSAC may exercise its right to appeal this determination to the Industrial Board of Appeals ("IBA"). The appeal should be addressed to:

Industrial Board of Appeals
State Office Building Campus
Building 12, Room 116
Albany, NY 12240

Sincerely,

James Rogers/s/

James Rogers
Special Counsel

cc:  Antonio Milillo, Esq.
    Office of General Counsel
    Department of State
    One Commerce Plaza
    99 Washington Avenue, Ste. 1120
    Albany, NY 12231-0001

# EXHIBIT G

**STATE OF NEW YORK**
**INDUSTRIAL BOARD OF APPEALS**

-------------------------------------------------------------------------x

In the Matter of the Petition of:                                                           :

NEW YORK STATE ATHLETIC COMMISSION,                          :

                                    Petitioner,    :

To Review Under Section 101 of the Labor Law               :
A Determination dated March 8, 2022                              :

                       -against-                              :

THE COMMISSION OF LABOR,                                         :

                          Respondent.    :

-------------------------------------------------------------------------x

**PETITION FOR REVIEW OF A DETERMINATION OF THE COMMISSIONER OF LABOR**

1.     We are attorneys with the law firm of Gleason, Dunn, Walsh & O'Shea, with an address of 40 Beaver Street, Albany, NY 12207, telephone number of 518-432-7511, and fax number of 518-432-5221. A Notice of Appearance Form is attached hereto as **"Exhibit A."**

2.     We are filing this Petition on behalf of Petitioner, the New York State Athletic Commission (hereinafter, "Petitioner" or "NYSAC"), a division of the New York State Department of State (hereinafter, "NYSDOS").

3.     The address for Petitioner is 123 Williams Street, 20th Floor, New York, NY 10038.

4.     On or about June 20, 2018, a former NYSAC employee, Dorothea Perry (hereinafter, "Ms. Perry") filed a PESH Discrimination Complaint against NYSAC. A copy of Ms. Perry's Complaint is attached hereto as **"Exhibit B."**

5.     On or about August 8, 2018, Antonio Milillo, Associate Attorney, NYSDOS, submitted a response to Perry's Complaint, on behalf of NYSAC. A copy of Mr. Milillo's response is attached hereto as **"Exhibit C."**

6.    On or about May 17, 2021, we submitted a Designation of Representative Form to PESH. A copy of this Form is attached hereto as **"Exhibit D."**

7.    On July 19, 2021, we signed a Tolling Agreement on behalf of NYSDOS with James Rogers, Special Counsel, New York State Department of Labor Counsel's Office, for Roberta Reardon, Commissioner of Labor, providing that any statute of limitations otherwise applicable in this matter was suspended until April 25, 2022. A copy of this Tolling Agreement is attached hereto as **"Exhibit E."**

8.    The Tolling Agreement further provided that both the Commission and NYSAC "desire to have a full and compete investigation completed" (*see* Ex. E).

9.    However, Mr. Rogers did not conduct a "full and complete" investigation, in that: (a) he did not seek information, documentation or testimony from any witnesses identified by NYSAC or NYDOS; (b) he did not interview any NYSAC or NYSDOS employees with personal knowledge of the facts and circumstances forming the basis for Ms. Perry's termination (including Kim Sumbler and Ed Kunkle); (c) he did not interview anyone who participated in the investigation of Ms. Perry's workplace violence complaint; and (d) he did not interview any NYSAC or NYDOS employees who made the determination to terminate Ms. Perry's employment.

10.    Rather, Mr. Rogers interviewed only Ms. Perry and four (4) witnesses identified by Ms. Perry.

11.    The witnesses interviewed by Mr. Rogers did not possess personal knowledge regarding: Petitioner's investigation of Ms. Perry's workplace violence complaint; the remedial actions taken by Petitioner as a result of Ms. Perry's workplace violence complaint; or the facts and circumstances leading to Ms. Perry's separation from employment.

2

12.    Based substantially on the beliefs and conclusions of Ms. Perry and her witnesses, Mr. Rogers issued a Determination on March 8, 2022.[1] concluding that NYSAC "discriminated against [Ms. Perry] for filing a workplace violence incident report in violation of section 27-a of the New York State Labor Law." A copy of this Determination, is attached hereto as **"Exhibit F."**

13.    By this Petition, we are appealing the Determination issued by Mr. Rogers, on behalf of NYSAC (*see* Ex. F).

14.    The Determination is unreasonable and/or invalid because:

   a.    There is no evidentiary support for Ms. Perry's conclusory allegations that NYSAC retaliated against her for filing a workplace violence incident report, or for any other reason.

   b.    NYSAC terminated Ms. Perry's employment because of legitimate business reasons that are not pretextual.

   c.    Mr. Rogers failed to conduct a full and complete investigation, and relied on information obtained solely from Ms. Perry and her witnesses.

   d.    Mr. Rogers failed to contact NYSAC, NYSDOS or their attorneys, at any time after the tolling agreement was signed, in order to conduct his investigation; and did not seek information or testimony from any witnesses for the defense.

   e.    Mr. Rogers failed to conduct a "full and complete" investigation, in that: (a) he did not seek information, documentation or testimony from any witnesses identified by NYSAC or NYDOS; (b) he did not interview any NYSAC or NYSDOS employees with personal knowledge of the facts and circumstances forming the basis for Ms. Perry's termination (including Kim Sumbler and Ed Kunkle); (c) he did not interview anyone who participated in the investigation of Ms. Perry's workplace violence complaint; and (d) he did not interview any NYSAC or NYDOS employees who made the determination to terminate Ms. Perry's employment.

   f.    The witnesses interviewed by Mr. Rogers did not possess personal knowledge regarding: Petitioner's investigation of Ms. Perry's workplace violence complaint; the remedial actions taken by Petitioner as a result of Ms. Perry's workplace violence complaint; or the facts and circumstances leading to Ms. Perry's separation from employment.

---

[1] Although the Determination is dated March 8, 2021, the year is an error, as it was received by NYSDOS on March 11, 2022.

3

g.   Rather than fully investigate the rationale for Ms. Perry's discharge, Mr. Rogers relied on conclusions he drew from a video recording from the evening in question.

h.   Mr. Rogers failed to seek or review other information collected by NYSAC that resulted in Ms. Perry's termination.

i.   Mr. Rogers' finding that "the video evidence is offered not as corroboration of facts gleaned from an investigation conducted prior to [Ms. Perry's] termination but rather as evidence in chief acquired after [Ms. Perry's] termination" is belied by the facts and circumstances of this matter; and is further evidence that Mr. Rogers failed to conduct a full and complete investigation.

15.   Petitioner requests the following relief from the Industrial Board of Appeals:

a.   A reversal of the Determination, and remand for the completion of a full and fair investigation.

b.   A finding that Mr. Rogers failed to conduct a full and complete investigation that would have included speaking to NYSAC personnel and other witnesses.

c.   A finding that NYSAC had legitimate business reasons for terminating Ms. Perry's employment.

d.   A finding that NYSAC did not retaliate against Ms. Perry for filing a workplace violence incident report.

Date: April 18, 2022                                  GLEASON, DUNN, WALSH & O'SHEA

By: _____
                                                NANCY S. WILLIAMSON, ESQ.

Attorneys for Petitioner
Office and P.O. Address
40 Beaver Street
Albany, New York 12207
(518) 432-7511

4

# EXHIBIT H

ATTORNEY GENERAL OF THE STATE OF NEW YORK
STATE OF NEW YORK DEPARTMENT OF LABOR
PUBLIC EMPLOYEE SAFETY AND HEALTH BUREAU


IN THE MATTER OF THE INVESTIGATION OF
ROBERTA REARDON, COMMISSIONER OF LABOR
OF THE STATE OF NEW YORK, OF:                    STIPULATION TOLLING
                                                 THE STATUTE OF
THE NEW YORK STATE ATHLETIC COMMISSION,          LIMITATIONS
concerning Dorothea Perry.

---

IT IS HEREBY STIPULATED between the attorneys for the parties that the

COMMISSIONER OF LABOR OF THE STATE OF NEW YORK and the STATE OF NEW

YORK DEPARTMENT OF LABOR PUBLIC EMPLOYEE SAFETY AND HEALTH

BUREAU (hereinafter referred to as "the Commissioner"), is represented by:


LETITIA JAMES
Attorney General of the State of New York
By: Richard Balletta, Esq.
28 Liberty Street, 15th Floor – Labor Bureau
New York, New York 10005
Richard.Balletta@ag.ny.gov
(212) 416-6546 (Office)
(347) 514-4223 (Cell)


and that THE NEW YORK STATE ATHLETIC COMMISSION (herein after referred to as

"NYSAC") is represented by:

GLEASON, DUNN, WALSH & O'SHEA
By: Lisa F. Joslin, Esq. and Nancy S. Williamson, Esq.
40 Beaver Street
Albany, New York 12207
nwilliamson@gdwo.net
(518) 765-7575 (Office)

1

IT IS FURTHER STIPULATED, that the Commissioner received allegations indicating that NYSAC violated New York State law by retaliating against Dorothea Perry for engaging in protected activity under the Public Employee Safety and Health Act, Section 27-a of the Labor Law (hereinafter referred to as "Perry PESH Complaint"); and

IT IS FURTHER STIPULATED, that the Commissioner requested the New York State Office of the Attorney General (hereinafter referred to as "OAG") bring an action pursuant to Section 27-a(10)(b) of the Labor Law concerning the alleged retaliation described above; and

IT IS FURTHER STIPULATED, that NYSAC denies the alleged retaliation occurred under Public Employee Safety and Health Act, Section 27-a of the Labor Law; and

IT IS FURTHER STIPULATED, that NYSAC represents that it has exercised its right to appeal the determination of the Commissioner to the Industrial Board of Appeals (hereinafter referred to as "IBA"); and

IT IS FURTHER STIPULATED, that the parties desire to provide adequate time without pressure for the Commissioner and OAG to decide prematurely and perhaps unnecessarily whether to commence legal action; and

IT IS FURTHER STIPULATED, that a previous Tolling Agreement was executed by the Commissioner and NYSAC on July 19, 2021, stating that commencing April 24, 2021, any statute of limitations otherwise applicable to the above-described claim is suspended until April 25, 2022, and any proceeding in connection with this claim must be commenced on or before April 25, 2022;

2

NOW, THEREFORE, the parties agree as follows:

That the previous Tolling Agreement executed by the Commissioner and NYSAC on July 19, 2021, shall be extended from the date of this Stipulation up to and including Monday, May 2, 2022.

Dated: New York, New York
      April 22, 2022

LETITIA JAMES
Attorney General of the State of New York
Attorney for the Commissioner
28 Liberty Street, 15ᵗʰ Floor – Labor Bureau
New York, New York 10005

By: _____
Richard Balletta
Assistant Attorney General
Richard.Balletta@ag.ny.gov

Dated: Albany, New York
      April 22, 2022

GLEASON, DUNN, WALSH & O'SHEA
Attorneys for NYSAC
40 Beaver Street
Albany, New York 12207

By: _____
Nancy S. Williamson, Esq.
nwilliamson@gdwo.net
(518) 765-7575 (Office)

3

# EXHIBIT I

STATE OF NEW YORK DEPARTMENT OF LABOR
PUBLIC EMPLOYEE SAFETY AND HEALTH BUREAU

IN THE MATTER OF THE INVESTIGATION OF
ROBERTA REARDON, COMMISSIONER OF LABOR
OF THE STATE OF NEW YORK, OF:                    TOLLING AGREEMENT

THE NEW YORK STATE ATHLETIC COMMISSION,
concerning Dorothea Perry.

 WHEREAS, the Commissioner of Labor of the State of New York (hereinafter "the Commissioner") has issued a determination that the New York State Athletic Commission (hereinafter "NYSAC"), violated New York State law by retaliating against Dorothea Perry for engaging in protected activity under the Public Employee Safety and Health Act, section 27-a of the Labor Law; and

 WHEREAS, the Commissioner and NYSAC entered into a tolling agreement tolling any applicable statute of limitations until April 25, 2022; and

 WHEREAS, the Commissioner has requested that the New York State Attorney General bring an action pursuant to section 27-a(10)(b) of the Labor Law concerning the alleged retaliation described above; and

 WHEREAS, the OAG and NYSAC entered into a tolling agreement tolling any applicable statute of limitations to May 2, 2022, before the OAG determined it has a conflict of interest in filing a complaint in this matter at the Commissioner's request;

 WHEREAS, NYSAC denies engaging in the alleged retaliation described above; and

 WHEREAS, the Commissioner and NYSAC want an opportunity to discuss the potential withdrawal of the Commissioner's determination and conduct of a full and complete investigation;

 WHEREAS, the applicability of any limitations period, including but not limited to the effect of the Executive Orders issued by then-Governor Andrew M. Cuomo related to the COVID 19 pandemic may be disputed, and the parties desire to provide adequate time as discussed above.

NOW, THEREFORE, the parties agree as follows:

1. Any statute of limitations otherwise applicable to the above-described claim is suspended until May 9, 2022; and, any proceeding in connection with this claim must be commenced on or before May 9, 2022.

Dated: Albany, New York
May 2, 2022

ROBERTA REARDON
Commissioner for the Department of Labor
Harriman Campus, Bldg. 12
Albany, New York 12240

By: _____
Jill Archambault
Deputy Commissioner and Counsel

Dated: Albany, New York
May 2, 2022

GLEASON, DUNN, WALSH & O'SHEA
Attorneys for NYSAC
40 Beaver Street
Albany, New York 12207

By: _____
Nancy Williamson, Esq.
(518) 765-7575 (Office)

Counsel for the New York State Department
of State

# EXHIBIT J

STATE OF NEW YORK DEPARTMENT OF LABOR
PUBLIC EMPLOYEE SAFETY AND HEALTH BUREAU


IN THE MATTER OF THE INVESTIGATION OF
ROBERTA REARDON, COMMISSIONER OF LABOR
OF THE STATE OF NEW YORK, OF:                        TOLLING AGREEMENT

THE NEW YORK STATE ATHLETIC COMMISSION,
concerning Dorothea Perry.


WHEREAS, the Commissioner of Labor of the State of New York (hereinafter "the Commissioner") has issued a determination that the New York State Athletic Commission (hereinafter "NYSAC"), violated New York State law by retaliating against Dorothea Perry for engaging in protected activity under the Public Employee Safety and Health Act, section 27-a of the Labor Law; and

WHEREAS, the Commissioner and NYSAC entered into a tolling agreement tolling any applicable statute of limitations until April 25, 2022; and

WHEREAS, the Commissioner has requested that the New York State Attorney General bring an action pursuant to section 27-a(10)(b) of the Labor Law concerning the alleged retaliation described above; and

WHEREAS, the OAG and NYSAC entered into a tolling agreement tolling any applicable statute of limitations to May 2, 2022, before the OAG determined it has a conflict of interest in filing a complaint in this matter at the Commissioner's request;

WHEREAS, the Commissioner and NYSAC extended said tolling agreement to May 9, 2022 to examine whether the Commissioner's underlying investigation should be re-opened;

WHEREAS, NYSAC denies engaging in the alleged retaliation described above; and

WHEREAS, the applicability of any limitations period, including but not limited to the effect of the Executive Orders issued by then-Governor Andrew M. Cuomo related to the COVID 19 pandemic may be disputed, and the parties desire to provide adequate time as discussed above.

NOW, THEREFORE, the parties agree as follows:

1.  NYSAC agrees to withdraw its petition filed with the Industrial Board of Appeals ("IBA") with Docket No. PES 22-002.

2.  Upon written notification that NYSAC has withdrawn IBA petition Docket No. PES 22-002, the Commissioner will withdraw her decision issued March 8, 2022 and re-open the investigation into the termination of Dorothea Perry. Any applicable statutes of limitation shall be tolled until notification of such withdrawal.

3.  The Commissioner will issue a new determination within 90 days of the commencement of the re-opened investigation.

4.  Should the Commissioner issue a new determination regarding the alleged retaliation, NYSAC and any other affected party, including Dorothea Perry, will have sixty (60) days to file a new petition challenging the same in accordance with section 101(1) of the Labor Law.

5.  Any statute of limitations otherwise applicable to the above-described claim is suspended until ten (10) days after the Commissioner's new determination, if any, and, any proceeding in connection with this claim must be commenced within ten (10) days after the Commissioner's determination.

Dated: Albany, New York
May 9, 2022

ROBERTA REARDON
Commissioner for the Department of Labor
Harriman Campus, Bldg. 12
Albany, New York 12240

By: _____
Jill Archambault
Deputy Commissioner and Counsel

Dated: Albany, New York
May 9, 2022

GLEASON, DUNN, WALSH & O'SHEA
Attorneys for NYSAC
40 Beaver Street
Albany, New York 12207

By: _____
Nancy S. Williamson, Esq.
(518) 765-7575 (Office)

Counsel for the New York State Department of State

# EXHIBIT K

# WE ARE YOUR DOL



*Kathy Hochul, Governor*
*Roberta Reardon, Commissioner*

**Bridget Holohan Scally**
Deputy General Counsel

**New York State Department of Labor**
State Office Campus, Building 12
Room 508, Albany, NY 12240
(518) 485-2191 | Bridget.HolohanScally@labor.ny.gov

June 2, 2022

Lisa F. Joslin, Esq.
Nancy Williamson, Esq.
Gleason, Dunn, Walsh & O'Shea
40 Beaver Street
Albany, NY 12207
ljoslin@gdwo.net
NWilliamson@gdwo.net

Re:   New York State Department of Labor
       PESH Discrimination Complaint
       Dorothea Perry vs. New York State Athletic Commission
       Case No. 30041867

Dear Ms. Joslin & Ms. Williamson:

Please find below the Department of Labor's ("DOL") request for additional documents for Case No. 30041867, relating to the complaint filed by Dorothea Perry ("Perry"). This request seeks documents, whether in electronic or hard copy, as well as any notes or Outlook entries, relevant to the request. In an effort to keep this re-opened investigation moving along, we will accept documents on a rolling basis, but expect compliance with all requests no later than June 15, 2022. If there are no documents response to the request, please so state.

DOCUMENTS REQUESTED:

1. Any and all exhibits presented to the New York State Division of Human Rights, as well as the hearing transcript, in the *Complaint of Dorothea Perry v. New York State Athletic Commission*, Case No. 10195419;
2. Any and all exhibits used during deposition testimony in *Perry v. New York State Athletic Commission*, 21-CVI-1967 (SDNY);
3. Deposition transcripts, if any, in the above-reference federal action of Ms. Perry, Kim Sumbler, Edward Kunkle, Juan Rivera, Avery Brown, Robert Orlando and George Ward;
4. To the extent not included in request 1 or 2, list of all New York State Athletic Commission ("NYSAC") employees present at the Barclays Center on April 21, 2018, including their title, assignment, job duties, and last known contact information;



**WE ARE YOUR DOL**

New York State | Department of Labor

*Kathy Hochul, Governor*
*Roberta Reardon, Commissioner*

5. To the extent not included in request 1 or 2, list of all NYSAC employees present at the Barclays Center on May 18, 2018, including their title, assignment, job duties, and last known contact information;

6. To the extent not included in request 1 or 2, records relating to any NYSAC employees counseled or disciplined as a result of conduct at a NYSAC event from January 1, 2016 through December 31, 2018;

7. To the extent not included in request 1 or 2, records relating to Ms. Sumbler's investigation of the April 21, 2018 incident leading to Ms. Perry's termination;

8. To the extent not included in request 1 or 2, a copy of any and all directives, regulations or policies Ms. Perry violated and which lead to her termination;

9. To the extent not included in request 1 or 2, security camera recording of the outside of the locker rooms at the Barclays Center on April 21, 2018;

10. To the extent not included in request 1 or 2, communications between NYSAC and Barclays Security Services pertaining to security measures for the April 21, 2018 event;

11. To the extent not included in request 1 or 2, records relating to the pre-event meeting held by Sumbler with NYSAC employees on April 21, 2018;

12. To the extent not included in request 1 or 2, list of authorized individuals in the locker rooms for the April 21, 2018 event, including any lists provided to Barclays Security Services; and

13. To the extent not included in request 1 or 2, records relating to how NYSAC employees communicate with each other at events and any records relating to such communications on April 21, 2018.

Thank you for your assistance in this matter.

Very truly yours,

Bridget Holohan Scally
Deputy General Counsel

EXHIBIT L



**GLEASON, DUNN, WALSH & O'SHEA**

Attorneys at Law

40 Beaver Street
4th Floor
Albany, NY 12207
(p) 518 432 7511 (f) 518 432 5221

Nancy S. Williamson, Esq.
**Principal**
**Direct: 518-765-7575**
nwilliamson@gdwo.net | www.gdwo.com

June 15, 2022

**VIA EMAIL**
Bridget Holohan Scally, Esq.
Deputy General Counsel
New York State Department of Labor
State Office Campus, Bldg. 12, Rm. 508
Albany, NY 12240

> RE: **Dorothea Perry v. New York State Athletic Commission**
> PESH Complaint
> Case No. 30041867

Dear Ms. Holohan Scally:

On behalf of the New York State Athletic Commission ("NYSAC") and the New York State Department of State ("NYSDOS"), we are providing the documents responsive to your request at https://gdwo.sharefile.com/d-s47dbdee4d5e6494c8babd247231d6c10.

1. **Any and all exhibits presented to the New York State Division of Human Rights, as well as the hearing transcript, in the *Complaint of Dorothea Perry v. New York State Athletic Commission*, Case No. 10195419.**

   The hearing in this matter is ongoing and we do not have any transcripts. The Respondents' exhibits, submitted to date, are provided as EMPLOYER-001 to 371.

2. **Any and all exhibits used during deposition testimony in *Perry v. New York State Athletic Commission*, 21-CVI-1967 (SDNY).**

   Defendants' deposition exhibits are provided as EMPLOYER-372 to 895. These exhibits were used by defendants during the depositions of the two plaintiffs in this matter – Dorothea Perry and Jean Seme. All of the exhibits for the other depositions listed in response to Request #3 are provided as part of the transcripts.

3. **Deposition transcripts, if any, in the above-referenced federal action of Ms. Perry, Kim Sumbler, Edward Kunkle, Juan Rivera, Avery Browne, Robert Orlando and George Ward.**

   We are providing the requested deposition transcripts and corresponding deposition exhibits for the following individuals:

Bridget Holohan Scally, Esq.            Page 2            June 15, 2022

- Dorothea Perry:
  - Volume I of Ms. Perry's deposition, conducted on October 15, 2021, is provided as provided as EMPLOYER-2442 to 2733.[1]
  - Volume II of Ms. Perry's deposition, conducted on November 29, 2021, is provided as provided as EMPLOYER-2734 to 2865.

- Kim Sumbler:
  - Volume I of Ms. Sumbler's deposition, conducted on October 26, 2021, is provided as EMPLOYER-2866 to 3137.
  - Volume II of Ms. Sumbler's deposition, conducted on December 6, 2021, is provided as EMPLOYER-3138 to 3162.
  - Ms. Sumbler's Errata Sheets are provided as EMPLOYER-3163 to 3165.
  - Ms. Sumbler's deposition exhibits are provided as EMPLOYER-3166 to 3246.

- Edward Kunkle:
  - Mr. Kunkle's deposition, conducted on September 24, 2021, is provided as EMPLOYER-1754 to 1998.
  - Mr. Kunkle's Errata Sheet is provided as EMPLOYER-1999.
  - Mr. Kunkle's deposition exhibits are provided as EMPLOYER-2000 to 2194.

- George Ward:
  - Mr. Ward's deposition, conducted on October 12, 2021, is provided as EMPLOYER-3247 to 3428.
  - Mr. Ward's deposition exhibits are provided as EMPLOYER-3429 to 3450.

We are also providing the deposition transcripts for the following individuals:

- Anthony Giardina:
  - Volume I, part 1 of Mr. Giardina's deposition, conducted on October 22, 2021, is provided as EMPLOYER-896 to 1136.
  - Volume I, part 2 of Mr. Giardina's deposition, conducted on October 22, 2021, is provided as EMPLOYER-1137 to 1214.
  - Volume II of Mr. Giardina's deposition, conducted on December 6, 2021, is provided as EMPLOYER-1215 to 1298.
  - Mr. Giardina's Errata Sheets are provided as EMPLOYER-1299 to 1300.
  - Mr. Giardina's deposition exhibits are provided as EMPLOYER-1301 to 1425.

- Maria Herman:
  - Volume I of Ms. Herman's deposition, conducted on September 24, 2021, is provided as EMPLOYER-1426 to 1499.

---

[1] This transcript is labeled as Volume II, but is actually Volume I.

Bridget Holohan Scally, Esq.                    Page 3                    June 15, 2022

- o  Volume II of Ms. Herman's deposition, conducted on December 7, 2021, is provided as EMPLOYER-1500 to 1663.
- o  Ms. Herman's Errata Sheet is provided as EMPLOYER-1664-1666.
- o  Ms. Herman's deposition exhibits are provided as EMPLOYER-1667 to 1753.

- • James Leary:
  - o  Mr. Leary's deposition, conducted on December 6, 2021, is provided as EMPLOYER-2195 to 2388.
  - o  Mr. Leary's Errata Sheet is provided as EMPLOYER-2389 to 2391.
  - o  Mr. Leary's deposition exhibits are provided as EMPLOYER-2392 to 2441.

Juan Rivera, Avery Browne, and Robert Orlando were not deposed.

4. **To the extent not included in request 1 or 2, list of all New York State Athletic Commission ("NYSAC") employees present at the Barclays Center on April 21, 2018, including their title, assignment, job duties, and last known contact information.**

We are providing the following documents for the April 21, 2018 event held at the Barclays Center:
- • The credential list is provided as EMPLOYER-3451.
- • The April 12, 2018 email from Mathew Delaglio to the staff and officials providing the itinerary for the weigh-in and events held from April 20-21, 2018 is provided as EMPLOYER-3452 to 3453.
- • The bout sheet listing which NYSAC staff members were assigned to each bout is provided as EMPLOYER-3454 to 3455.
- • The contact information for the Deputy Commissioners and Inspectors assigned to work the event is provided as EMPLOYER-3456.

5. **To the extent not included in request 1 or 2, list of all NYSAC employees present at the Barclays Center on May 18, 2018, including their title, assignment, job duties, and last known contact information.**

NYSAC did not have an event at Barclays Center on May 18, 2018. We are providing the following documents for the May 18, 2018 event held at Club Amazura in Queens, New York:
- • The bout sheet listing which NYSAC staff members were assigned to each bout is provided as EMPLOYER-3457.
- • The Event Contest Report which lists the fighters and NYSAC employees assigned to work the event is provided as EMPLOYER-3458.
- • The contact information for the Deputy Commissioners and Inspectors assigned to work the event is provided as EMPLOYER-3459.

Bridget Holohan Scally, Esq.                    Page 4                    June 15, 2022

6.  **To the extent not included in request 1 or 2, records relating to any NYSAC employees counseled or disciplined as a result of conduct at a NYSAC event from January 1, 2016 through December 31, 2018.**

NYSAC has no records of counseling or disciplining boxing Inspectors. However, NYSAC is providing documentation regarding the following Inspectors who had their employment terminated:
- Yevgeniy Balitskiy – Information regarding Mr. Balitskiy's termination is provided as EMPLOYER-3460.
- James Hayes – Information regarding Mr. Hayes' termination is provided as EMPLOYER-3461 to 3462.
- John Scalesi – Information regarding Mr. Scalesi's termination is provided as EMPLOYER-3463.
- Jean Seme – Information regarding Mr. Seme's termination is provided as EMPLOYER-3464 to 3469.

In addition, we are providing information regarding the following other NYSAC employees who had their employment terminated:
- Deputy Commissioner Anthony Vellano's employment was terminated in 2020. Information regarding Mr. Vellano's termination is provided as EMPLOYER-3470 to 3476.
- Ringside Physician Richard Weinstein's employment was terminated in 2017. Information regarding Dr. Weinstein's termination is provided as EMPLOYER-3477 to 3484.

7.  **To the extent not included in request 1 or 2, records relating to Ms. Sumbler's investigation of the April 21, 2018 incident leading to Ms. Perry's termination.**

Ms. Sumbler personally witnessed Ms. Perry's violations of NYSAC policy, procedure and protocol on April 21, 2018 when she entered the locker room for the fighter assigned to Ms. Perry and needed to personally ask unauthorized individuals to leave. She followed up with the Deputy Commissioner who was overseeing the back of the house activities that evening, Edward Kunkle, and the Barclays Center security supervisor to obtain information regarding whether Ms. Perry sought their assistance in clearing the locker room and found out that Ms. Perry took no action to remove several unauthorized individuals. *See* EMPLOYER-036 to 042, and EMPLOYER-045 to 046.

Ms. Sumbler's summary of the incident was provided in a memorandum to her supervisors on April 23, 2018. Ms. Sumbler's memorandum and other documentation are provided as EMPLOYER-3485 to 3501.

8.  **To the extent not included in request 1 or 2, a copy of any and all directives, regulations or policies Ms. Perry violated and which lead to her termination.**

Ms. Perry violated the following directives, regulations and policies:

Bridget Holohan Scally, Esq.                    Page 5                         June 15, 2022

- NYSAC Locker Room Access Policy: This policy states which persons are allowed in a boxer's locker room. *See*, EMPLOYER-212 to 215. Ms. Perry acknowledged the importance of putting caps on the number of individuals permitted in a fighter's locker room in an email dated July 26, 2016. *See*, EMPLOYER-363.

- Inspector Protocol: Page 3 of the Inspector Protocol includes the following information:
  - o Upon arrival, the Inspector is to "[t]ake possession of paperwork (inspector paperwork, bout sheet, camp list, list of individuals authorized to visit dressing rooms) and urine kit(s)."
  - o "Ascertain that individuals on camp list will be working boxer's corner. Unless otherwise directed, and except for Commission staff, promoter's staff and television production staff, no individuals other than those on camp list should be in boxer's dressing room."
  
  *See*, EMPLOYER-001 to 009.

- NYSAC Deputy Commissioner & Inspector Manual: Pages 4-5 of the Manual includes the following information:
  - o "Inspectors are NYSAC's core enforcement personnel and must ensure that the highest levels of safety and integrity are maintained at events."
  - o "Inspector's duties and responsibilities include . . . Enforce all applicable statutes, regulations and/or policies of the Commission."
  - o An Inspector's duties also includes, "Supervise the dressing rooms at events so that only those affiliated with the combatant are present and that prohibited items are not brought into the dressing room."
  
  *See*, EMPLOYER-010 to 035.

- October 2016 and May 2017 Training PowerPoint Presentations: both presentations include the following requirements of Inspectors:
  - o On Inspector Overview of Responsibilities Slide: "Core enforcement (police) – monitor and enforce rules and regulations of the Commission"
  - o On Inspector Pre-Event Activities Slide: "Do not allow anyone into the dressing room unless they are on the camp list, or authorized entry list"
  
  The May 2017 training is provided as EMPLOYER-3502 to 3575; *see also*, EMPLOYER-091 to 204.

9. **To the extent not included in request 1 or 2, security camera recording of the outside of the locker rooms at the Barclays Center on April 21, 2018.**

   The video is available at:
   https://www.youtube.com/watch?v=uKWq3pqJg4M&feature=youtu.be. It is also provided as EMPLOYER-2194, 3246 and 3450.

Bridget Holohan Scally, Esq.                    Page 6                         June 15, 2022

10. **To the extent not included in request 1 or 2, communications between NYSAC and Barclays Security Services pertaining to security measures for the April 21, 2018 event.**

Communications between NYSAC, Barclays Center, and DiBella Entertainment are provided as EMPLOYER-3576 to 3609.

11. **To the extent not included in request 1 or 2, records relating to the pre-event meeting held by Sumbler with NYSAC employees on April 21, 2018.**

Ms. Sumbler used notes when she spoke with the NYSAC staff at the pre-event meeting on April 21, 2018. Those notes include the following information:
- "Heightened security"
- "Only those on the camp list will be permitted entry (2 family members for 3 TV bouts)"
- "Ringwalk will consist of fighter and corner only"

*See*, EMPLOYER-337.

12. **To the extent not included in request 1 or 2, list of authorized individuals in the locker rooms for the April 21, 2018 event, including any lists provided to Barclays Security Services.**

The camp list for the April 21, 2018 event held at the Barclays Center and the list of additional family members allowed in the fighter's locker room were provided to NYSAC staff at the staff meeting held on April 21, 2018. These documents are provided as EMPLOYER-3610 to 3611.

13. **To the extent not included in request 1 or 2, records relating to how NYSAC employees communicate with each other at events and any records relating to such communications on April 21, 2018.**

NYSAC does not have any records responsive to this request. Radios are sometimes provided to Deputy commissioners for use at larger events in bigger venues. Inspectors are expected to use their personal cell phones to contact other NYSAC staff during an event. Inspectors and Deputy Commissioners are provided with phone lists for this purpose. It is our understanding that on April 21, 2018, Ms. Perry did not use her personal cell phone to request assistance from either Ms. Sumbler or Mr. Kunkle.

In addition to the information you requested, NYSAC is also providing documents demonstrating that immediately upon being notified of Ms. Perry's workplace violence complaint, Ms. Sumbler notified the appropriate personnel in Human Resources. She also contacted the physician who was with Ms. Perry at the time of the incident – Dr. Avery Browne. Dr. Browne reported that the individual from Swanson Communications did not threaten to kill Ms. Perry, but instead yelled, "I'm about to kill somebody!" Regardless, NYSAC and NYSDOS took Ms. Perry's

Bridget Holohan Scally, Esq.                    Page 7                    June 15, 2022

complaint very seriously, contacted Swanson Communications and demanded that they take steps to ensure that the employee no longer engaged in such behavior. *See*, EMPLOYER-3612 to 3617.

Ms. Perry's workplace violence complaint had absolutely nothing to do with her termination from her position as an Inspector at NYSAC. Instead, Ms. Perry's employment was terminated because her failure to clear the locker room for her assigned fighter was a serious violation of NYSAC policy and protocol. Throughout her employment with NYSAC, Ms. Perry was repeatedly provided with training regarding the obligation of an Inspector to ensure the locker room was adequately controlled. This was reiterated on April 21, 2018 at the pre-event staff meeting due to the security concerns that evening. Ms. Perry's failure to follow this clear directive is the sole reason why her employment was terminated.

Very truly yours,

GLEASON, DUNN, WALSH & O'SHEA

Nancy S. Williamson, Esq.

NSW/ks

cc:    Linda Baldwin, Esq. (*via email*)

# EXHIBIT M




WE ARE YOUR DOL

NEW YORK STATE | **Department** of **Labor**

Kathy Hochul, Governor
Roberta Reardon, Commissioner

**BRIDGET HOLOHAN SCALLY**
Deputy General Counsel

**New York State Department of Labor**
State Office Campus, Building 12
Room 509, Albany, NY 12240
(518) 485-2191 | Bridget.HolohanScally@labor.ny.gov

August 11, 2022

**Via Mail and Email**

Dorothea Perry
74 Tapscott Street, Apartment 1
Brooklyn, NY 11212
Msdorothea.perry@gmail.com

Susan Ghim, Esq.
244 Fifth Avenue, Suite 1434
New York, NY 10001
sghim@ghimlaw.com

Nancy S. Williamson, Esq.
Lisa S. Joslin, Esq.
Gleason, Dunn, Walsh & O'Shea
40 Beaver Street
Albany, NY 12207
nwilliamson@gdwo.net
ljoslin@gdwo.net

Re:    PESH Discrimination Case
Dorothea Perry v. New York State Athletic Commission
Case No. 30041867

Dear Ms. Perry:

The New York State Department of Labor (DOL) received your complaint in which you allege that as a result of filing a workplace violence incident report with your former employer, the New York State Athletic Commission (NYSAC), you were retaliated against in violation of Section 27-a(10)(a) of the Labor Law. Upon receipt of your complaint, Labor Law Section 27-a(10)(b) required DOL to investigate and determine whether Section 27-a(10)(a) has been violated.

Based upon DOL's investigation and as outlined herein, DOL finds that NYSAC violated Section 27-a(10)(a) of the Labor Law by terminating your employment after you filed a workplace violence incident report.

## BACKGROUND

You were employed by NYSAC as a Boxing Inspector from approximately January 15, 2004 until April 25, 2018. NYSAC is the New York State (State) entity responsible for sanctioning and regulating combat sports in the State to ensure "the health and safety of participants and the integrity of the contests."[1] As a Boxing Inspector, you were primarily responsible for assisting NYSAC with ensuring the health and safety of fighters and the fairness and integrity of fights.

On March 2, 2018, you filed a complaint with DOL alleging you were terminated in retaliation for filing a workplace violence incident report with NYSAC. NYSAC denied the allegation and stated that you were terminated for violating dressing room protocol during a boxing event held at Barclays Center on April 21, 2018.[2]

DOL reviewed approximately 500 pages of documents; took approximately 13 witness statements, including all witnesses identified by NYSAC; and reviewed recorded security footage. Additionally, DOL learned that you filed a federal lawsuit involving many of the same underlying events. DOL obtained and reviewed your sworn deposition testimony, and that of current or former NYSAC employees including Kimberly Sumbler, Edward Kunkle, George Ward, Anthony Giardina, Maria Herman, and James Leary.

## FACTUAL FINDINGS

### Barclays Center Event on April 21, 2018: Pre-Fight Activity

Your workplace violence incident report and NYSAC's stated reason for your termination stem from events that occurred on April 21, 2018, at a NYSAC-sanctioned boxing event held at the Barclays Center in Brooklyn, New York.

Generally, a NYSAC-sanctioned boxing event like the April 21st Barclays Center event includes eight to ten fights. NYSAC is responsible for ensuring each fight comports with New York State rules and regulations. This includes conducting pre- and post-fight medical exams, obtaining pre- and post-fight urine samples, and observing the fighters. To accomplish their mission, and for an event of this size, NYSAC typically assigns seven or eight Deputy Commissioners. Additionally, each boxer is assigned a Boxing Inspector; although, where staffing allows, NYSAC may assign two inspectors to each boxer. In addition to collecting the fighters' urine samples, boxing inspectors are required to ensure their boxer is constantly monitored.

---

[1] See dos.ny.gov/athletic-commission (last visited July 28, 2022).
[2] DOL and NYSAC entered into a tolling agreement in which DOL and NYSAC agreed to toll the three-year statute of limitations through April 25, 2022. On March 8, 2022, DOL issued a determination finding that NYSAC violated Labor Law Section 27-a(10). On March 14, 2022, DOL referred this matter to the Office of the Attorney General (OAG). On March 14, 2022, the OAG, on behalf of DOL, extended the tolling agreement to May 2, 2022. On April 28, 2022, the OAG informed DOL that it could no longer represent DOL in this matter due to an undisclosed conflict. DOL subsequently entered into two additional tolling agreements with NYSAC. As a condition of the tolling agreement, and in response to NYSAC's concerns that DOL did not sufficiently interview all necessary individuals, DOL agreed to withdraw its March 8th determination; re-open this investigation; and issue a new determination 90 days thereafter.

2

One of the headlining events on April 21, 2018 was a fight between Gervonta Davis and Jesus Cuellar.  Prior to the event, Barclays Center security advised NYSAC that social media posts indicated a potential for violence at the event between boxing camps, including Davis's camp, with known gang affiliations.  Due to the security concern, the event promoter, Barclays Center, and NYSAC agreed to increase security by increasing police presence, restricting spectator access to the "back of the house,"[3] posting security guards outside of each boxer's dressing room, and limiting authorized guests in each boxer's dressing room.

Despite the heightened security concerns, due to concurrent NYSAC-sanctioned events on the same night, NYSAC only assigned four Deputy Commissioners to the Barclays Center event and only one Deputy Commissioner to the back of the house.[4]  According to NYSAC Executive Director Kimberly Sumbler, during a pre-event meeting, she informed NYSAC employees that there would be heightened security at the event.  She further instructed the boxing inspectors, including you, that the number of authorized fighters' guests would be limited to two family members.

You were assigned as the boxing inspector for Davis.  According to security footage obtained from Barclays Center by NYSAC, you were inside Davis's dressing room prior to 7:45 pm.[5]  The footage shows that numerous individuals entered and exited Davis's dressing room.  Eventually, many of the individuals leave, but it is undisputed that three or four unauthorized individuals remained in the dressing room, including a musician known as Casanova.  At 8:12:36 pm, Sumbler and former Deputy Commissioner Edward Kunkle enter Davis's dressing room.  There is no footage from inside Davis's dressing room.

According to Kunkle, prior to entering Davis's dressing room with Sumbler, he looked in the dressing room and did not recall seeing you or Davis at that time.  He stated that he left without asking anyone to leave because he did not know who was authorized to be in Davis's dressing room.  Kunkle stated that he subsequently saw you in the hallway; told you there were too many people in Davis's dressing room; and that he would be back to help you remove unauthorized individuals.  Kunkle admits that he observed the unauthorized individuals in Davis's dressing room prior to the start of the video recording, and did not return to Davis's dressing room for approximately 25 minutes because, as he stated, NYSAC was short-staffed and he was handling other issues, including an issue with missing boxing gloves.  When Kunkle returned and entered Davis's dressing room at 8:12:36 pm with Sumbler, Kunkle observed Sumbler remove Casanova and his friends. Kunkle never indicated that he felt intimidated by Casanova.

You stated that after Sumbler and Kunkel entered Davis's dressing room, Sumbler asked Davis the identity of the guests in room.  You stated that Davis informed Sumbler who Casanova was and that they were there to escort him to the ring.  Sumbler informed Davis that there would be no entertainment escorts and asked Casanova and his friends to leave.  They all gave Davis a hug and left.  The security footage corroborates Casanova and two others leave approximately five minutes after Sumbler and Kunkle entered Davis's dressing room.

---

[3] The "back of the house" is a reference to the backstage area of the event location.  "Back of the house" is where fighters' dressing rooms are located, as well as NYSAC's commission room. NYSAC's commission room is where NYSAC conducts much of its business, including but not limited to medical exams, staff meetings, and storage of event paperwork.
[4] During his interview with DOL, former Deputy Commissioner Edward Kunkle stated that he was assigned to the back of the house and, due to being short staffed, he had no help.
[5] The recorded security footage provided by NYSAC to DOL begins at 7:45pm.

At approximately 9:00pm, Davis's fight began.

Barclays Center Event on April 21, 2018: Post-Fight Activity

As part of your duties after the fight, you were required to escort Davis back to his dressing room and ensure he did not have contact with anyone before his post-fight medical exam and urine test. You, along with Dr. Avery Browne and another boxing inspector, escorted Davis to his post-fight medical exam and urine test when a reporter associated with Swanson Communications tried to interview Davis. You stopped the interview, and the reporter lost his temper. It is alleged that the reporter stated that he was "going to kill me [you]" or "going to kill someone." Moments later, the reporter was observed kicking over a garbage can. The reporter's threat of violence was the basis of your workplace violence incident report.

You stated that you spoke to Sumbler regarding the reporter's conduct. Sumbler stated that she saw you later that night but was too busy to discuss either the reporter's conduct or your failure to remove unauthorized individuals from the dressing room at that time.

Following each event, NYSAC Deputy Commissioners complete a "Team Member Performance Review" for each boxing inspector. For the April 21, 2018 event, Kunkle, your direct supervisor at the event, completed your performance review and awarded you 3 out of 4 in all performance categories.[6] Kunkle did not insert any comments on the performance review form in the designated sections, nor did he make any reference to unauthorized individuals in Davis's dressing room.

Events on the Following Days

On Sunday, April 22, 2018, at 8:10 pm, and in accordance with Labor Law § 27-b(6)(a), you filed a workplace violence incident report, via email, with NYSAC management, including Sumbler.[7] Less than 30 minutes later, at 8:39 pm, Sumbler sent a text to Rey Rosario, a Barclays Center security employee and NYSAC Boxing Inspector, to see if you asked for any help to get unauthorized individuals out of Davis's dressing room. At 8:55 pm, Sumbler sent a text to Dr. Browne to determine what he observed regarding the alleged threat from the reporter.

On Monday, April 23, 2018, at 1:51 pm Sumbler sent an email to Rosario for security footage outside of Davis's dressing room. At 7:34 pm that evening, Kunkle emailed Sumbler, expressing his concerns that there were unauthorized persons in Davis's room.[8] At some point on April 23, 2018, Sumbler added a notation to your performance review stating: "Possible breach of protocol, investigation to follow." When asked by DOL what steps she took after adding this notation, Sumbler stated she took no further action because in her mind, she had already determined you committed a terminable offense.

On April 24, 2018, at 5:46 pm, Sumbler forwarded Kunkle's email and a memo she drafted to the Assistant Executive Deputy Secretary of State James Leary and Executive Deputy Secretary of State Brendan Fitzgerald. In her statement to DOL, Sumbler said that it was her recommendation to

---

[6] NYSAC's Team Member Performance Review form scores Boxing Inspectors on a scale from 1 to 4 (with 4 being the highest score) in ten categories, including job knowledge and quality of work, as well as judgment, problem solving, and decision making.
[7] On April 24, 2018, you supplemented your complaint by forwarding a copy of your complaint with the New York City Police Department.
[8] As discussed in greater detail below, Kunkle and Sumbler have different recollections of when and why he drafted this email.

4

Leary and Fitzgerald that you be terminated, but that it was ultimately not her decision. In his federal deposition testimony, Leary stated that he was aware of Sumbler's recommendation, but that it was also not his decision; that Fitzgerald agreed with Sumbler's recommendation; and that the recommendation was conveyed to Human Resources (HR).[9]

On April 25, 2018, HR informed you by telephone that you were terminated from your position as a Boxing Inspector. HR subsequently mailed you a termination letter dated April 26, 2018. You were not informed of the reason for your termination in either the telephone call or in the termination letter.

On May 2, 2018, approximately 10 days after you filed your workplace violence incident report, HR obtained a statement from Dr. Browne outlining his observations. Dr. Browne stated that the reporter "was trying to interview Gervonta Davis in the hallway. Dorothea said we can't stop. I said keep walking. We kept walking as we entered the commission room, and when we entered the room [the reporter] punched or kicked the door or the garbage can and said, 'I'm going to kill somebody.' Yelled it. He walked around in the commission room and then went out the door." Approximately 19 days later, HR sent a letter to the reporter's employer, Swanson Communications, informing it that the reporter's "behavior is unacceptable" and requested that Swanson Communications take steps to ensure that such behavior does not reoccur.

On May 17, 2018, Sumbler sent an email to Rosario requesting the videotape of outside Davis's dressing room again. At some point after this second request, NYSAC obtained the videorecording, but it only contained approximately 30 minutes of footage.

## ANALYSIS

To establish a claim that an employee was unlawfully discharged in retaliation under New York State Labor Law §27-a(10)(a), an employee must first establish a prima facie case of retaliation. To establish a prima facie case, an employee must establish that: (1) they engaged in protected activity; (2) they were subjected to adverse action; and (3) there was a causal connection between the protected activity and the adverse action. If a prima facie case is established, the burden shifts to the employer to establish a legitimate, non-retaliatory reason for the adverse employment action. After the employer sets forth a legitimate business reason for the retaliatory act, the burden shifts back to the employee to demonstrate that the stated reason is a pretext for retaliation.

You have established a prima facia case of retaliation as follows: (1) you were engaged in the protected activity of filing a workplace violence incident report; (2) your termination constitutes an adverse action; and (3) a causal connection was established based on the temporal proximity between the protected activity and the adverse action. Here, the three business days between your filing a workplace violence complaint and your termination satisfy the causal connection element.

NYSAC asserts that you were terminated because you failed to remove unauthorized individuals from Davis's dressing room. It is undisputed that there were unauthorized individuals in Davis's dressing room and that you knew that it was NYSAC's policy to ensure only authorized individuals are permitted inside dressing rooms. Thus, NYSAC contends that your breach of protocol is a legitimate business reason for your termination.

However, and despite NYSAC's contention, there is evidence of pretext, as discussed in more detail below. This evidence includes: (1) the lack of documentation regarding your breach of protocol

---

[9] Fitzgerald was not interviewed because he is deceased.

5

*prior to* the filing of your workplace violence incident report; and (2) security failures in Davis's dressing room when there were other NYSAC employees present.

<u>Lack of Documentation</u>

The lack of documentation that you committed a terminable offense *prior to* your filing of your workplace violence incident report supports the conclusion that NYSAC's legitimate business justification was pretext for retaliation.

On April 22, 2018, less than 30 minutes after you filed your workplace violence complaint, Sumbler commenced her investigation into your violation of dressing room procedures. Specifically, at 8:39 pm, Sumbler sent a text message to Rey Rosario, her subordinate,[10] seeking assistance "with a confidential matter." She informed Rosario that she was investigating the "actions of the inspector assigned to Gervonta Davis's dressing room." In the detailed text, she outlined the additional security put in place for the event and then she asked Rosario to find out if the inspector assigned to Davis's dressing room asked for assistance. This was the first documentation reflecting your breach of protocol.

On Monday, April 23, 2018, at 10:42 am, Rosario responded that no NYSAC staff "asked for assistance in removing individuals … in the dressing rooms." At 1:51pm, Sumbler emailed Rosario and reiterated the heightened security protocols and requested recorded security footage from outside of Davis's dressing room.

At 4:48 pm, Sumbler responded to and earlier email from Leary seeking "write ups" for all the breaches of protocol stating: "Will do. I have requested the security footage from that night as well."

Sometime on April 23, 2018, Sumbler reviewed the Team Member Performance Reviews from the April 21, 2018 event. Sumbler added the notation: "Possible breach of protocol – Investigation to follow." According to Sumbler, on April 23, 2018, she also reached out to Kunkle and asked him to memorialize his observations regarding Perry's performance.[11] Kunkle sent his observations via email on April 23, 2018, at 7:34 pm.

Prior to receiving the requested security footage, on Tuesday, April 24, 2018, at 5:46 pm, Sumbler sent a memo and Kunkle's email to Leary and Fitzgerald. In the memo, Sumbler outlines her observations upon entering Davis's dressing room. She states: "Upon entering, I saw three large men there in addition to Gervonta's camp, and guests. I asked Inspector Dorothea Perry who they were, she said she didn't know and shrugged her shoulders. So, I asked them who they were, they informed me that they were artists who were going to walk Gervonta to the ring. I told them they were not permitted to do so, and further were not permitted in the dressing room and asked them to leave. There were a few tense moments where they stared me down, then eventually left without incident…. Dorothea's failure to notify security immediately of this breach … placed both Ed Kunkle, and me in a

---

[10] During her interview with DOL, Sumbler stated that she had some concern asking Rosario because he was her subordinate. She stated that because of this concern, neither her text nor subsequent email referenced you by name. However, DOL notes that Sumbler could have asked whether any Boxing Inspector asked for any assistance.

[11] Kunkle's recollection of when Sumbler asked him to put his observations of your performance in writing is different from Sumbler's recollection. Kunkle testified that Sumbler asked him the night of April 21, 2018, to memorialize his observations. As discussed later, Sumbler's recollection is supported by the documentary evidence.

6

very dangerous situation."  Neither Leary nor Fitzgerald made any further inquiries of Sumbler regarding her memo.

The following day, on April 25, 2018, your employment was terminated.

Kunkle's and Sumbler's emails contradict your Team Member Performance Review that Kunkle completed on April 21, 2018.  You received 3 out of 4 in all performance categories and Kunkle did not use the comment section to document any breach of protocol.  When asked about the "disconnect" between your performance review and his memo of April 23rd, Kunkle stated that because Sumbler had asked him to draft a memo outlining his observations, your breach of protocol was properly documented.  However, Kunkle conceded he could not remember whether he had completed your performance review before or after Sumbler asked him to memorialize his observations.  He further stated that whenever he granted less than 3 in any performance category for any inspector, the other Deputy Commissioners would push back and not want to sign off on the performance review; to avoid disagreement, Kunkle stated that he could just document his concerns in his memo to Sumbler.

This procedure is contradicted by how Kunkle handled another Boxing Inspector's performance review following the April 21, 2022 Barclays Center event.  Kunkle scored 1's and 2's on James Hayes's performance review and entered notes in the comment section highlighting Hayes's repeated violations of NYSAC procedures.[12]  Unlike the other performance reviews, Hayes's is typed and not signed by the other Deputy Commissioners.  When asked about the Hayes performance review, Kunkle stated that he completed it in his hotel room that night after the fight.

Additionally, as noted above, Sumbler testified that she did not request Kunkle's observations until Monday, April 23, 2018. Kunkle provided his observations after being asked to do so later that day.

Security Failures by Other Individuals

You were not the only NYSAC employee involved in protocol breaches related to Davis's dressing room on April 21, 2022, but you were the only one held responsible.

It is undisputed that there were heightened security protocols put in place for the April 21, 2018 event.  It is also undisputed that there were failures in those security protocols.  The recorded security footage evidence obtained by NYSAC on May 17, 2018, demonstrates, and Kunkle concedes, that he knew there were unauthorized individuals in Davis's dressing room for at least 25 minutes before he took any steps to address the issue.  He stated that it was because NYSAC was short staffed, and he needed to handle other, more pressing matters.  Sumbler admitted she would have had concerns with the long delay in addressing the situation but did not take any steps to discipline Kunkle.  She attempted to explain Kunkle's delay in addressing the situation by stating that she did not know if Kunkle entered the dressing room from another door; but Kunkle admitted that he did not.

Additionally, Barclays Center's security (a venue approved by NYSAC) was asked to prevent unauthorized individuals from roaming the back of the house hallways.  As the recorded security footage evidence establishes, and Sumbler concedes, Barclays failed at preventing unauthorized individuals from entering the back of the house.  This failure made your job duty of controlling the number of people in Davis's dressing room harder.  Additionally, the recorded security footage shows

---

[12] According to NYSAC, Hayes was terminated by NYSAC on April 27, 2018 for repeated violations of NYSAC procedures on April 21, 2018, as well as prior poor performance.  The documentation relied upon by NYSAC in deciding to terminate Hayes was his April 21 performance review and a memo prepared by Sumbler outlining Hayes's "egregious" breach of protocol.  There was no separate memo from Kunkle.

7

that the Barclays Center's security stationed outside of Davis's dressing room failed to stop the numerous individuals who were entering and exiting the dressing room.

<u>Additional Considerations</u>

Sumbler conceded that you were an experienced inspector of 14 years, with no prior infractions. In all of your performance reviews, you received 3 out of 4 in all performance categories. During his interview, Kunkle also stated that you were a very good inspector, with no prior infractions. When asked if he would recommend terminating an inspector for failure to remove unauthorized individuals from a dressing room, Kunkle could not answer the question because he said that was not his role. Kunkle stated that he was not aware of any inspector being terminated for failing to remove unauthorized individuals from dressing rooms.

Former Deputy Commissioner George Ward testified in his federal deposition that during your 14-year tenure at NYSAC, you were an excellent boxing inspector and a final candidate for a promotion to Deputy Commissioner.

**CONCLUSION**

For the reasons stated above, DOL determines by a preponderance of the evidence that NYSAC violated Labor Law § 27-a(10)(a) by terminating you for filing a workplace violence incident report. As required by Labor Law § 27-a(10)(b), DOL will refer this determination to the Office of the Attorney General. NYSAC may exercise its right to appeal this determination to the Industrial Board of Appeals. An appeal should be addressed to:

Industrial Board of Appeals
State Office Building Campus Building 12, Room 136
Albany, NY 12240

Or filed electronically to: <u>industrialappeals.sm.service@industrialappeals.ny.gov</u>[13].

Very truly yours,

Bridget Holohan Scally
Deputy General Counsel

---

[13] See the Guidelines for Filing Petitions Electronically at: https://industrialappeals.ny.gov/system/files/documents/2022/03/guideline-for-filing-petitions-electronically-final-rules.pdf.

8